# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

Consumer Financial Protection Bureau,

       Plaintiff,

   v.

MoneyLion Technologies Inc., ML Plus, LLC, MoneyLion of Alabama LLC, MoneyLion of Arizona LLC, MoneyLion of California LLC, MoneyLion of Colorado LLC, MoneyLion of Connecticut LLC, MoneyLion of Delaware LLC, MoneyLion of Florida LLC, MoneyLion of Georgia LLC, MoneyLion of Idaho LLC, MoneyLion of Illinois LLC, MoneyLion of Indiana LLC, MoneyLion of Kansas LLC, MoneyLion of Kentucky LLC, MoneyLion of Louisiana LLC, MoneyLion of Maryland LLC, MoneyLion of Michigan LLC, MoneyLion of Minnesota LLC, MoneyLion of Mississippi LLC, MoneyLion of Missouri LLC, MoneyLion of Nevada LLC, MoneyLion of New Jersey LLC, MoneyLion of New Mexico LLC, MoneyLion of New York LLC, MoneyLion of North Carolina LLC, MoneyLion of North Dakota LLC, MoneyLion of Ohio LLC, MoneyLion of Oklahoma LLC, MoneyLion of Oregon LLC, MoneyLion of South Carolina LLC, MoneyLion of South Dakota LLC, MoneyLion of Tennessee LLC, MoneyLion of Texas LLC, MoneyLion of Utah LLC, MoneyLion of Virginia LLC, MoneyLion of Washington LLC, MoneyLion of Wisconsin LLC, and MoneyLion of Wyoming LLC,

       Defendants.

No. 1:22-CV-8308-JPC

Judge John P. Cronan

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

   I.   The CFPB ........................................................................................................ 3

   II.  The MLA, TILA, and the MLA Rule ................................................................ 4

        A.  The MLA ................................................................................................ 4

        B.  TILA .................................................................................................... 4

        C.  The MLA Rule ..................................................................................... 5

   III. This Lawsuit .................................................................................................... 6

STANDARD OF DECISION ........................................................................................ 7

ARGUMENT ............................................................................................................... 8

   I.   This Court should dismiss this lawsuit because Congress violated the
Appropriations Clause in creating the CFPB .................................................... 8

        A.  The Appropriations Clause grants Congress the "power of the purse" and,
therefore, limits the spending powers of the other branches of government ........ 8

        B.  The CFPB's funding and operations violate the Appropriations Clause ...................... 9

        C.  The Court should dismiss the Complaint to remedy the harm that the CFPB's
unconstitutional structure causes ........................................................... 10

   II.  The Court should dismiss this lawsuit because it is based on an unconstitutional
delegation of congressional power .................................................................. 11

        A.  Congress cannot delegate legislative authority without an intelligible principle ........ 11

        B.  Congress violated the nondelegation doctrine with regard to the CFPB in two
independent respects ............................................................................ 12

            1.  The CFPB's funding scheme violates the nondelegation doctrine ........................ 12

            2.  The CFPB's authority to determine what constitutes unfair, deceptive, or
abusive acts or practices violates the nondelegation doctrine .............................. 13

            3.  The breadth of the CFPB's authority amplifies the constitutional violations
above ................................................................................................. 14

        C.  The first nondelegation violation requires the Court to dismiss the entire
Complaint, while the second requires the Court to dismiss Counts Four through
Seven .............................................................................................. 15

   III. The MAPR portion of the MLA Rule Is Invalid Under The APA ........................ 15

        A.  The APA requires that all aspects of agency rules comply with the governing
statute and be otherwise reasonable ....................................................... 16

B.  The MLA Rule's inclusion of bona fide fees, including participation fees, within the MAPR for many types of consumer credit is not in accordance with the law, and is arbitrary and capricious ...................................................................16

1.  The MLA Rule violates the statutory text...........................................................16

2.  The MLA Rule is arbitrary and capricious ..........................................................18

C.  Because the relevant aspect of the MLA Rule is unlawful, the Court should dismiss Count One and the portion of Count Four related to the MAPR ...................21

IV.  The Complaint fails to state a claim .................................................................................22

A.  The Complaint fails to establish that the loans are for personal, family, or household purposes (all Counts).........................................................................22

B.  The CFPB fails to introduce facts necessary to plausibly allege that MoneyLion's loans violates the MAPR cap in the MLA Rule (Count One)...............24

1.  The Complaint fails to allege any specific loan with an MAPR that exceeds 36% .........................................................................................................25

2.  The Complaint fails to allege plausible facts showing "membership fees" must be included in the MAPR calculation for each loan ....................................25

a.  The Complaint fails to demonstrate that MoneyLion *imposes* the membership fees ......................................................................................26

b.  The Complaint fails to demonstrate any fees were imposed *for participation in any plan or arrangement for consumer credit* ......................27

C.  The CFPB cannot state a claim related to arbitration under Count Two ....................29

D.  The CFPB cannot state a claim related to disclosures under Count Three .................31

E.  The CFPB cannot state a claim in Count Four because that claim is dependent on Counts One through Three.........................................................................32

CONCLUSION.............................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935)................................................................................................15

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946)................................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................25, 32

*Billie v. Credit Collection Servs., Inc.*,
    No. 16-786-VAB, 2017 WL 396536 (D. Conn. Jan. 30, 2017).......................24

*Biocad JSC v. F. Hoffman-La Roche*,
    942 F.3d 88 (2d Cir. 2019).................................................................................7

*Brass v. Am. Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993)............................................................................30

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005).....................................................16, 18, 19, 20

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022) .....................................................................*passim*

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021).....................................................................................10

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    No. 16-900-WHP, 2017 WL 3524682 (S.D.N.Y. Aug. 15, 2017) ..................30

*De Jesus v. Sears, Roebuck & Co.*,
    87 F.3d 65 (2d Cir. 1996)..................................................................................7

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003)....................................................................................16, 18

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021).....................................................................................20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010).........................................................................................10

*Gundy v. United States*,
    139 S. Ct. 2116 (2019).....................................................................................12

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)................................................................................7

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928).........................................................................................12

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ...................................................................... 11, 30

*Lamour v. Uber Tech., Inc.*,
    No. 1:16-cv-21449, 2017 WL 878712 (S.D. Fla. Mar. 1, 2017) ....................... 30

*MFS Sec. Corp. v. S.E.C.*,
    380 F.3d 611 (2d Cir. 2004) ................................................................................ 7

*Mistretta v. United States*,
    488 U.S. 361 (1989) .......................................................................................... 12

*Nesbit v. Gears Unlimited, Inc.*,
    347 F.3d 72 (3d Cir. 2003) ................................................................................... 7

*Nicholas v. CMRE Fin. Servs., Inc.*,
    No. 08-4857-JLL, 2009 WL 1652275 (D.N.J. June 11, 2009) ......................... 24

*OPM v. Richmond*,
    496 U.S. 414 (1990) ............................................................................................ 8

*Piper v. Meade & Associates, Inc.*,
    282 F. Supp. 3d 905 (D. Md. 2017) .............................................................. 23, 24

*Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*,
    638 F. App'x 100 (2d Cir. 2016) ...................................................................... 24

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ............................................................................ 3, 10, 14

*Shetty v. Lewis*,
    No. 16-3112-BLF, 2017 WL 1177993 (N.D. Cal. Mar. 30, 2017) ................... 23

*Singh v. Uber Tech. Inc.*,
    235 F. Supp.3d 656 (D.N.J. 2017) ................................................................... 30

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) .............................................................................. 11

*Strougo v. Bassini*,
    282 F.3d 162 (2d Cir. 2002) ................................................................................ 7

*Thapa v. Gonzales*,
    460 F.3d 323 (2d Cir. 2006) .............................................................................. 16

*Touby v. United States*,
    500 U.S. 160 (1991) ..................................................................................... 12, 13

*U.S. Dep't of Navy v. Fed. Lab. Relations Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ...................................................................... 8, 9

*United States v. Mingo*,
    964 F.3d 134 (2d Cir. 2020) ..................................................................... 12, 13, 14

*United States v. Rowland*,
    826 F.3d 100 (2d Cir. 2016) ....................................................................... 26, 27

*United States v. Titan Int'l, Inc.*,
    811 F.3d 950 (7th Cir. 2016) ........................................................................ 28

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ......................................................................... 15, 17

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................. 12, 15

**Constitutional Provisions**

U.S. Const. art. I, § 1 ......................................................................................... 11

U.S. Const. art. I, § 7 ........................................................................................... 8

U.S. Const. art. I, § 8 ........................................................................................... 8

U.S. Const. art. I, § 9 ........................................................................................... 8

**Statutes And Rules**

5 U.S.C. § 706 ................................................................................................. 7, 16

10 U.S.C. § 987 ........................................................................................... *passim*

12 U.S.C. § 289 ..................................................................................................... 9

12 U.S.C. § 5481 ............................................................................................. 3, 23

12 U.S.C. § 5497 ..................................................................................... 9, 10, 12, 13

12 U.S.C. § 5531 ...................................................................................... 4, 13, 14

12 U.S.C. § 5536 ........................................................................................ *passim*

15 U.S.C. § 1605 ................................................................................................... 4

15 U.S.C. § 1606 ..................................................................................... 4, 16, 17

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376
    (July 21, 2010) ................................................................................................ 3

Fed. R. Civ. P. 12 ................................................................................................. 7

**Regulations**

12 C.F.R. § 1026.2 .............................................................................................. 18

12 C.F.R. § 1026.4 ......................................................................................... 5, 17

32 C.F.R. § 232.3 .......................................................................... 18, 22, 23, 26

32 C.F.R. § 232.4 ......................................................................................... *passim*

32 C.F.R. § 232.6 ......................................................................................... 23, 31

32 C.F.R. § 232.8 ......................................................................................... 23, 29

*Limitations on Terms of Consumer Credit Extended to Service Members and
Dependents*, 80 Fed. Reg. 43,560-01 (July 22, 2015) ................................ 5, 19, 20, 21

**Other Authorities**

CFPB Official Interpretation of Paragraph 4(c)(4), *Section 1026.4 Finance Charge* ................... 5

CFPB, *CFO Update Through the Third Quarter of Fiscal Year 2022* (Aug. 23, 2022) ............. 11

CFPB, *CFPB Sues MoneyLion for Overcharging Servicemembers and Trapping Consumers in Costly Memberships* (Sept. 29, 2022) ........................................................ 7

Joseph Story, Commentaries on the Constitution of the United States (3d ed. 1858) ................... 9

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ............................................. 26, 27, 28

OED Online (3d ed. Dec. 2022) ........................................................................... 26, 27, 28

The American Heritage Dictionary of the English Language (5th ed. 2022) ................... 26, 27, 28

**INTRODUCTION**

MoneyLion is an innovative financial technology company that improves its customers' lives by giving them access to financial products that many people have the luxury of taking for granted.   MoneyLion serves an important role because its customers—including military servicemembers and their families—often cannot access the products MoneyLion provides from traditional banking institutions.  To help achieve this laudable mission, MoneyLion offers a suite of products through two membership options: (1) a no-membership-fee option; and (2) a monthly paid membership option.  A customer who chooses the first option may choose to pay *a la carte* monthly fees for products such as a deposit account and an investment account.  A customer who chooses the paid membership option pays a flat $19.99 monthly membership fee for a broad suite of services, but no separate monthly fees for deposit and investment accounts, while receiving enhanced rewards and benefits, including the ability to recoup the entire membership fee and the option to apply for credit-builder installment loans.  MoneyLion's products allow its customers to build their credit histories, while saving and investing for their retirement and their families.

The Consumer Financial Protection Bureau ("CFPB"), on the other hand, is an unconstitutional agency, unaccountable to Congress through its historically unprecedented design, which is seeking to destroy MoneyLion's membership model.   In the name of consumer "protection," the CFPB aims to eliminate the genuine value MoneyLion provides to its customers. Then, in a misleading press release accompanying this lawsuit, the CFPB attacked MoneyLion's reputation, falsely lumping MoneyLion in with unscrupulous businesses that target military members.  To be clear, while MoneyLion prides itself on serving military members, it aims to offer its products and services to all consumers who are underserved by traditional banks.

If this lawsuit proceeds beyond the pleadings stage, MoneyLion will demonstrate that none of the CFPB's claims can withstand legal and factual scrutiny.  But this case should not proceed beyond this stage for several reasons.

*First*, most fundamentally, the CFPB itself is unconstitutional in a manner that renders this lawsuit invalid.  Unlike every other federal agency, to isolate the CFPB from political (and thus democratic) accountability, Congress authorized the CFPB's Director to determine unilaterally the agency's funding each year without congressional approval, while also prohibiting any later congressional oversight of the CFPB's budgetary choices.  As the Fifth Circuit recently held, this unique funding structure violates the Appropriations Clause and renders invalid CFPB actions that, like this lawsuit, flow directly from that unconstitutional statutory scheme.

*Second*, Congress also unconstitutionally delegated its legislative authority to the CFPB in two respects.  Congress improperly delegated its appropriations authority to the CFPB when it created the agency's unconstitutional funding structure.  Congress also failed to articulate any intelligible principle to determine the meaning of unfair, deceptive, or abusive acts or practices under the Consumer Financial Protection Act ("CFPA").  These constitutional infirmities require the Court to dismiss the case either in its entirety or, as to the second nondelegation argument, for all Counts under the CFPA.

*Third*, the Court should dismiss the CFPB's claims related to the military annual percentage rate under the Military Lending Act ("MLA") because the Department of Defense's regulations promulgated under the MLA ("MLA Rule")—which were in fact written by CFPB personnel— violate both the MLA itself and the Administrative Procedure Act ("APA").  The MLA Rule violates the MLA because it unlawfully includes within the calculation of "annual percentage rate" bona fide participation fees (sometimes called membership fees), contrary to the statutory

definition of that term.  And the MLA Rule also violates the APA because it unlawfully discriminates by treating bona fide fees, which are separate and distinct from the annual percentage rate, differently depending on whether the product is a credit card or another type of credit.  The MLA Rule offers no reasoned basis for this differentiation based on product type, and so the MLA Rule violates the APA.[1]

*Fourth*, even if the CFPB's claims survive the constitutional and APA arguments above, the Court should dismiss each Count for failure to state a claim.  The Complaint is haphazard and fails to allege facts sufficient to state a claim as to each Count.[2]

## BACKGROUND

### I.     The CFPB

Congress created the CFPB in 2010 as an independent financial regulator within the Federal Reserve System, charged with enforcing 18 existing federal statutes and regulating unfair, deceptive, or abusive acts or practices by certain participants in the consumer-finance sector.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2193 (2020); *see also* 12 U.S.C. § 5481(12), (14).  Congress endowed the CFPB with "potent enforcement powers," *Seila Law*, 140 S. Ct. at 2193 (citations omitted), including the power to administer the Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"), which includes the CFPA.

The CFPA, in turn, broadly authorizes the CFPB to "prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law" relating to "any transaction with a consumer for a consumer financial product or

---

[1] MoneyLion's membership fees are also permissible because, as a threshold matter, they are not credit-plan participation fees.  *See infra* pp. 27–29.

[2] MoneyLion brings this motion on behalf of all of the defendants.  Although these defendants are separate entities, this filing refers to them collectively as "MoneyLion" for ease of reference.

service." 12 U.S.C. § 5531(a).  The CFPA, however, does not adequately define the terms at issue, including the complete absence of a definition for "deceptive."  And while giving the CFPB vast authority over the economy, Congress adopted historically unprecedented measures to insulate the agency from congressional accountability, as explained in detail below.  *See infra* pp.8–11.

## II.     The MLA, TILA, and the MLA Rule

### A.     The MLA

The MLA, enacted by Congress in 2006, regulates consumer credit offered to military servicemembers and their dependents.  *See generally* 10 U.S.C. § 987.  The MLA is intertwined with and cross-references many aspects of TILA, including required disclosures and the definition of "annual percentage rate" ("APR").  *See id.* § 987(c), (i).  Most relevant to the issues in this case, the MLA provides that a creditor cannot charge servicemembers and their dependents an APR greater than 36 percent.  *Id.* § 987(b).  It also grants the Department of Defense the authority to promulgate regulations to carry out the MLA's provisions, including regulations establishing "[t]he method for calculating the applicable annual percentage rate of interest on such obligations, in accordance with the limit established under this section."  *Id.* § 987(h)(1)–(2)(B).

### B.     TILA

Because the MLA expressly incorporates TILA's definition of APR, one must look to TILA and its related regulation, Regulation Z.  TILA—the 1968 statute that standardized how borrowing costs are calculated and disclosed—provides a methodology for determining the APR for all types of consumer credit.  *See* 15 U.S.C. § 1606.  A key input into the APR calculation is the finance charge for the credit.  *See Id.* §§ 1605(a), 1606.  Importantly, Regulation Z explicitly excludes certain fees from the definition of "finance charge," including "[f]ees charged for participation in a credit plan, whether assessed on an annual or other periodic basis" (*i.e.*,

participation fees).  12 C.F.R. § 1026.4(c)(4).  In its interpretive guidance, the CFPB explained that these excluded participation fees "do not necessarily have to be formal membership fees, *nor are they limited to credit card plans*."  CFPB Official Interpretation of Paragraph 4(c)(4), *Section 1026.4 Finance Charge* (emphasis added).[3]  The CFPB has also confirmed that this exclusion "applies to *any* credit plan in which payment of a fee is a condition of access to the plan itself." *Id.* (emphasis added).  As a result, under TILA and Regulation Z, participation fees are *not* included in finance charges or APR calculations, regardless of product type.

      **C.**      **The MLA Rule**

On July 22, 2015, the Department of Defense promulgated the MLA Rule, purporting to act under its authority to issue regulations under the MLA, including a rule establishing the method for calculating the APR.  *See Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43,560-01 (July 22, 2015).  The MLA Rule created what it called a "military annual percentage rate" ("MAPR"), which is calculated under § 232.4(c). Under § 232.4(c), the MAPR includes finance charges, certain fees, and, contrary to TILA and Regulation Z, participation fees, with the exception noted below.  32 C.F.R. § 232.4(b), (c).

The MLA Rule also departs from TILA and Regulation Z in another way.  Although the MLA Rule follows TILA and Regulation Z by excluding bona fide participation fees (and other bona fide fees) from the MAPR for credit cards, 32 C.F.R. § 232.4(c)(1)(iii), it includes the same fees in the MAPR calculation for other credit products, including closed-end loans, "even if that charge would be excluded from the finance charge under Regulation Z," *id.* § 232.4(c)(1)(iv).

---

[3] Available at https://www.consumerfinance.gov/rules-policy/regulations/1026/4/.

### III.   This Lawsuit

After the CFPB conducted a three-year investigation into MoneyLion's business practices, with MoneyLion fully cooperating, the CFPB filed this lawsuit without providing MoneyLion customary notice or an opportunity to address the CFPB's concerns.  In the Complaint, the CFPB raises seven counts, with counts one through three arising under the MLA and counts four through seven arising under the CFPA.  Dkt.1 ("Compl.").  The counts are summarized as follows:

- Count One:  The CFPB claims that, by allegedly imposing a cumulative MAPR greater than 36%, MoneyLion violated the MLA's 36% total percentage rate cap.  The Complaint, however, does not specify any such charges or amounts of charges the CFPB concludes must be included in that calculation.  Compl. ¶¶ 59–64.

- Count Two:  The CFPB alleges that MoneyLion required MLA-covered borrowers to submit to arbitration, contrary to the MLA's and MLA Rule's prohibitions on requiring arbitration for covered borrowers.  Here, the CFPB fails to address the express opt-out provision in MoneyLion's arbitration provision; nor does it allege that MoneyLion ever required a covered borrower to arbitrate.  Compl. ¶¶ 66–68.

- Count Three:  The CFPB alleges that MoneyLion failed to make various disclosures required by the MLA and MLA Rule, but does not specify what disclosures MoneyLion purportedly failed to make.  Compl. ¶¶ 70–72.

- Count Four:  The CFPB alleges that MoneyLion committed deceptive acts or practices for the same reasons alleged in Counts One through Three, in violation of the CFPA.  Compl. ¶¶ 74–79.

- Count Five:  The CFPB alleges that MoneyLion committed deceptive acts and practices by making misrepresentations and omissions about a borrower's ability to cancel a membership and stop paying fees, contrary to the CFPA.  Compl. ¶¶ 81–86.

- Count Six:  The CFPB alleges that MoneyLion committed unfair acts in violation of the CFPA by charging consumers fees after they asked to cancel their membership.  Compl. ¶¶ 88–95.

- Count Seven:  The CFPB alleges that MoneyLion committed abusive acts and practices by failing to permit consumers with active loans to cancel their membership, contrary to the CFPA.  Compl. ¶¶ 97–101.

Before serving this lawsuit, the CFPB issued a deeply misleading press release boasting about the filing and falsely accusing MoneyLion of targeting servicemembers.  *See* CFPB, *CFPB*

- 6 -

*Sues MoneyLion for Overcharging Servicemembers and Trapping Consumers in Costly Memberships* (Sept. 29, 2022).[4]

## STANDARD OF DECISION

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a claim for a failure to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *Strougo v. Bassini*, 282 F.3d 162, 167 (2d Cir. 2002).  A motion to dismiss under this rule "test[s] the legal sufficiency of the complaint."  *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (citation omitted).  This can include assessing whether a claim is unconstitutional or otherwise deficient.  *See Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 82 (3d Cir. 2003); *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 93–94 (2d Cir. 2019).  In assessing the sufficiency of a complaint, a court must accept as true any well-pleaded factual allegations but need not accept either "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" or "legal conclusions."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration omitted; citation omitted).

Under the APA, a court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  After that review, the Court *shall* set aside agency action determined to be "arbitrary, capricious, . . . or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(A), (C); *see also MFS Sec. Corp. v. S.E.C.*, 380 F.3d 611, 617 (2d Cir. 2004).

---

[4] Available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-moneylion-for-overcharging-servicemembers-trapping-consumers-in-costly-memberships/.  MoneyLion's responsive press release can be found here:  https://investors.moneylion.com/news/detail/87/moneylion-responds-to-cfpbs-meritless-complaint.

## ARGUMENT

I.    **This Court should dismiss this lawsuit because Congress violated the Appropriations Clause in creating the CFPB**

A.    **The Appropriations Clause grants Congress the "power of the purse" and, therefore, limits the spending powers of the other branches of government**

Under our Nation's system of separated powers, the Constitution grants to Congress the power of the purse.  The Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives," U.S. Const. art. I, § 7, and authorizes Congress "to lay and collect Taxes" and expend public funds for multiple ends, U.S. Const. art. I, § 8.  The Appropriations Clause cabins this authority, providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9.

The Appropriations Clause guarantees Congress' power over the federal purse, prohibiting any money from being "paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (citation omitted).  This restriction on the use of funds from the Treasury is so exacting that it cannot be usurped by other branches of government exercising their own enumerated powers.  The Appropriations Clause also mandates that Congress "… require legislative appropriations prior to expenditure." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 637 (5th Cir. 2022) ("*CFSAA*") (citations omitted).  Instead, "it affirmatively obligates Congress to use that authority to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *Id.* (citation omitted).

The Appropriations Clause is an important "bulwark of the Constitution's separation of powers among the three branches." *U.S. Dep't of Navy v. Fed. Lab. Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).  It "prevents Executive Branch officers from even

inadvertently obligating the Government to pay money without statutory authority." *Id.*; *see also* 2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858) (noting that the object of the Appropriations Clause, "apparent upon the slightest examination . . . is to secure regularity, punctuality, and fidelity, in the disbursements of the public money" and avoid giving the Executive Branch "unbounded power over the public purse of the nation").

    **B.**    **The CFPB's funding and operations violate the Appropriations Clause**

    As the Fifth Circuit correctly held only a few months ago, the CFPB's structure and operations violate the Appropriations Clause. *CFSAA*, 51 F.4th at 638–43.

    As an initial matter, the CFPB's structure is a "self-actualizing, perpetual funding mechanism," which does not "rely on annual appropriations for funding." *Id.* at 638; *see* 12 U.S.C. § 5497(a). As the Fifth Circuit recognized, under this unprecedented mechanism, the CFPB can demand from the Federal Reserve (which itself is funded from bank assessments outside the appropriations process) any funding "amount 'determined by [its] Director to be reasonably necessary to carry out' the [CFPB's] functions . . . so long as it does not exceed 12% of the Federal Reserve's 'total operating expenses.'" *CFSAA*, 51 F.4th at 638 (quoting 12 U.S.C. § 5497(a)(1)–(2)). This has the practical effect of improperly "reduc[ing] amounts that would otherwise flow to the general fund of the Treasury, as the Federal Reserve is required to remit surplus funds in excess of a limit set by Congress." *Id.* (citing 12 U.S.C. § 289(a)(3)(B)).

    The CFPB also retains control over these funds without any congressional oversight. The CFPB maintains a separate fund called the Bureau of Consumer Financial Protection Fund (the "Bureau Fund"), which is maintained and established at a Federal Reserve bank. *Id.* at 639 (citing 12 U.S.C. § 5497(b)(1)). These funds remain "permanently available" to the CFPB without any further act of Congress, which allows the CFPB to continue rolling over the funds it allocates to

itself in perpetuity.  *Id.*  Congress also renounced any oversight over the CFPB's funds by both declaring that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies" and legislating that "funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate."  *Id.* (quoting 12 U.S.C. § 5497(c)(2), (a)(2)(C)).

As a result, the CFPB enjoys an unprecedented, unaccountable system of funding that is "double-insulated on the front end from Congress' appropriations power," with Congress also "relinquish[ing] its jurisdiction to review agency funding on the back end," and with the middle consisting of "an off-books charge card that rings up '[un]appropriated monies.'"  *Id.*  This scheme presents a "novel structure," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010), that transforms the CFPB's independence from Congress to a degree that no other agency enjoys.  By abandoning its check on the Executive Branch, Congress "ran afoul of the separation of powers embodied in the Appropriations Clause."  *CFSAA*, 51 F.4th at 639–40.

The breadth of the CFPB's authority magnifies the significance of the constitutional violation.  The CFPB "acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Id.* at 640 (quoting *Seila Law*, 140 S. Ct. at 2202 n.8).  In effect, Congress created an "expansive executive agency insulated (no, *double-insulated*) from Congress's purse strings, expressly exempt from budgetary review, and headed by a single Director removable at the President's pleasure." *Id*. (emphasis added).

### C.    The Court should dismiss the Complaint to remedy the harm that the CFPB's unconstitutional structure causes

The Supreme Court has held that parties harmed by an agency's unconstitutional structure are entitled to a remedy. *Collins v. Yellen*, 141 S. Ct. 1761, 1770 (2021).  The remedy is to render

void any challenged agency action that flows from the unconstitutional structure and inflicts harm. *CFSAA*, 51 F.4th at 642–43 (citations omitted).  When an agency's entire funding scheme is unconstitutional, like the CFPB, it is difficult to envision any agency action that does not meet this standard.  *See id.*  Indeed, if the money employed in litigating a case is "wholly drawn through the agency's unconstitutional funding scheme," then a "straightforward" application of the law requires the Court to void the agency action (and dismiss this lawsuit).  *See id.*

Here, the CFPB's funding scheme is unconstitutional.  In turn, the CFPB used these unconstitutional funds to initiate this lawsuit and prosecute the litigation.  *See* CFPB, *CFO Update Through the Third Quarter of Fiscal Year 2022* (Aug. 23, 2022) (noting $294.4 million spent on payroll, and $13,950,000 spent on CFPB's "Legal Division");[5] *CFSAA*, 51 F.4th at 643 n.17 (relying on similar CFPB CFO document for the "fairly apparent" conclusion that CFPB financed its efforts "with funds requisitioned via its unconstitutional funding mechanism").[6]  And the CFPB's actions in prosecuting this lawsuit have undoubtedly harmed MoneyLion.  In short, the "funding employed by the [CFPB]" in litigating this case is "wholly drawn through the agency's unconstitutional funding scheme."  *CFSAA*, 51 F.4th at 643.  As a result, the Court should dismiss the Complaint.

## II.  The Court should dismiss this lawsuit because it is based on an unconstitutional delegation of congressional power

### A.  Congress cannot delegate legislative authority without an intelligible principle

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  Inherent in "that assignment of power to

---

[5] Available at https://files.consumerfinance.gov/f/documents/cfpb_cfo_update_report_fy-2022_q3.pdf.

[6] The Court may consider the CFPB's official budgetary documents at the motion to dismiss stage without converting the motion to one for summary judgment.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion); *see also Mistretta v. United States*, 488 U.S. 361, 372 (1989). Thus, Congress may "obtain[ ] the assistance of its coordinate Branches," *Mistretta*, 488 U.S. at 372, but only "[s]o long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform,'" *Touby v. United States*, 500 U.S. 160, 165 (1991) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Congress provides a sufficiently intelligible principle only when it "clearly delineates the policy, the public agency which is to apply it, and the boundaries of this delegated authority." *United States v. Mingo*, 964 F.3d 134, 138 (2d Cir. 2020) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). And as the scope of the power Congress delegates increases, so to must Congress' guidance on that delegation. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001) (holding that Congress must "provide substantial guidance on setting . . . standards that affect the entire national economy").

### B.   Congress violated the nondelegation doctrine with regard to the CFPB in two independent respects

#### 1.   The CFPB's funding scheme violates the nondelegation doctrine

Even beyond the clear Appropriations Clause problems with the CFPB's funding, Congress' complete delegation of funding authority to the CFPB also violates the nondelegation doctrine. This provides an additional and independent reason for dismissing the Complaint.

Congress granted the CFPB the complete authority to determine its own funding in whatever amount it deems "reasonably necessary" to complete its statutory duties, with the only cap being that funding cannot exceed 12% of the Federal Reserve's total operating expenses. 12 U.S.C. § 5497(a)(1)–(2). Even if Congress could delegate this exclusive legislative (appropriations) authority, Congress' attempt to do so as to the CFPB fails. Congress provided no

basis for the CFPB to determine what is or is not "reasonably necessary," *id.*, let alone an "intelligible principle" to guide this determination, *Touby*, 500 U.S. at 165.  This blank check to determine each year the CFPB's funding falls well short of the requirement to "delineate[ ] the policy . . . and the boundaries of this delegated authority."  *Mingo*, 964 F.3d at 138.  Because this lawsuit is based on that unconstitutional structure, this violation provides an additional reason to dismiss the entire case.

> 2. **The CFPB's authority to determine what constitutes unfair, deceptive, or abusive acts or practices violates the nondelegation doctrine**

Congress' grant of vast authority to the CFPB to determine what constitutes unfair, deceptive, or abusive acts or practices also violates the nondelegation doctrine.

The CFPA grants exceptionally broad authority to regulate transactions concerning consumer financial products or services.  Under the CFPA, the CFPB "may take any action . . . to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law" in connection with certain consumer products and services.  12 U.S.C. § 5531(a).  The CFPA also gives the CFPB the authority to promulgate rules identifying what conduct is unfair, deceptive, or abusive.  *Id.* § 5531(b).  Thus, the CFPA gives the CFPB enormous discretion to take action to prevent unfair, deceptive, or abusive acts or practices, while also providing the CFPB rulemaking authority as to what constitutes an unfair, deceptive, or abusive act or practice.  The CFPA, however, provides no sufficiently intelligible principles to guide the CFPB's determination of what is an "unfair, deceptive, or abusive act or practice."  *Id.* § 5536(a)(1)(B).

All three aspects of the "unfair, deceptive, or abusive" provision are unconstitutional for lack of an intelligible principle.  As an initial matter—and most obviously unconstitutional—the statute provides no guidance whatsoever as to the type of actions that are "deceptive."  In that way,

the CFPB is completely unhindered by statutory text in deciding what the law is and what might make an act or practice "deceptive" in some manner.  *See id.*  With respect to "unfairness," the CFPA merely provides that the CFPB cannot bring a claim for an unfair act or practice unless the CFPB also determines that the act or practice "is likely to cause substantial injury to consumers which is not reasonably avoidable" and that substantial injury "is not outweighed by countervailing benefits."  *Id.* § 5531(c)(1)(A)–(B).  Similarly, the CFPA authorizes the CFPB to "declare an act or practice abusive" if it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage of" either (1) "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service"; (2) "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service"; or (3) "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."  *Id.* § 5531(d).  But none of this legislation provides a guide to determining what is "unfair" or "abusive" in the first place.  As a result, the CFPA falls well short of delineating an "intelligible principle" for the CFPB to follow.  *Mingo*, 964 F.3d at 138.

### 3.    The breadth of the CFPB's authority amplifies the constitutional violations above

The CFPB's immense authority over the nation's economy only renders Congress' unguided delegation even more problematic, both under the nondelegation doctrine and the closely related major questions doctrine.  Dodd-Frank grants the CFPB enforcement powers that put it in "an entirely different league" from other regulatory agencies, with authority to "levy[ ] knee-buckling penalties against private citizens" *Seila Law*, 140 S. Ct. at 2202 n.8; *id.* at 2191, 2193. As the Supreme Court has held, the CFPB has "authority over a significant portion of the U.S. economy."  *Id.* at 2191.  Given this authority, it was incumbent on Congress to "provide substantial

guidance" as to the standards the CFPB would administer. *Whitman*, 531 U.S. at 475. Congress'

decision to provide the CFPB with only "vague terms," *West Virginia v. EPA*, 142 S. Ct. 2587,

2609 (2022) (citation omitted), before setting the CFPB loose to exert its broad power fails to

provide the necessary guidance under the nondelegation doctrine.

> C.      **The first nondelegation violation requires the Court to dismiss the entire Complaint, while the second requires the Court to dismiss Counts Four through Seven**

Each of the two separate nondelegation doctrine violations discussed above requires a

different remedy. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42, 551

(1935). The first violation—relating to Congress' impermissible delegation of all appropriations

authority to the CFPB—infects all of the CFPB's actions, including this entire litigation, *see*

*CFSAA*, 51 F.4th at 643; *supra* pp.10–11. All of the CFPB's funding comes from an

unconstitutional delegation, so necessarily all of the CFPB's actions, including bringing this

lawsuit, flow from that unconstitutionality. The Court should dismiss all claims as a result. The

second violation—relating to Congress' unconstitutional delegation of legislative authority to the

CFPB on the meaning of unfair, deceptive, or abusive acts or practices, 12 U.S.C. § 5536(a)(1)(B);

*see supra* pp.13–14—infects the CFPB's claims regarding allegedly unfair, deceptive, or abusive

acts or practices. Counts Four through Seven all involve claims that MoneyLion's conduct was

either unfair, deceptive, or abusive, and, thus, arise directly from this unconstitutional delegation.

The Court should dismiss those claims. *Schechter Poultry*, 295 U.S. at 541–42, 551.

## III.   **The MAPR portion of the MLA Rule Is Invalid Under The APA**

The APA requires that rulemaking cannot be contrary to law or otherwise arbitrary or

capricious. In derogation of that guiding principle, the MLA Rule violates the MLA by imposing

a method for calculating MAPR that contradicts the statutory definition. Moreover, the MLA Rule

is arbitrary and capricious because it requires the inclusion of bona fide fees, including participation fees, in the MAPR calculation for many types of consumer credit, while not including the same fees in the MAPR calculation for credit cards, with no statutory support for this distinction.  Because the MAPR portion of the MLA rule is invalid, the CFPB's claims arising under that provision—Count One and a portion of Count Four—fail to state a claim and the Court should dismiss those Counts.

### A.      The APA requires that all aspects of agency rules comply with the governing statute and be otherwise reasonable

The APA authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A rule that is inconsistent with any statute must be set aside under the APA as "not in accordance with law." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003); *see also Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).  Additionally, a rule must be set aside as arbitrary or capricious if it treats similarly situated parties differently without a reasoned basis.  *See Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776-77 (D.C. Cir. 2005).

### B.      The MLA Rule's inclusion of bona fide fees, including participation fees, within the MAPR for many types of consumer credit is not in accordance with the law, and is arbitrary and capricious

#### 1.      The MLA Rule violates the statutory text

The MLA Rule—issued by the Department of Defense, but written by CFPB personnel—contradicts the MLA's statutory text, because it forces the inclusion of bona fide participation fees into the calculation of the annual percentage rate, 15 U.S.C. § 1606, in violation of the MLA's statutory definition of APR.

The MLA's statutory text prohibits any creditor from "impos[ing] an annual percentage rate of interest greater than 36 percent," 10 U.S.C. § 987(b), while incorporating the definition of

"annual percentage rate" found in TILA and Regulation Z.  Specifically, the MLA defines "annual percentage rate" as having the same meaning as in section 107 of the Truth in Lending Act, 15 U.S.C. § 1606, as implemented by Regulation Z.  10 U.S.C. § 987(i)(4).  Under TILA, a key component of determining the APR is the "finance charge," 15 U.S.C. § 1606(a)(1)(A).  Regulation Z correctly recognizes that participation fees (i.e., "fees charged for participation in a credit plan") associated with all types of credit are *not* finance charges included in the APR calculation.  12 C.F.R. § 1026.4(c)(4).[7]

The MLA Rule rewrites the statutorily mandated "annual percentage rate" calculations by forcing companies that offer products other than credit cards, such as closed-end loans, to include within the APR calculation bona fide participation fees, when those fees are not part of the "annual percentage rate" under the MLA and TILA.  The MLA Rule includes in the MAPR "[a]ny fee imposed for participation in any plan or arrangement for consumer credit," without any exception, for non-credit-card products, even if the fees are legitimate participation fees.  32 C.F.R. § 232.4(b), (c).  But that is fundamentally different from the definition of "annual percentage rate" found in TILA, *see* 15 U.S.C. § 1605(a), and Regulation Z, *see* 12 C.F.R. § 1026.4(c)(4), because the definition does not include participation fees within the APR calculation.

The foundational difference between the MLA Rule's definition of "annual percentage rate" and the one found in TILA and Regulation Z finds no grounding in the MLA's statutory text, including any reasonable reading of that text.  After all, a membership or participation fee charged for a valuable suite of products and services is simply not part of the "annual percentage rate"

---

[7] Section 987(i)(4) also states that, for purposes of the MLA, the "term [APR] includes all fees and charges," 10 U.S.C. § 987(i)(4), which phrase—when read in context—refers only to all fees and charges that are connected to the extension of credit, *West Virginia*, 142 S. Ct. at 2607.  TILA and Regulation Z correctly recognized that participation fees are not sufficiently connected to be included in the APR.  12 C.F.R. § 1026.4(c)-(c)(4).

charged for credit.  Notably, the MLA Rule correctly recognizes this tenet when it comes to credit cards and their attendant benefits, because bona fide participation fees can pay for products and services that are *not* part of the "annual percentage rate" for the extension of credit.  *Compare* 32 C.F.R. § 232.4(d)(1), *with* 32 C.F.R. § 232.4(c)(1)(iii)(C).

The MLA Rule's treatment of participation fees for non-credit-card products is "not in accordance with" the MLA, and thus must be set aside, in relevant part, under the APA.  *See NextWave*, 537 U.S. at 300.

### 2.      The MLA Rule is arbitrary and capricious

The MLA Rule is also "arbitrary" or "capricious" under the APA because it applies different standards to similarly situated entities without adequate justification.  *Burlington*, 403 F.3d at 777.  As noted, the MLA Rule states that bona fide participation fees may be excluded from the MAPR for credit cards, 32 C.F.R. § 232.4(d)(1), but not for closed-end loans and other forms of credit, 32 C.F.R. § 232.4(c)(1)(iii)(C).  The Department of Defense's explanation of its "atextual" differential treatment between credit cards and other consumer-credit products does not withstand scrutiny.  *See Burlington*, 403 F.3d at 776-77.

Credit cards are no different than any other form of open-end or closed-end credit in any relevant respect that would permit a different calculation of the APR under the MLA.  The MLA Rule follows Regulation Z's definition of open-end credit, which includes credit cards.  12 C.F.R. § 1026.2(a)(20); 32 C.F.R. § 232.3(q).  Closed-end credit is simply defined as all other forms of credit not encapsulated in the definition of open-end credit.  32 C.F.R. § 232.3(d).  Accordingly, these definitions do not provide any basis to distinguish between the two types of credit, much less to differentiate credit cards from all other forms of credit, when calculating the APR under the

MLA.  In sum, there is nothing inherently unique about credit cards, compared to other forms of consumer credit, that would allow for the MLA Rule's discriminatory treatment.

The MLA Rule provides two reasons in support of its distinction between credit cards and all other forms of credit, neither of which withstand scrutiny.  This is true, even if these reasons had any grounding in the statutory text, which they do not.  *See supra* pp.16–18.

*First*, to explain excluding bona fide fees, including participation fees, from the APR calculation for credit cards, the MLA Rule correctly concludes that "the funds borrowed in a credit card account can be segregated from the fees that a creditor expressly ties to specific products or services for using the credit card itself," because such costs are actually tied to particular products or services based upon "the covered borrower's own choices regarding the use of the card" and can "meaningfully be distinguished from the cost of borrowing itself."  80 Fed. Reg. at 43,572.  But fatal to the MLA Rule, this very same logic—that bona fide fees can be separated from the extension of credit (e.g., bona fide participation fees are not finance charges)—applies to other types of consumer credit.  Just as credit card providers can offer products or services for a fee that are not finance charges included in the APR, such as credit monitoring and rewards, so too can closed-end credit providers charge fees for services that are wholly distinct from finance charges connected to the credit itself.  If participation fees are charged in connection with credit cards (which is often the case) and they "can meaningfully be distinguished from the cost of borrowing itself," *id.*, there is no reasonable explanation for, or evidence in the record supporting, different treatment for participation fees charged in connection with other credit products.  *Burlington*, 403 F.3d at 776–77.

*Second*, the MLA Rule claims that credit cards warrant "special" consideration because another set of regulations provide protections to servicemembers and their families when they use

credit cards that are comparable to the protections they will receive under the MLA Rule if they use other credit products. 80 Fed. Reg. at 43,572. More specifically, the MLA Rule claims that the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act"), which amended TILA and Regulation Z, offer protections that are similar to the protections in the MLA Rule. *Id.* This rationale for discriminatory treatment between credit cards and all other product types is arbitrary and unreasonable and thus violates the APA for the reasons discussed below. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *Burlington*, 403 F.3d at 777.

Closed-end loans and open-end lines of credit operate similarly to credit cards by providing consumers with much-needed credit. A servicemember choosing a credit product may have various personal reasons for selecting a particular product. Nothing in the MLA or the MLA Rule supports different treatment depending on product type. To the contrary, the MLA Rule encourages creditors to "continue to offer a wide range of [such] products that carry reasonable costs expressly tied to specific products or services and which vary depending upon the covered borrower's own choices," 80 Fed. Reg. at 43,585. Thus, the MLA Rule should permit bona fide, reasonable fees across all products, without discriminating against any particular product. To prove that the fees are "bona fide," a creditor must show that the fees are fair when "compared to fees typically imposed by other creditors for the same or a substantially similar product or service," *see* 32 C.F.R. § 232.4(d)(3), thereby "limit[ing] the opportunity for a creditor to exploit the exclusion for those products," 80 Fed. Reg. at 43,573.

The Department of Defense's reliance on protections in the CARD Act, 80 Fed. Reg. at 43,572, is misplaced because it fails to "reasonably explain[ ]" the MLA Rule's discriminatory treatment. *Prometheus*, 141 S. Ct. at 1158. The MLA Rule's abbreviated discussion about the CARD Act demonstrates that the CARD Act does not provide protections comparable to the MLA

Rule. Instead, the Department of Defense's reference to the CARD Act shows how the MLA Rule is simultaneously more stringent and more lenient than the CARD Act. For example, the MLA Rule cites the CARD Act's limitation on credit-card penalty fees, including late fees and over-the-limit fees, to amounts that are "reasonable and proportional" to the omission or violation that triggered the fee. 80 Fed. Reg. at 43,572. This feature of the CARD Act is not comparable to the protections in the MLA Rule for other forms of credit because the MLA Rule neither limits penalty fees nor includes them in the MAPR calculation. *See* 32 C.F.R. § 232.4(c)(2)(i) (incorporating Regulation Z's calculation of the APR, which excludes penalty fees). Moreover, the MLA Rule requires participation fees to be included in the MAPR for closed-end credit and other non-credit-card products, while the CARD Act permits credit cards to charge participation fees during the first year up to 25% of the initial credit limit *plus* the APR charged for the extension of credit. *See* 80 Fed. Reg. at 43,572.

### C. Because the relevant aspect of the MLA Rule is unlawful, the Court should dismiss Count One and the portion of Count Four related to the MAPR

Because the MLA Rule is not in accordance with law and is arbitrary and capricious, this Court should hold unlawful and set aside that Rule to the extent it requires including participation fees and other bona fide fees in the MAPR calculation for any extension of consumer credit. This, in turn, requires this Court to dismiss Count One and the portion of Count Four related to the MAPR. In Count One, the CFPB claims MoneyLion eclipsed a 36% MAPR when the CFPB included certain membership fees in the calculation of its MAPR. Compl. ¶ 63. But these fees, which are legal in any event, should not be included in the MAPR. They would plainly be permissible under the MLA Rule if MoneyLion was offering a credit card product with the same fees. Accordingly, the Court should dismiss Count One. Moreover, because Count Four alleges

a violation of the CFPA based, in part, on the invalid MAPR, the Court should dismiss that portion of Count Four.

## IV.   The Complaint fails to state a claim

The CFPB's Complaint is rushed and haphazard.  The CFPB filed this lawsuit before giving MoneyLion customary notice or providing MoneyLion with the chance to address any concerns the CFPB may have had following its investigation of MoneyLion.  Indeed, the CFPB even issued a mendacious press release before serving the Complaint.  Given the CFPB's approach, it is not surprising that the Complaint has numerous deficiencies beyond the constitutional and administrative shortcomings discussed above.  As explained below, the CFPB has failed to properly allege a cause of action on any of its claims.

### A.   The Complaint fails to establish that the loans are for personal, family, or household purposes (all Counts)

The MLA and the CFPA extend only to credit offered to consumers for personal, family, or household purposes.  The CFPB has failed to plausibly assert this most fundamental allegation, rendering each of its claims insufficient as a matter of law.

In Counts One through Three, the Complaint alleges MLA violations that each require the CFPB to establish that "consumer credit" is at issue.  Specifically, as for Count One, the Complaint relies on the prohibition that "[a] creditor may not impose an MAPR greater than 36 percent in connection with an extension of *consumer credit* that is closed-end credit or in any billing cycle for open-end credit."  32 C.F.R. § 232.4(b) (emphasis added).  Thus, if a loan is not "consumer credit," it does not fall within the ambit of the MAPR restriction.  The MLA Rule defines "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes."  *Id.* § 232.3(f)(1).  As a result, if a loan is not for those purposes, it is not "consumer credit" and is not subject to the 36% MAPR cap.  The same "consumer credit"

- 22 -

limitation applies to the MLA's restrictions on arbitration clauses relevant to Count Two, *see* 10 U.S.C. § 987(e); 32 C.F.R. § 232.8, and the disclosure obligations referenced in Count Three, *see* 10 U.S.C. § 987(c)(1); 32 C.F.R. § 232.6(a).

The CFPA adopts a similar framework, applicable to Counts Four through Seven, which stems from the CFPA's restrictions in 12 U.S.C. § 5536(a). *See also* Compl. ¶¶ 74, 81, 88, 97. Section 5536(a) prohibits a "covered person" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). In turn, a "covered person" under the CFPA is defined as "any person" or affiliate "that engages in offering or providing a consumer financial product or service." *Id.* § 5481(6)(A)–(B). And, in turn (again), a "consumer financial product or service" is one that is "offered or provided for use by consumers primarily for personal, family, or household purposes." *Id.* § 5481(5)(A). Altogether, these definitions mean that, to be a covered person, the financial product must be for personal, family, or household purposes.

Given the language above, to sufficiently state a claim in any of its Counts, the CFPB must allege facts establishing that the loan in question was for personal, family, or household purposes. Multiple courts in analogous contexts have dismissed claims when a plaintiff fails to sufficiently allege that the transactions at issue were "primarily for personal, family, or household purposes." 32 C.F.R. § 232.3(f)(1). For example, in *Piper v. Meade & Associates, Inc.*, 282 F. Supp. 3d 905 (D. Md. 2017), a case involving an identically worded provision of the Fair Debt Collection Practices Act ("FDCPA"), the complaint merely stated that the "debt was 'incurred for personal purposes'" and listed the name of the debtholder. *Id.* at 912 (citation omitted). But the court held this amounted to a mere "legal conclusion couched as a factual allegation" and, therefore, dismissed the claim. *Id.*; *see also Shetty v. Lewis*, No. 16-3112-BLF, 2017 WL 1177993, at *6 (N.D. Cal. Mar. 30, 2017) (same); *Billie v. Credit Collection Servs., Inc.*, No. 16-786-VAB, 2017

- 23 -

WL 396536, at *3 (D. Conn. Jan. 30, 2017) (same); *Nicholas v. CMRE Fin. Servs., Inc.*, No. 08-4857-JLL, 2009 WL 1652275, at *2 (D.N.J. June 11, 2009) (same).  And the Second Circuit has affirmed dismissal of an FDCPA claim that provided "conclusory statements" that debt-collection efforts related to an account used "primarily for personal, family, or household purposes" as those claims were "not supported by facts" alleged in the complaint.  *Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100, 102–03 (2d Cir. 2016).

Here, the CFPB alleges in two paragraphs that MoneyLion offered loans "primarily for personal, family, or household purposes."  Compl. ¶¶ 15, 55.  But beyond that rote recitation of the statutory element, the CFPB alleges no facts to support such sweeping allegations across the entire portfolio of MoneyLion loans.  For example, the CFPB does not allege facts demonstrating the purpose behind any individual borrower obtaining a loan or how that borrower intended to use a loan.  In this regard, the CFPB's regurgitations of the statutory text are "not supported by facts" alleged in the Complaint, *Scarola*, 638 F. App'x at 103, and amount to nothing more than a "legal conclusion couched as a factual allegation" this Court need not accept, *Piper*, 282 F. Supp. 3d at 912.

Because the CFPB failed to allege facts showing MoneyLion offered loans for personal, family, or household purposes, it has failed to plead a claim.  This deficiency alone provides an independent basis on which to dismiss the entire Complaint.

**B.  The CFPB fails to introduce facts necessary to plausibly allege that MoneyLion's loans violates the MAPR cap in the MLA Rule (Count One)**

In Count One, the CFPB claims that MoneyLion violated the MLA by issuing loans with an MAPR greater than 36%.  Compl. ¶¶ 33, 58-64.  To reach this conclusion, the CFPB alleges that MoneyLion's monthly "membership fees" should be included in the MAPR and, as a result, those fees push the MAPR over the 36% threshold.  Compl. ¶ 63.  But the Complaint fails to allege

facts sufficient to demonstrate that MoneyLion's loans violate the MLA Rule.  Instead, the CFPB

discusses the MLA Rule, cites the law, and makes sweeping generalizations that assume liability.

That is not enough.  The Complaint fails to allege sufficient facts in at least two respects.

### 1.    The Complaint fails to allege any specific loan with an MAPR that exceeds 36%

Even accepting the MLA Rule's flawed MAPR methodology, Count One fails because the

CFPB has not alleged facts demonstrating that any loan has an MAPR over 36%.  *See* 32 C.F.R.

§ 232.4(b).

In the Complaint, the CFPB only references MoneyLion loans with rates of interest that

vary between 5.99% and 29.99%.  Compl. ¶ 32.  Thereafter, the CFPB merely surmises that when

"membership fees" are added to the rate of interest, that total eclipses 36%.  Compl. ¶¶ 62-63.  But

the Complaint fails to identify a single loan where the inclusion of membership fees caused the

MAPR to exceed 36%, which is fatal to any claim under the MLA Rule.  *See Ashcroft v. Iqbal*,

556 U.S. 662, 679 (2009).  The CFPB has not identified the rate of interest on any specific loan,

has not identified the specific membership fees a particular borrower paid monthly, has not

identified the principal amount of any specific loan, and has not identified how all of these numbers

together result in a MAPR that exceeds 36%.  That is insufficient to state a claim, and this Court

should dismiss Count One.  *Id.*

### 2.    The Complaint fails to allege plausible facts showing "membership fees" must be included in the MAPR calculation for each loan

In addition, the CFPB summarily alleges that MoneyLion's "membership fees" are fees

"imposed for participation in any plan or arrangement for consumer credit" and, as a result, must

be included in the MAPR calculation.  Compl. ¶ 62.  But the Complaint is devoid of facts to support

this conclusion, and the affirmative allegations contradict the CFPB's contention.

As discussed above, under the MLA Rule, the MAPR consists only of those fees required to be paid to participate in a consumer credit plan.  MAPR is defined as "the cost of the consumer credit expressed as an annual rate" and calculated under § 232.4(c).  *See* 32 C.F.R. § 232.3(p).  In turn, under § 232.4(c), MAPR includes finance charges, certain fees, as well as *"[a]ny fee imposed for participation in any plan or arrangement for consumer credit.*"  32 C.F.R. § 232.4(b), (c) (emphasis added).  Although the meaning of "participation in any plan" does not appear to have been litigated in any court, the plain language of the phrase includes at least two elements: a fee that is (1) imposed; (2) *for* participating in a plan or arrangement for consumer credit; neither of which the CFPB has plausibly alleged.

### a.  The Complaint fails to demonstrate that MoneyLion *imposes* the membership fees

The plain meaning of "imposed" as used in the MLA Rule includes force or another element of compulsion.  The MLA Rule does not define "imposed," *see* 32 C.F.R. § 232.4(c), so a reviewing court may consider dictionary definitions of the term to discern "the ordinary, common-sense meaning of the word[ ]," *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016).  And dictionaries routinely define "impose" as having an element of force.  For example, the Oxford English Dictionary Online defines "impose," in relevant part as "[t]o lay on, as something to be borne, endured, or submitted to; to inflict (something) on or upon; to levy or enforce authoritatively or arbitrarily."  *Impose*, OED Online (3d ed. Dec. 2022);[8] *see also Impose*, The American Heritage Dictionary of the English Language (5th ed. 2022) ("[t]o establish or apply as compulsory");[9] *Impose*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to establish

---

[8] Accessible at https://www.oed.com/view/Entry/92591.

[9] Accessible at https://ahdictionary.com/word/search.html?q=impose.

or apply by authority" or "to establish or bring about as if by force").  Thus, the "ordinary, common-sense meaning," *Rowland*, 826 F.3d at 108, of "imposed" in the MLA Rule necessarily incorporates force or authority, not merely an option.

Applying these principles, the Complaint itself indicates MoneyLion does not "impose" any fee for participation in any plan, because MoneyLion does not "inflict" the fee on its members, nor does it "levy or enforce [the fee] authoritatively."  *Impose*, OED Online; *see also Impose*, The American Heritage Dictionary of the English Language; *Impose*, Merriam-Webster's Collegiate Dictionary.  Rather, consumers voluntarily choose to engage MoneyLion at whatever level of membership the consumer deems best for them.  And even for those consumers who choose to sign up for a paid membership, MoneyLion allows consumers to recoup the membership fee by, for example, logging in to MoneyLion's mobile app to engage with financial literacy tools or taking other actions offered through the rewards program.  *See* Compl. ¶ 51.  As a result, MoneyLion has not "imposed" fees on any consumer who wishes to engage with MoneyLion's various programs, and the fees cannot be incorporated into the MAPR.

### b. The Complaint fails to demonstrate any fees were imposed *for participation in any plan or arrangement for consumer credit*

The CFPB must also show that the membership fees at issue were imposed "*for* participation in any plan or arrangement *for* consumer credit."  32 C.F.R. § 232.4(c).  The common-sense meaning of "for" in this context is "[e]xpressing purpose or destination," used "[w]ith a view to; with the object or purpose of; as preparatory to."  *For*, OED Online;[10] *see also For*, The American Heritage Dictionary of the English Language ("[u]sed to indicate the object,

---

[10] Accessible at https://www.oed.com/view/Entry/72761.

aim, or purpose of an action or activity");[11] *For*, Merriam-Webster's Collegiate Dictionary ("as a function word to indicate purpose"); *cf. United States v. Titan Int'l, Inc.*, 811 F.3d 950, 952–53 (7th Cir. 2016) (noting that "for" in a law limits the scope to the stated purpose).  Thus, an MAPR calculation can only incorporate fees that are specifically imposed for the purpose of "participat[ing] in a[ ] plan or arrangement for consumer credit," 32 C.F.R. § 232.4(c), and not fees for other things.

The Complaint makes clear that any fees consumers pay to MoneyLion cover a suite of products and services.  They are not simply *for* consumer credit.  Although the CFPB attempts to minimize these "membership features," Compl. ¶ 44,[12] the Complaint concedes they include: (1) access to rewards programs; (2) access to investment or managed accounts; (3) social media group(s); (4) credit-monitoring tools; (5) monthly credit reporting; (6) automated deposits into investment accounts; and (7) access to loans.  Compl. ¶¶ 44, 49-50.  Indeed, the Complaint recognizes these are perks of a MoneyLion membership that includes access to both credit and non-credit services.  *Id.*  For that reason, the CFPB has not plausibly alleged facts demonstrating that "membership fees" constitute fees "for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4(c).  These fees are not solely for the "object or purpose" of receiving credit, *For*, OED Online; *see also For*, The American Heritage Dictionary of the English Language; *For*, Merriam-Webster's Collegiate Dictionary.  To the contrary, the Complaint shows these fees go toward a host of membership perks that far exceed access to consumer credit.

---

[11] Accessible at https://ahdictionary.com/word/search.html?q=for.

[12] The CFPB's attempts to minimize the value of MoneyLion's benefits do not constitute factual allegations that the Court needs to credit on a motion to dismiss.  Instead, they are merely opinions the CFPB is offering under the guise of facts.

Moreover, even if some of the monthly membership fees could be attributed to the credit offering itself and included in the MAPR (which they should not be), common sense dictates that at least some portion of the fees must be attributable to membership features other than participation in consumer credit.  32 C.F.R. § 232.4(c).  Yet, the Complaint fails to demonstrate *how much* of the fee should be attributable to loan access, as opposed to other membership benefits, and whether that allocated portion would cause MAPR to exceed 36%.  Even if the CFPB were correct in its theory that some portion of the membership fees should be part of the MAPR, the CFPB must, at a minimum, allege the value that should be incorporated into that calculation.  Without that, the Complaint provides no factual basis to support the conclusory claim that "all Membership-Program Loans impos[e] MAPRs greater than 36%."  Compl. ¶ 63.  As a result, the Court should dismiss Count One.

### C.    The CFPB cannot state a claim related to arbitration under Count Two

In Count Two, the CFPB alleges that from about the fall of 2017 through at least August 2019, MoneyLion required all covered borrowers to submit to arbitration without exception, in violation of the MLA.  Compl. ¶ 67.  As a result, the CFPB claims that MoneyLion violated 10 U.S.C. § 987(e)(3) and 32 C.F.R. § 232.8(c).  The Court should dismiss Count Two because the CFPB has not introduced a single example of MoneyLion requiring a servicemember to submit to arbitration.  Similarly, the CFPB entirely ignores the fact that MoneyLion's loan agreement includes an opt-out provision.

As an initial matter, § 987(e)(3) includes restrictions on the ability to "*require[ ] the borrower to submit to arbitration or impose[ ] onerous legal notice provisions in the case of a dispute.*"  10 U.S.C. § 987(e)(3) (emphasis added).  The associated provision of the MLA Rule includes a similar restriction.  *See* 32 C.F.R. § 232.8(c) (near identical).  The CFPB's Complaint

repeatedly alleges that MoneyLion required servicemembers to submit to arbitration.   Compl. ¶¶ 66, 67.   Yet, the Complaint does not contain a single instance of MoneyLion actually requiring a servicemember to arbitrate.   The CFPB has investigated MoneyLion *for years*, yet did not include a single example in the Complaint.   As a result, the Complaint fails to include facts necessary to state a plausible claim.

Moreover, the fact that MoneyLion included an opt-out provision in consumer arbitration agreements defeats the CFPB's claim.   Courts addressing arbitration provisions that contain an opt-out clause have consistently found that the arbitration provision is voluntary rather than mandatory.   *See Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-900-WHP, 2017 WL 3524682, at *8 (S.D.N.Y. Aug. 15, 2017), *rev'd on other grounds* 990 F.3d 173 (2d Cir. 2021) (noting that participation in the arbitration agreement was "entirely voluntary" where all employees had 30 day period to opt-out); *Singh v. Uber Tech. Inc.*, 235 F. Supp.3d 656, 673 (D.N.J. 2017) (arbitration provision was voluntary due to presence of opt-out clause); *Lamour v. Uber Tech., Inc.*, No. 1:16-cv-21449, 2017 WL 878712, *12 (S.D. Fla. Mar. 1, 2017) ("[f]ive Circuits have squarely addressed whether and when a class and collective action waiver may violate the NLRA, and none have held that a class waiver in a voluntary arbitration agreement—e.g., one with an opt-out clause—violates the NLRA").

Despite this case law, the CFPB inexplicably omits that all of the loan agreements at issue contain opt-outs in the arbitration provision.[13]   But the documents incorporated into the Complaint

---

[13] MoneyLion has attached a sample loan agreement during the relevant time period, previously provided to the CFPB during its investigation, as **Exhibit A** to the contemporaneously filed Declaration of James Kim.   It is well-established that documents referenced in a complaint or necessary to the allegations can be considered on a Rule 12 motion. *See Kramer*, 937 F.2d at 773. The Court can also consider documents that a plaintiff knew of and relied on in bringing the action. *See Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

through the agency's reliance on the arbitration provision, *see* Compl. ¶ 57, are clear.  For example, the MoneyLion Installment Loan Pledge and Security Agreement dated February 7, 2019, attached as **<u>Exhibit A</u>** to the Declaration of James Kim, states:

> If you do not want to arbitrate all claims as provided in the Agreement, then you have the right to reject the Arbitration Provision by delivering a written notice to us at the Notice Address within thirty (30) days following the date of this Agreement.

Kim Decl., Ex. A, at 2.  Not only has the CFPB never alleged in the Complaint that MoneyLion forced any covered borrowers into arbitration, but the agreement makes clear that MoneyLion does not *require* covered borrowers to submit to arbitration.  As a result, the CFPB cannot state a claim.

### D.      The CFPB cannot state a claim related to disclosures under Count Three

In Count Three, the CFPB alleges that from about the fall of 2017 until at least August 2019, MoneyLion made loans to covered borrowers without making all loan disclosures required by the MLA.  Compl. ¶ 71 (citing 10 U.S.C. § 987(c) and 32 C.F.R. § 232.6(a)).

The CFPB has failed entirely to state a claim under 10 U.S.C. § 987(c) and 32 C.F.R. § 232.6(a) because it nowhere alleges which disclosures MoneyLion supposedly failed to make. Under these applicable statutes and regulations, creditors are required to disclose: (a) a statement of the annual percentage rate; (b) any disclosure required under TILA and Regulations Z; and (c) a clear description of the payment obligations.  10 U.S.C. § 987(c)(1); 32 C.F.R. § 232.6(a).  Rather than explain, with factual allegations, what, if any, disclosures MoneyLion failed to make, the CFPB remarkably contends only that MoneyLion "made loans to covered borrowers without making all loan disclosures required by the MLA," Compl. ¶ 71, without any further explanation. Such allegations amount to nothing more than the barest recitation of the elements of the cause of action possible, and completely unsupported legal conclusions that MoneyLion somehow violated the MLA.  A court deciding a motion to dismiss may not credit such assertions absent factual

- 31 -

support.  *Iqbal*, 556 U.S. at 679–80.  Given that these are the only allegations the CFPB makes, this claim clearly fails to pass muster.

> **E.    The CFPB cannot state a claim in Count Four because that claim is dependent on Counts One through Three**

In Count Four, the Complaint alleges that MoneyLion engaged in deceptive acts or practices in violation of the CFPA, codified at 12 U.S.C. § 5536.  *See* Compl. ¶¶ 73-79.  The entire theory of liability in Count Four is premised on the notion that MoneyLion committed the violations of the MLA alleged in Counts One through Three.  Stated another way, the Complaint claims MoneyLion violated the CFPA because it allegedly (1) imposed an MAPR over 36%: (2) required covered borrowers to submit to arbitration; and (3) failed to make disclosures that the MLA requires.  Compl. ¶ 76.  As discussed above, *supra* pp.24–32, the CFPB has failed to state a plausible claim in Counts One, Two, and Three, premised on those same violations.  As a result, the CFPB cannot possibly (or plausibly) state a claim in Count Four.

## CONCLUSION

For the reasons above, the Court should grant MoneyLion's motion to dismiss the Complaint.

Dated: January 10, 2023

                                           Respectfully submitted,

                                           /s/ Misha Tseytlin
                                           MISHA TSEYTLIN (Reg. No. 4642609)
                                           TROUTMAN PEPPER HAMILTON
                                           SANDERS LLP
                                           227 W. Monroe Street
                                           Suite 3900
                                           Chicago, IL 60606
                                           (608) 999-1240
                                           (312) 759-1939 (fax)
                                           misha.tseytlin@troutman.com

                                           STEPHEN G. RINEHART
                                           JAMES KIM
                                           TROUTMAN PEPPER HAMILTON
                                           SANDERS LLP
                                           875 Third Avenue
                                           New York, NY 10022
                                           (212) 704-6000
                                           (212) 704-5957 (fax)
                                           stephen.rinehart@troutman.com
                                           james.kim@troutman.com

                                           DAVID GETTINGS
                                           TROUTMAN PEPPER HAMILTON
                                           SANDERS LLP
                                           222 Central Park Avenue, Suite 2000
                                           Virginia Beach, VA 23462
                                           (757) 687-7747
                                           (757) 687-1545 (fax)
                                           dave.gettings@troutman.com

                                           *Attorneys for MoneyLion*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of January, 2023, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin

MISHA TSEYTLIN
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com