UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Consumer Financial Protection Bureau,

         Plaintiff,

         v.

MoneyLion Technologies Inc., ML Plus, LLC,
MoneyLion of Alabama LLC, MoneyLion of
Arizona LLC, MoneyLion of California LLC,
MoneyLion of Colorado LLC, MoneyLion of
Connecticut LLC, MoneyLion of Delaware LLC,
MoneyLion of Florida LLC, MoneyLion of
Georgia LLC, MoneyLion of Idaho LLC,
MoneyLion of Illinois LLC, MoneyLion of Indiana
LLC, MoneyLion of Kansas LLC, MoneyLion of
Kentucky LLC, MoneyLion of Louisiana LLC,
MoneyLion of Maryland LLC, MoneyLion of
Michigan LLC, MoneyLion of Minnesota LLC,
MoneyLion of Mississippi LLC, MoneyLion of
Missouri LLC, MoneyLion of Nevada LLC,
MoneyLion of New Jersey LLC, MoneyLion of
New Mexico LLC, MoneyLion of New York LLC,
MoneyLion of North Carolina LLC, MoneyLion
of North Dakota LLC, MoneyLion of Ohio LLC,
MoneyLion of Oklahoma LLC, MoneyLion of
Oregon LLC, MoneyLion of South Carolina LLC,
MoneyLion of South Dakota LLC, MoneyLion of
Tennessee LLC, MoneyLion of Texas LLC,
MoneyLion of Utah LLC, MoneyLion of Virginia
LLC, MoneyLion of Washington LLC, MoneyLion
of Wisconsin LLC, and MoneyLion of Wyoming
LLC,

         Defendants.

Case No. 1:22-cv-8308

Judge John P. Cronan

**PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS THE COMPLAINT**

**Table of Contents**

Table of Authorities.................................................................................................................ii

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

ARGUMENTS AND AUTHORITIES.....................................................................................4

   I.   Standard of review for a motion to dismiss. ....................................................................4

   II.   Defendants' constitutional arguments are meritless. .....................................................4

     A.   Congress did not violate the Appropriations Clause when it authorized the Bureau to draw and spend money on its operations. .........................................................................4

     B.   Congress did not violate the nondelegation doctrine when it authorized the Bureau to spend up to a specified amount on its operations. ....................................................................7

     C.   Congress also did not violate the nondelegation doctrine when it authorized the Bureau to prosecute deceptive, unfair, and abusive practices. ...............................................8

   III.   The MLA Rule is valid...................................................................................................9

     A.   The MLA Rule is consistent with the Military Lending Act....................................10

     B.   Defendants' arbitrary-and-capricious challenge to the MLA Rule fails. ..................12

       1.   Defendants' arbitrary-and-capricious challenge is time-barred. ...........................12

       2.   Defendants' arbitrary-and-capricious challenge fails on the merits...................12

   IV.   The Complaint states claims under the MLA and CFPA. .........................................16

     A.   The Complaint sufficiently alleges that Defendants' loans were primarily for personal, family, or household purposes............................................................................16

     B.   The Complaint sufficiently alleges that Defendants violated the 36%-MAPR cap on loans to covered borrowers. ...............................................................................................19

       1.   The Complaint sufficiently alleges that Defendants' membership fees are participation fees under the MLA. .................................................................................19

       2.   The Complaint sufficiently alleges that Defendants' loans exceeded the MAPR cap…......23

     C.   The Complaint adequately alleges that Defendants violated the MLA's prohibition on mandatory arbitration.............................................................................................................25

       1.   Defendants' proffered arbitration-opt-out clause is not properly before the Court.........25

       2.   Defendants' opt-out argument fails on the merits. ...............................................28

       3.   The Complaint need not allege that Defendants compelled any individual covered borrower to arbitrate.........................................................................................................31

     D.   The Complaint properly alleges that Defendants' contracts lacked MLA disclosures. ....33

     E.   The Complaint states a claim that Defendants violated the CFPA by engaging in deceptive acts and practices against covered borrowers....................................................................33

CONCLUSION.......................................................................................................................34

## Table of Authorities

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ..................................................................................................9

*Acevedo v. Loan Co. of San Diego,*
2020 WL 4596760 (S.D. Cal. Aug. 10, 2020) ...................................................... 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................... 4, 26

*Barnes v. Equifax Info. Servs., LLC, Trans Union LLC, and MoneyLion, Inc.,*
2021 WL 2471052 (N.D. Ga. Mar. 17, 2021) ...................................................... 32

*Beauvoir v. Israel,*
794 F.3d 244 (2d Cir. 2015) ................................................................................. 19

*Bergman v. Fidelity Nat. Financial, Inc.,*
2012 WL 6013040 (C.D. Cal. Dec. 3, 2012) ....................................................... 17

*Butts v. Barnhart,*
416 F.3d 101 (2d Cir. 2005) ...................................................................................5

*CFPB v. Citizens Bank, N.A.,*
504 F. Supp. 3d 39 (D.R.I. 2020) ...........................................................................5

*CFPB v. Fair Collections & Outsourcing, Inc.,*
2020 WL 7043847 (D. Md. Nov. 30, 2020) ...........................................................5

*CFPB v. Gordon,*
819 F.3d 1179 (9th Cir. 2016) ................................................................................9

*CFPB v. TransUnion,*
2022 WL 17082529 (N.D. Ill. Nov. 18, 2022) .......................................................5

*Chen v. Major League Baseball Properties, Inc.,*
798 F.3d 72 (2d Cir. 2015) ................................................................................... 22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ........................................................................................... 9, 10

*Cincinnati Soap Co. v. United States,*
301 U.S. 308 (1937) ............................................................................................. 4, 5

*Clinton v. City of New York,*
524 U.S. 417 (1998) ................................................................................................8

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
51 F.4th 616 (5th Cir. 2022) ................................................................................ 5, 9

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ......................................................................................... 6, 7

*Cooper v. Ruane Cunniff & Goldfarb Inc.,*
2017 WL 3524682 (S.D.N.Y. Aug. 15, 2017) ..................................................... 31

*Corpening v. MoneyLion Inc.,*
2019 WL 8561889 (W.D.N.C. Sept. 12, 2019) .................................................... 32

*Cuthill v. Blinken,*
990 F.3d 272 (2d Cir. 2021) ................................................................................. 29

*DiCarlo v. MoneyLion, Inc.,*
988 F.3d 1148 (9th Cir. 2021) .............................................................................. 32

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ............................................................................................. 12

*Epic Sys. Corp. v. Lewis,*
  138 S.Ct. 1612 (2018)................................................................................................ 31
*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).................................................................................................. 29
*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010)....................................................................................................7
*Garrett v. Monterey Fin. Servs., LLC,*
  2018 WL 3579856 (D. Md. July 25, 2018)............................................................... 31
*Gilliam v. Levine,*
  562 F. Supp. 3d 614 (C.D. Cal. 2021) ..................................................................... 17
*Huntco Pawn Holdings, LLC v. U.S. Dep't of,*
  240 F. Supp. 3d 206 (D.D.C. 2016)................................................... 13, 16, 20, 30
*JEM Broad. Co. v. FCC,*
  22 F.3d 320 (D.C. Cir. 1994) .................................................................................. 12
*Karpova v. Snow,*
  497 F.3d 262 (2d Cir. 2007) .................................................................................... 12
*Kramer v. Time Warner Inc.,*
  937 F.2d 767 (2d Cir. 1991)................................................................. 25, 26, 27, 28
*Lamour v. Uber Tech., Inc.,*
  2017 WL 878712 (S.D. Fla. Mar. 1, 2017) ............................................................. 31
*Lewis v. M&T Bank,*
  2022 WL 775758 (2d Cir. Mar. 15, 2022) ..........................................................26, 27
*Lyons v. PNC Bank, Nat'l Ass'n,*
  26 F.4th 180 (4th Cir. 2022) ................................................................................... 30
*Maleh v. United Collection Bureau, Inc.,*
  287 F. Supp. 3d 265 (E.D.N.Y. 2018) .................................................................... 18
*Mauro v. Countrywide Home Loans, Inc.,*
  727 F. Supp. 2d 145 (E.D.N.Y. 2010) .................................................................... 17
*Metcalf v. TransPerfect Glob., Inc.,*
  2020 WL 7028644 (S.D.N.Y. Nov. 30, 2020) ........................................................ 17
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).......................................................................................12, 13, 14
*OPM v. Richmond,*
  496 U.S. 414 (1990)................................................................................................ 4, 5
*Perez-Guzman v. Lynch,*
  835 F.3d 1066 (9th Cir. 2016) ................................................................................ 12
*PHH Corp. v. CFPB,*
  881 F.3d 75 (D.C. Cir. 2018) ....................................................................................5
*Purgess v. Sharrock,*
  33 F.3d 134 (2d Cir. 1994) ...................................................................................... 17
*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007) .................................................................................... 28
*Rubin v. Islamic Republic of Iran,*
  138 S. Ct. 816 (2018) .............................................................................................. 29
*Sai Kwan Wong v. Doar,*
  571 F.3d 247 (2d Cir. 2009) .................................................................................... 12
*Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff,*
  638 F. App'x 100 (2d Cir. 2016)............................................................................. 18

*Schiller v. Tower Semiconductor Ltd.,*
  449 F.3d 286 (2d Cir. 2006) ........................................................................ 12
*Seila Law LLC v. CFPB,*
  140 S. Ct. 2183 (2020) .............................................................................. 5, 6
*Simone v. M & M Fitness LLC,*
  2017 WL 1318012 (D. Ariz. Apr. 10, 2017) ............................................... 32
*Singh v. Uber Tech. Inc.,*
  235 F. Supp.3d 656 (D.N.J. 2017) .............................................................. 31
*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
  547 F.3d 406 (2d Cir. 2008) ...................................................................... 25
*Thorns v. Sundance Properties,*
  726 F.2d 1417 (9th Cir.1984) ..................................................................... 17
*Touby v. United States,*
  500 U.S. 160 (1991) ..................................................................................... 8
*United States v. Bruce,*
  950 F.3d 173 (3d Cir. 2020) ......................................................................... 9
*United States v. Connolly,*
  2018 WL 2411760 (S.D.N.Y. May 15, 2018) ............................................. 27
*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ................................................................................... 10
*United States v. Moseley,*
  980 F.3d 9 (2d Cir. 2020) ..................................................................... 29, 30
*United States v. Sanchez,*
  517 F.3d 651 (2d Cir. 2008) ........................................................................ 9
*Whitman v. American Trucking Ass'ns,*
  531 U.S. 457 (2001) ..................................................................................... 8
*Yakus v. United States,*
  321 U.S. 414 (1944) .................................................................................. 8, 9


**Statutes**
1 Stat. 232 (1792) ............................................................................................ 5
38 Stat. 251 (1913) .......................................................................................... 6
38 Stat. 261(1913) ........................................................................................... 6
9 U.S.C. § 2 .................................................................................................... 29
10 U.S.C. § 987 ....................................................................................... Passim
12 U.S.C. § 16 .................................................................................................. 5
12 U.S.C. § 243 ................................................................................................ 5
12 U.S.C. § 1815 .............................................................................................. 5
12 U.S.C. § 1820 .............................................................................................. 5
12 U.S.C. § 5481 ....................................................................................... 16, 18
12 U.S.C. § 5491 .............................................................................................. 4
12 U.S.C. § 5496 .............................................................................................. 6
12 U.S.C. § 5497 ........................................................................... 4, 5, 6, 7, 8
12 U.S.C. § 5531 ........................................................................................... 3, 9
12 U.S.C. § 5536 ..................................................................................... 3, 9, 34
12 U.S.C. § 5564 ........................................................................................... 3, 9
15 U.S.C. § 45 .................................................................................................. 9
15 U.S.C. § 1605 .................................................................................. 11, 22, 24

15 U.S.C. § 1606 ...................................................................................... 10, 11

15 U.S.C. § 1639c ............................................................................................. 31

15 U.S.C. § 1692a ............................................................................................. 18

29 U.S.C. § 157 ................................................................................................ 31

31 U.S.C. § 1349 ................................................................................................ 7

31 U.S.C. § 1350 ................................................................................................ 7

U.S. Const. Art. I, § 8, cl. 12 ............................................................................. 5

U.S. Const. Art. I, § 9, cl. 7 .............................................................................. 4

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 26

Fed. R. Evid. 201 ............................................................................................. 26

Rule 12(b) ........................................................................................................ 28

**Regulations**

12 C.F.R. § 226.4 ............................................................................................. 22

12 C.F.R. § 1026.4 ........................................................................................... 10

32 C.F.R. § 232.3 ........................................................................................ 16, 18

32 C.F.R. § 232.4 ..................................................................................... Passim

32 C.F.R. § 232.6 ................................................................................... 3, 33, 34

32 C.F.R. § 232.8 ................................................................................... 3, 25, 28

32 C.F.R. § 232.9 ................................................................................... 3, 24, 34

32 C.F.R. § 232.9 ............................................................................................. 29

72 Fed. Reg. 50,580 (Aug. 31, 2007) .............................................................. 21

79 Fed. Reg. 58,602 (Sept. 29, 2014) .............................................................. 20

80 Fed. Reg. 43,560 (July 22, 2015) .......................................................... 12, 20

**INTRODUCTION**

The Bureau's action seeks to enforce protections for active-duty servicemembers and their dependents (covered borrowers) under the Military Lending Act (MLA) and to enforce protections for all U.S. consumers under the Consumer Financial Protection Act (CFPA). As the Complaint alleges, Defendants violated the MLA by overcharging covered borrowers, requiring them to submit to arbitration, and failing to provide disclosures. And as further alleged, Defendants violated the CFPA by engaging in unfair, deceptive, and abusive acts and practices involving their customers.

All asserted grounds for dismissing the Complaint are meritless. Defendants argue that the Bureau is suing them using funding that Congress granted in violation of the Appropriations Clause. But Congress did not violate the Appropriations Clause by passing a statute that makes funds available to the Bureau for expenditure—as every court to consider the issue, save one, has held. And even if there were a constitutional problem with the statutory provisions funding the Bureau, that wouldn't require dismissal of the Complaint because, among other things, Defendants haven't shown that any such problem would have affected the Bureau's decision to bring this enforcement action.

Nor is there any merit to Defendants' claim that Congress unconstitutionally delegated legislative power to the Bureau in authorizing the Bureau's funding or in empowering the Bureau to prosecute unfair, deceptive, and abusive financial practices. The nondelegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power—such as the Bureau's instant enforcement action. And even if the nondelegation doctrine did apply, a statute delegating authority to an agency does not violate the non-delegation doctrine where Congress has supplied an intelligible principle to guide the delegee's use of discretion. The CFPA's funding provisions and its specific prohibitions on unfair, deceptive, and abusive acts and practices easily satisfy this standard. They provide at least as much guidance as the far broader

1

delegations that the Supreme Court has repeatedly upheld.

Defendants next contend that the MLA Rule is invalid to the extent that it requires certain fees (including participation fees like the membership fees that Defendants charge) to be included in the calculation of the Military Annual Percentage Rate (MAPR). But Defendants have failed to show, as they must, that the MLA Rule is either manifestly contrary to the statute or arbitrary and capricious. And Defendants' arbitrary-and-capricious challenge also fails because it is time-barred, having been brought more than six years after the Department of Defense (DoD) issued the 2015 MLA Rule.

Defendants also advance a number of meritless arguments asserting that the Complaint fails to state a claim. All plainly fail as well. Defendants baselessly assert that the Court should dismiss the Complaint because it does not plausibly allege that Defendants' loans were offered primarily for personal, family, or household purposes. To the contrary, it is clear from the facts alleged in the Complaint that Defendants' loans—typically $500 payable over one year—were marketed and offered primarily as personal consumer loans, not as commercial loans. Similarly, there can be no question that the Complaint sufficiently alleges that Defendants exceeded the MLA's 36% cap on MAPR—by imposing compulsory membership fees which covered borrowers had to pay to access Defendants' loans and had to continue paying during the life of the loans.

Defendants' challenge to Count Two—that Defendants violated the MLA's prohibition on mandatory arbitration—also fails. Defendants base their argument on a document attached to a defense-attorney declaration. There is no legal basis for the Court to consider the contents of this document. And even if there were, the presence of a time-limited opt-out provision would not allow Defendants to evade the MLA's categorical prohibition against requiring covered borrowers to submit to arbitration. Finally, Defendants' contention that the Complaint doesn't sufficiently allege a failure to provide MLA disclosures utterly ignores the Complaint's straightforward allegations.

## STATEMENT OF FACTS

As detailed in the Complaint, Defendants violated the MLA every time they extended credit to a covered borrower. Defendants overcharged covered borrowers, imposing fees that, together with stated interest-rate charges, exceeded the 36%-MAPR cap.[1] Defendants included prohibited arbitration clauses in contracts with covered borrowers.[2] And Defendants failed to give covered borrowers disclosures required by the MLA.[3] Defendants also violated the CFPA when they sought to collect loans and fees from covered borrowers, falsely representing that they owed those amounts even though there was no such repayment obligation because the loans were illegal and therefore void ab initio under the MLA.[4]

Defendants' unlawful practices also extended beyond covered borrowers. As the Complaint describes, Defendants attracted consumers with promises of low-APR installment loans and then trapped many consumers—particularly those behind on loan payments—in costly membership programs that provided few benefits other than the loans themselves.[5] Defendants misled many consumers by telling them at the time of enrollment that they could cancel their memberships for any reason when that was not true.[6] And in many instances, Defendants went to great lengths to extract unpaid membership fees from consumers, even those who had paid off their loans.[7] By engaging in these and other practices detailed in the Compliant, Defendants committed unfair, deceptive, and abusive acts and practices in violation of the CFPA.[8]

---

[1] Complaint, ECF 1 ("Compl.") ¶¶ 59-64; *see* 32 C.F.R. § 232.4(b).
[2] Compl. ¶¶ 57, 66-68; *see* 10 U.S.C. § 987(e)(3); 32 C.F.R. § 232.8(c).
[3] Compl. ¶¶ 57, 70-72; *see* 10 U.S.C. § 987(c)(1)(A); 32 C.F.R. § 232.6(a).
[4] Compl. ¶¶ 74-79; *see* 10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c).
[5] Compl. ¶¶ 2, 3, 49-52.
[6] *Id.* ¶¶ 36-38, 52, 81-86.
[7] *Id.* ¶¶ 39-43.
[8] *Id.* ¶¶ 81-101; *see* 12 U.S.C. §§ 5531, 5536, 5564.

## ARGUMENTS AND AUTHORITIES

### I.     Standard of review for a motion to dismiss.

In reviewing the sufficiency of a complaint, the Court accepts all well-pleaded allegations as true and construes those allegations in the light most favorable to the nonmoving party.[9] Although the complaint may not contain only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,"[10] the Bureau is not required to meet a heightened pleading standard. The complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[11]

### II.    Defendants' constitutional arguments are meritless.

#### A.     Congress did not violate the Appropriations Clause when it authorized the Bureau to draw and spend money on its operations.

Defendants claim that "Congress violated the Appropriations Clause in creating the CFPB" because it chose to fund the Bureau through an authorization in the Bureau's organic statute rather than through annual spending bills.[12] But there is no support for that argument in the text of the Appropriations Clause, which states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[13] As the Supreme Court has held, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'"[14] "[I]n other

---

[9] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[10] *Id.*

[11] *Id.* at 663.

[12] Defs.' Memo. of Law in Supp. of Mot. to Dismiss, ECF 58 ("Mot.") at 8-9. By statute, the Bureau's funds come from the earnings of the Federal Reserve System, of which the Bureau is a part. *See* 12 U.S.C. §§ 5491(a), 5497(a), (c). For fiscal years 2013 and later, Congress capped the amount the Bureau can draw at $597.6 million, adjusted for a particular measure of inflation. *See id.* §§ 5497(a)(2)(A)(iii), (a)(2)(B). (The $597.6 million cap represents 12 percent of the total operating expenses of the Federal Reserve System as reported in 2009.) The Bureau may draw an amount, up to the cap, as is "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law," taking into consideration amounts previously made available. *Id.* § 5497(a)(1).

[13] U.S. Const. Art. I, § 9, cl. 7.

[14] *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

words, the payment of money from the Treasury must be authorized by a statute."[15]

The Bureau's funding is so authorized. By statute, Congress authorized the Bureau to draw up to a capped amount from the Federal Reserve System's earnings each year to spend on its operations.[16] It thus complies with the Appropriations Clause's "straightforward and explicit command" that federal spending "be authorized by a statute."[17] While the Bureau's funding is not set through annual spending bills, the Appropriations Clause does not require annual appropriations.[18] Indeed, since the Founding Era, Congress has chosen to fund certain agencies and programs through sources other than annual spending bills.[19] Today, there are many such agencies, including the Office of the Comptroller of the Currency, Federal Reserve Board, and Federal Deposit Insurance Corporation.[20]

Consistent with that history, courts have recognized that "Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process."[21] Indeed, every court but one that has considered the issue has upheld the Bureau's funding.[22]

Defendants' contrary arguments—which largely repeat those of the Fifth Circuit's outlier decision in *CFSA*—fail to engage with the constitutional text, binding precedent, historical practice, and other contrary authority just described. Defendants note that Congress has the "power of the

---

[15] *Id.*; *accord Butts v. Barnhart*, 416 F.3d 101, 105 (2d Cir. 2005) (the Clause allows the "payment of money by the federal government only where authorized by statute").

[16] *See* 12 U.S.C. § 5497(a), (c).

[17] *Richmond*, 496 U.S. at 424.

[18] *Cf.* U.S. Const. Art. I, § 8, cl. 12 (limiting appropriations for the Army—but not for any other purpose—to no more than two years).

[19] *See, e.g.*, 1 Stat. 232 (1792) (establishing the Post Office and funding it through postage rates).

[20] 12 U.S.C. §§ 16, 243, 1815(d), 1820(e).

[21] *PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

[22] *Compare, e.g.*, *id.* at 95-96 (upholding funding); *CFPB v. TransUnion*, No. 1:22-cv-1880, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022) (same); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020) (same); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020) (same; collecting other cases), *with Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635-43 (5th Cir. 2022) (holding funding invalid) ("*CFSA*"), *pet. for cert. pending*, No. 22-448 (U.S.).

purse,"[23] but that is not in dispute. Congress validly exercised that power when it authorized the Bureau to spend money to carry out the duties Congress assigned it and specified a source of funds for that spending. Congress retains complete authority to alter the amount or source of the Bureau's funding as it sees fit. Defendants also go astray in describing the Bureau's funding as "unprecedented."[24] In fact, Congress has long appropriated money through means other than annual spending bills. And the Federal Reserve Board—like the Bureau, part of the Federal Reserve System—has for decades been funded from the very same source as the Bureau.[25]

Defendants also claim that the Bureau's funding lacks "any congressional oversight."[26] But Congress is fully able to oversee the Bureau's spending, including through audits, reports, and appearances before Congress that are required by the Bureau's statute.[27] Defendants' suggestion that the Bureau's authority is more significant than other, similarly funded agencies, such as the Federal Reserve Board, is self-evidently wrong. As Justice Kagan noted, "[I]f influence on economic life is the measure [of agency authority], consider the Federal Reserve [Board], whose every act has global consequence. The CFPB, gauged by that comparison, is a piker."[28] More fundamentally, the scope of an agency's regulatory and enforcement responsibilities is irrelevant to assessing whether the categorical language of the Appropriations Clause has been satisfied.[29]

And even if Defendants could show an Appropriations Clause problem, the proper remedy would not be dismissal of this case. If the concern is about particular features of the Bureau's funding mechanism, such as the provision circumscribing the authority of certain congressional

---

[23] Mot. at 8.
[24] *Id.* at 9.
[25] *See* 38 Stat. 251, 261 (1913).
[26] Mot. at 9.
[27] *See* 12 U.S.C. §§ 5496(a)-(b), (c)(2), 5497(a)(5), (e)(4) (requiring audits, reports, and appearances before Congress concerning Bureau spending).
[28] *See, e.g., Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2239 (2020) (Kagan, J., concurring in part).
[29] *Cf. Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) (explaining that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies" and rejecting that inquiry in a different separation-of-powers context).

committees to review Bureau funds,[30] then the appropriate remedy would be to simply sever those provisions while leaving the rest of the funding mechanism in place.[31] And while Defendants claim to have somehow been harmed by the Bureau's method of funding,[32] they have not shown that the Bureau would have acted differently had it been funded by (what Defendants would consider to be) a "valid" appropriation.[33]

Moreover, when Congress has established remedies for unauthorized Executive Branch spending, it has not authorized the unwinding of otherwise-valid government actions, as Defendants seek here.[34] The only decision Defendants can muster in support of their preferred remedy is *CFSA*. That decision, however, failed to conduct a severability analysis or to consider the application of traditional remedial principles to the Appropriations Clause issue it described. This Court should not follow the badly flawed remedial analysis in that decision.

### B. Congress did not violate the nondelegation doctrine when it authorized the Bureau to spend up to a specified amount on its operations.

The Bureau may draw an amount each year—up to the statutory cap—that the Director determines is "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)."[35] Defendants assert that this provision violates the nondelegation doctrine. They are wrong.

To begin, Defendants fail to explain why nondelegation principles would even apply to an

---

[30] *See* Mot. at 10 (citing 12 U.S.C. § 5497(a)(2)(C)).
[31] *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotation marks omitted)).
[32] *See* Mot. at 10-11 (citing *Collins*, 141 S. Ct. 1761).
[33] *See Collins*, 141 S. Ct. at 1789 (holding that a party can obtain relief because of an agency official's unconstitutional insulation from removal if the party can show that the removal restriction itself "inflicted harm"); *id.* at 1801-02 (Kagan, J., concurring in part) ("agree[ing]" with the majority that a party must show that the unconstitutional provision actually "affected the complained-of decision").
[34] *See* 31 U.S.C. §§ 1349(a), 1350.
[35] 12 U.S.C. § 5497(a).

executive agency's decision about how much of a congressionally authorized amount to spend. They do not. Congress has long passed appropriations that grant to the Executive "wide discretion with respect to both the amounts to be spent and how the money would be allocated among different functions."[36] "From a very early date Congress . . . made permissive individual appropriations, leaving the decision whether to spend the money to the President's unfettered discretion. . . . The constitutionality of such appropriations has never seriously been questioned."[37]

But even if the nondelegation doctrine did apply, Section 5497 would easily pass muster. It directs the Bureau to draw an amount, up to the cap, that is "reasonably necessary" to carry out the Bureau's authorities and responsibilities (which are spelled out in detail in the rest of the statute), taking account of any past amounts received. That instruction provides at least as much guidance as the far broader delegations that the Supreme Court has repeatedly upheld. The Court has approved, for example, instructions for agencies to set air quality standards "requisite to protect the public health";[38] to take action "necessary to avoid an imminent hazard to the public safety";[39] and to fix "fair and equitable" prices.[40] These and similar decisions—the key holdings of which Defendants simply ignore—foreclose Defendants' argument here.

### C.   Congress also did not violate the nondelegation doctrine when it authorized the Bureau to prosecute deceptive, unfair, and abusive practices.

Defendants contend that the Bureau's statute "provides no sufficiently intelligible principles to guide the CFPB's determination of what is an 'unfair, deceptive, or abusive act or practice.'"[41] But the nondelegation doctrine does not apply to the Bureau's exercise of executive authority in bringing suit to enforce a statutory prohibition that Congress itself enacted. "[T]he non-delegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of

---

[36] *Clinton v. City of New York*, 524 U.S. 417, 446 (1998).
[37] *Id.* at 466-67 (Scalia, J., concurring in part and dissenting in part).
[38] *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472-76 (2001).
[39] *Touby v. United States*, 500 U.S. 160, 165-67 (1991).
[40] *Yakus v. United States*, 321 U.S. 414, 426-27 (1944).
[41] Mot. at 13-14.

executive power."[42]

Even on its own terms, Defendants' argument fails because the statutory prohibitions on deceptive, unfair, and abusive practices provide more-than-sufficient intelligible principles.[43] The statute defines with great specificity what constitutes an "unfair" or "abusive" act or practice.[44] (Indeed, Defendants devote nearly a full page of their motion to laying out the relevant statutory language.[45]) "This was more than sufficient to confer an 'intelligible principle.'"[46]

So too, the prohibition on "deceptive" practices is at least as cabined as other provisions the Supreme Court has upheld,[47] including because its meaning is informed by decades of precedent involving the similar prohibition in the Federal Trade Commission Act.[48] In Defendants' misguided view, it seems that every Bureau and FTC action ever brought to remedy unfair or deceptive practices was, in fact, invalid. That is not the law.[49]

### III.   The MLA Rule is valid.

Defendants wrongly assert that Count One and part of Count Four must be dismissed because the MLA Rule is invalid to the extent that it requires certain fees (including participation fees like the membership fee that Defendants charge) to be included in the MAPR calculation.[50]

It is well established that an agency's rule implementing a statute is entitled to *Chevron* deference where (as here) "Congress delegated authority to the agency generally to make rules

---

[42] *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020) (rejecting non-delegation challenge to government's filing of information seeking enhanced sentence); *see also United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008) ("It is well established that the decision as to what federal charges to bring against any given suspect is within the province of the Executive Branch of the government.").
[43] *See* 12 U.S.C. §§ 5531, 5536(a).
[44] *Id.* § 5531(c)-(d).
[45] *See* Mot. at 13-14.
[46] *CFSA*, 51 F.4th at 635
[47] *See, e.g., Yakus*, 321 U.S. at 425-27 (approving instruction to set "fair and equitable" prices).
[48] *See, e.g., CFPB v. Gordon*, 819 F.3d 1179, 1192-93 n.7 (9th Cir. 2016) ("adopt[ing]" the "established meaning" of the term "'deceptive act or practice' … in the context of the [FTC] Act" to analyze the Bureau's statute); *see also* 15 U.S.C. § 45(a).
[49] *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532-34 (1935) (specifically contrasting the FTC's permissible authority to regulate "unfair methods of competition" with the "much broader" delegation that the Court held unconstitutional).
[50] *See* 32 C.F.R. § 232.4(c).

carrying the force of law" and the rule "claiming deference was promulgated in the exercise of that authority," as is the case with notice-and-comment rulemaking.[51] *Chevron* holds that if Congress has made "an express delegation of authority to [an] agency to elucidate a specific provision of [a] statute by regulation," the regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[52] Congress made such an express delegation in the MLA: The statute empowers DoD to "prescribe regulations" that "establish … [t]he method for calculating the applicable annual rate of interest" (*i.e.*, the MAPR) on covered loans.[53] Accordingly, DoD's rule providing that participation fees are included in the MAPR calculation must therefore be given "controlling weight" unless it is manifestly contrary to the statute or arbitrary and capricious.[54] It is neither.

### A.   The MLA Rule is consistent with the Military Lending Act.

Defendants contend that the MLA Rule's inclusion of participation fees in the MAPR calculation conflicts with the statute because (1) the MLA defines "annual percentage rate" to have "the same meaning as in section 107 of the Truth [in] Lending Act [(TILA)] (15 U.S.C. 1606), as implemented by regulations of [the administering agency],"[55] and (2) TILA's implementing regulation does not include participation fees in its annual percentage rate (APR) calculation.[56] This argument misses the mark.

For one, Section 107 of TILA[57]—the section that the MLA's definition of "annual percentage rate" cross-references—does not specify what charges are included in the calculation of the APR. Rather, that section speaks to the computational method for calculating the APR based on

---

[51] *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 230 (2001) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)).
[52] 467 U.S. 837, 843-44 (1984).
[53] 10 U.S.C. § 987(h)(2)(B).
[54] *Chevron*, 467 U.S. at 844.
[55] 10 U.S.C. § 987(i)(4).
[56] *See* 12 C.F.R. § 1026.4(c)(4).
[57] 15 U.S.C. § 1606.

the "finance charge" (*i.e.*, the cost of the credit) and the amount financed (*i.e.*, the amount of credit extended).[58] A separate section of TILA governs what fees and charges are included in the "finance charge."[59] Hence, the language in the first sentence of the MLA's definition of "annual percentage rate,"[60] stating that that term has the same meaning as in Section 107 of TILA, merely indicates that the MAPR should be calculated using the same computational methodology as set forth in TILA and its implementing regulations. It has no bearing on what charges are included or excluded.

The following sentence in the MLA's definition of "annual percentage rate" removes any doubt on that issue. That sentence states that the term "annual percentage rate" includes "all fees and charges, including charges and fees . . . for ancillary products sold in connection with the credit transaction" and specifies that "such fees and charges shall be included in the calculation of the annual percentage rate."[61] This sentence makes clear that, for purposes of calculating the MAPR, "all fees and charges" should be included. And further underscoring the appropriateness of including participation fees in the calculation of the "annual percentage rate of interest," the MLA defines "interest" to include "all cost elements associated with the extension of credit" as well as "any ancillary product sold with any extension of credit."[62]

To overcome Section 987(i)(4)'s direction that the MAPR include all fees and charges, Defendants argue in a footnote[63] that this language should be read to refer only to fees and charges "that are connected to the extension of credit." But participation fees *are* connected to the extension of credit because they are fees "imposed for participation in any plan or arrangement for consumer credit."[64] Thus, including participation fees in the MAPR is entirely consistent with the statute.

---

[58] *See id.*
[59] *See id.* § 1605 ("Determination of finance charge").
[60] 10 U.S.C. § 987(i)(4).
[61] *Id.*
[62] *Id.* § 987(i)(3).
[63] Mot. at 17 n.7.
[64] 32 C.F.R. § 232.4(c)(iii)(C).

**B.** **Defendants' arbitrary-and-capricious challenge to the MLA Rule fails.**

Defendants also argue that the MLA Rule is arbitrary and capricious, asserting that it does not provide "adequate justification" for including participation fees in the MAPR calculation for most types of credit but not for credit cards. That challenge is time-barred and fails on the merits in any event.

**1.** **Defendants' arbitrary-and-capricious challenge is time-barred.**

While "substantive" challenges to a rule (such as a claim that a rule "exceeds the scope of the agency's substantive authority") "have no time bars, challenges to the procedural lineage of agency regulations . . . will not be entertained outside the time period provided by statute," even where (as here) the challenge is raised "as a defense to an agency enforcement proceeding."[65] Defendants' arbitrary-and-capricious challenge—essentially a claim that DoD failed to provide "adequate justification" or a "reasonable explanation" for its decision to treat credit cards differently from other types of credit—is such a "procedural" challenge.[66] That challenge is governed by a six-year statute of limitations,[67] which begins to run "upon issuance of the regulation."[68] DoD issued the MLA Rule in 2015,[69] so the time for challenging it on arbitrary-and-capricious grounds expired six years later in 2021, and Defendants cannot raise that challenge now.

**2.** **Defendants' arbitrary-and-capricious challenge fails on the merits.**

The MLA Rule easily withstands a "narrow" review under the arbitrary-and-capricious

---

[65] *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 293 (2d Cir. 2006) (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994)).

[66] *See Schiller*, 449 F.3d at 297 (treating claims that an agency failed to "engage in reasoned decisionmaking" or failed to "provide[] an adequate justification for its decision" as procedural); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (describing rule that agency "give adequate reasons for its decisions" as a "procedural").

[67] 28 U.S.C. § 2401 ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). *See also Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077 (9th Cir. 2016) ("Procedural challenges to agency rules under the Administrative Procedure Act are subject to the general six-year limitations period in the U.S. Code.").

[68] *Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009); *accord Perez-Guzman*, 835 F.3d at 1077.

[69] 80 Fed. Reg. 43,560 (2015).

standard.[70] Under that standard, the Court must uphold an agency's action as long as the agency "examine[d] the relevant data" and set out "a satisfactory explanation including a rational connection between the facts found and the choice made."[71] A rule is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[72] In conducting arbitrary-and-capricious review, "a court is not to substitute its judgment for that of the agency."[73]

The MLA Rule's inclusion of participation fees in the MAPR calculation for most credit products easily withstands arbitrary-and-capricious review. The MLA Rule includes fees in the MAPR calculation to prevent creditors from circumventing the MLA's interest-rate cap. As DoD explained, if fees were excluded from the MAPR calculation, "a creditor would have a strong incentive to evade the interest-rate limit by shifting the costs of a credit product by offering an interest rate below that limit and imposing (or increasing) . . . fees."[74] And, moreover, "from the perspective of the covered borrower who is the focus of protection under [the MLA], the financial institution's own apportioning of revenue among the various 'fees' and 'interest' does not change the key fact that it is all part of an aggregate bundle of costs."[75] Defendants do not dispute the reasonableness of this explanation for the decision to include fees in the MAPR calculation.[76]

Instead, Defendants complain that DoD did not provide "adequate justification" for its decision to exclude such fees from the MAPR calculation for credit cards but not for other credit

---

[70] *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).
[71] *State Farm*, 463 U.S. at 43.
[72] *Id.*
[73] *Id.*
[74] 80 Fed. Reg. at 43,569.
[75] *Id.*
[76] *Cf. Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 222 (D.D.C. 2016) (upholding DoD's reasoning for including other fixed fees in the MAPR).

products. But that purported legal argument is really a policy disagreement that provides no support for deeming the MLA Rule arbitrary and capricious.[77]

DoD thoroughly explained its reasoning for exempting certain credit card fees from the MAPR calculation.[78] For one, DoD expressed a concern that including all credit card fees in the MAPR would "likely would result in dramatic changes to the terms, conditions, and availability of [credit card] products to Service members and their families."[79] DoD explained that credit cards often have "pricing mechanisms that, in part, account for the value of products or services delivered through the cardholder's use of the card itself" and that charges for "specific products or services which may be imposed upon the covered borrower's own choices regarding the use of the card" could "meaningfully be distinguished from the cost of borrowing itself."[80] It therefore chose to exclude such charges from the MAPR calculation for credit cards given that including them could result in "unusually adverse consequences" for credit card issuers and covered borrowers alike, such as card issuers having to "significantly re-structure their current products, services, and pricing mechanisms" for borrowers covered by the MLA—"without a corresponding benefit" to those borrowers.[81] DoD also reasoned that "credit card products warrant special consideration . . . because comparable protections for consumers who use these products separately apply under the CARD Act."[82]

Defendants claim that DoD's reasoning for exempting certain credit card fees is faulty for two reasons; both are incorrect. First, Defendants object that DoD's reasoning "applies to other types of consumer credit."[83] In particular, Defendants claim that, like credit cards, other credit products can include fees "expressly tied to specific products or services" that are distinct from the

---

[77] *See State Farm*, 463 U.S. at 43.
[78] *See* 80 Fed. Reg. at 43,572-76.
[79] *Id.* at 43,572.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Mot. at 19.

14

"cost of borrowing itself."[84] But this misunderstands DoD's reasoning. DoD did not exempt such fees for credit cards solely because those fees could "meaningfully be distinguished"[85] from charges for the credit itself; rather, the fact that such fees could be distinguished was one of multiple factors that, taken together, supported exempting those fees for credit cards. DoD exempted those fees for credit cards because including them would have been disruptive: credit cards commonly have those sorts of pricing structures and would have to dramatically revamp their products (or stop offering them to servicemembers and their families altogether) if those sorts of charges were included in the APR calculation.[86] DoD concluded that this result was not warranted, particularly given that another law, the CARD Act, provides protections to credit card borrowers. Defendants offer no basis to second-guess this reasoning.

Second, Defendants contend that the protections for credit card borrowers in the CARD Act do not warrant treating credit cards differently under the MLA. They claim that the CARD Act's protections—which include a requirement that credit card issuers assess consumers' ability to repay before opening an account as well as limits on late fees and other fees—are not "comparable" to the MLA's protections because they are both "more stringent and more lenient."[87] But DoD never claimed that the protections offered by the CARD Act and the MLA Rule were coterminous. Instead, DoD considered the existence of the CARD Act's consumer protections for credit cards in striking the right "balance[]" between "the interests of limiting credit practices that have an adverse impact on covered borrowers" and not "unduly impeding the availability of credit that is benign or beneficial to those borrowers."[88] In other words, because the CARD Act provided credit card borrowers important protections, DoD deemed it unnecessary for credit card issuers to include

---

[84] 80 Fed. Reg. at 43,572.
[85] *Id.*
[86] *See id.*
[87] Mot. at 20-21.
[88] 80 Fed. Reg. at 43,573.

bona fide fees in the calculation of the APR that would be subject to the MLA's 36% MAPR cap.

Defendants offer no reason to disturb DoD's conclusion that credit card fees should be treated differently than fees for other credit products.[89] Thus, even if Defendants' arbitrary-and-capricious challenge were timely, it would fail on the merits.

## IV.    The Complaint states claims under the MLA and CFPA.

### A.  The Complaint sufficiently alleges that Defendants' loans were primarily for personal, family, or household purposes.

When creditors offer loans primarily for personal, family, or household purposes, they are subject to consumer protections under the MLA and CFPA.[90] Accordingly, the Complaint alleges that Defendants offered their loans to consumers primarily for these purposes and includes factual support for this allegation.[91] Defendants' assertions regarding the absence of such supporting facts in the Complaint are without merit.

As the Complaint alleges, Defendants used their online platform to "attract[] consumers with promises of low-APR installment loans,"[92] initially with a 5.99% APR loan for $500 payable over 12 months (the ML Plus Loan).[93] Bundled with the loans, Defendants also promised purported benefits geared toward consumers, including "monthly credit reporting" of their loan payments to credit bureaus, credit-monitoring tools, and a "members-only Facebook Group" page.[94] The terms and marketing of this loan make clear that Defendants offered these loans primarily as personal-consumer loans, not commercial loans.

Additionally, the loan amounts themselves leave no doubt that Defendants offered these loans primarily as personal-consumer loans. In an analogous context, courts have considered the

---

[89] *Cf. Huntco*, 240 F. Supp. 3d at 223 (concluding that DoD had "sufficiently explain[ed]" why it decided to include certain fees in the calculation of MAPR).
[90] *See* 32 C.F.R. § 232.3(f)(1)(i); 12 U.S.C. § 5481(5)(A).
[91] Compl. ¶¶ 15, 55.
[92] Compl. ¶ 2.
[93] Compl. ¶ 30.
[94] Compl. ¶¶ 49-50.

loan amount (among other factors) in determining whether a loan is a consumer-credit transaction covered by TILA—or a business loan not covered by TILA.[95] Smaller loans are presumed to be for personal purposes; larger loans for a non-personal, business purpose.[96] Applying this test, courts have determined that loans far exceeding $100,000 were still relatively small and therefore likely for personal purposes.[97] Here, it strains credulity to suggest that Defendants offered their $500-ML Plus Loan for anything other than personal purposes.

The same is true for Defendants' Credit-Builder Loan. Like its predecessor, the Credit-Builder Loan was initially for $500 payable over 1 year.[98] But Defendants disbursed only a portion of the loan amount at origination and deposited the remainder into a "credit reserve account," which Defendants only released to borrowers after they had paid off the loan[99]—ostensibly to "build" the borrower's "credit." Accordingly, Defendants initially disbursed *less than* $500 to borrowers. And even after Defendants later increased the loan amount to up to $1,000, borrowers would still receive less than the full amount, with the remainder going into the "credit reserve account."[100] This small amount initially disbursed to borrowers together with Defendants' marketing of the loan as building a borrower's credit make clear that Defendants also offered this Credit-Builder Loan primarily as a personal-consumer loan.

Indeed, Defendants' own brief—which this Court may consider as a party admission[101]—

---

[95] See *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010) (citing *Thorns v. Sundance Properties,* 726 F.2d 1417, 1419 (9th Cir.1984)).

[96] *Thorns*, 726 F.2d at 1419.

[97] *Gilliam v. Levine*, 562 F. Supp. 3d 614, 623 (C.D. Cal. 2021) ("Here, the loan was for $150,000, which is relatively small."); *see also Bergman v. Fidelity Nat. Financial, Inc.*, No. 2:12-cv-05994-ODW(MANx), 2012 WL 6013040, at *4 (C.D. Cal. Dec. 3, 2012) ("The Court therefore has no basis in the record to determine whether $626,250 is so disproportionately higher than an average personal loan that it suggests a business purpose."); *cf. Acevedo v. Loan Co. of San Diego*, No. 20-CV-1263-BAS-MSB, 2020 WL 4596760, at *4 (S.D. Cal. Aug. 10, 2020) at *4 (finding $1.2 million loan sufficiently large to suggest business purpose).

[98] Compl. ¶ 32.

[99] Compl. ¶ 33.

[100] Compl. ¶¶ 32, 33.

[101] *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact."); *see also Metcalf v. TransPerfect Glob., Inc.*, No. 19-CV-10104 (AJN), 2020 WL 7028644, at *6 (S.D.N.Y. Nov. 30, 2020) (citing *Purgess* and ruling that claims survived a 12(b)(6) motion based in part on Defendant's admission).

confirms that Defendants offered these loans primarily as personal loans. Defendants claim to "improve [their] customers' lives by giving them access to financial products that many people have the luxury of taking for granted;" by "allow[ing] [their] customers to build their credit histories, while saving and investing for their retirement and their families;" and by giving their customers access to loans that they "often cannot access . . . from traditional banking institutions."[102] By their own admission, Defendants offered the loans primarily for personal, household, or family purposes.

The line of Fair Debt Collection Practices Act (FDCPA) cases cited by Defendants are inapposite. Those cases focus on a different question: the purpose for which the individual plaintiff-debtor *incurred* the debt—specifically whether the complaint alleged facts showing that the individual plaintiff *incurred* the debt primarily for a personal purpose.[103] Defendants adopt this standard, claiming that the Complaint "does not allege facts demonstrating the purpose behind any individual borrower obtaining a loan or how that borrower intended to use a loan."[104] But that is not the issue here. Claims under the MLA and CFPA depend on the primary purpose for which the creditor *offers* the loan.[105] Accordingly, the Complaint need not allege facts relating to any individual borrower's purpose or intention in taking out a loan. The Complaint must only plausibly allege that Defendants offered the loans primarily as personal-consumer loans, which it does.

Nor do the FDCPA complaints scrutinized in Defendants' cases bear any resemblance to the Bureau's Complaint. For example, in *Scarola*, the court found that not only did the complaint fail to contain any factual allegations supporting the inference that the debt arose from a consumer transaction, the complaint contained facts affirmatively suggesting the opposite: that the debt was

---

[102] Mot. at 1.
[103]  15 U.S.C. § 1692a(5).
[104] Mot. at 30.
[105] *See* 32 C.F.R. § 232.3(f)(1)(i) ("offered or extended to a covered borrower primarily for personal, family, or household purposes"); 12 U.S.C. § 5481(5)(A) ("offered or provided for use by consumers primarily for personal, family, or household purposes").

instead for a business purpose.[106] And in *Maleh*[107] and the cases it cites, courts found that the complaints merely regurgitated the statutory definitions and were otherwise devoid of any factual detail or content from which the courts could ascertain or reasonably infer the asserted jurisdictional bases for the claims.[108] That is not the case here: there is more than sufficient factual detail in the Complaint to plausibly state claims under the MLA and CFPA.

### B. The Complaint sufficiently alleges that Defendants violated the 36%-MAPR cap on loans to covered borrowers.

Contrary to Defendants' contentions regarding Count One's defects and deficiencies, the Complaint methodically details how Defendants' loans exceeded the MLA's 36%-MAPR cap. According to the Complaint, before covered borrowers could access Defendants' loans, Defendants required them to enroll in membership programs and begin paying monthly membership fees. And Defendants required covered borrowers to maintain their memberships and continue paying monthly membership fees over the life of the loans.[109] As detailed below, Defendants' compulsory membership fees therefore constituted fees "imposed for participation in any plan or arrangement for consumer credit" under the MLA[110] and consequently were a required component of the loans' MAPR.[111] When these fees are included in the MAPR calculation, explains the Complaint, all of Defendants' Membership-Program Loans exceeded the MLA's 36%-MAPR cap.[112] The Complaint therefore states a plausible claim for relief in Count One.

### 1. The Complaint sufficiently alleges that Defendants' membership fees are participation fees under the MLA.

Defendants claim that the Complaint fails to allege plausible facts showing that their membership fees must be included in their loans' MAPR. But the history and text of the applicable

---

[106] *Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100, 102 (2d Cir. 2016).

[107] *Maleh v. United Collection Bureau, Inc.*, 287 F. Supp. 3d 265 (E.D.N.Y. 2018).

[108] *Id.* at 271-72 (citing, *e.g.*, *Beauvoir v. Israel*, 794 F.3d 244, 248 (2d Cir. 2015)).

[109] Compl. ¶¶ 29-35, 55-56, 62.

[110] 32 C.F.R. § 232.4(c)(1)(iii)(C).

[111] Compl. ¶ 60 (citing 32 C.F.R. § 232.4(c)(1)(iii)(C), (c)(1)(iv)).

[112] Compl. ¶¶ 1, 62-63.

MLA regulation make clear that Defendants' membership fees, as described in the Complaint, are precisely the type of fees that DoD intended to include in the MAPR calculation. When Congress directed DoD to prescribe regulations to carry out the MLA, it specifically charged DoD to include "'[t]he method for calculating the applicable annual percentage rate of interest on such obligations'" and "'[a] maximum allowable amount of all fees, and the types of fees, associated with any such extension of credit.'"[113] The DoD stressed the importance of preventing creditors from circumventing the MLA's 36% cap with added fees:

> [T]he Department recognizes that, under Regulation Z, a wide range of charges that a creditor may impose in connection with a credit product are excluded as "finance charges," particularly an application fee and a participation fee. If these exclusions from the definition of finance charge were to be maintained in the context of consumer credit covered under the MLA, *a creditor would have a strong incentive to evade the interest-rate limit of 10 U.S.C. 987(b) by shifting the costs of a credit product by lowering the interest rate and imposing (or increasing) one or more of these excluded fees. To guard against this obvious result, the Department specifically has included any application fee and any participation fee as charges that generally must be included in the MAPR.*[114]

Accordingly, the MLA's implementing regulation specifically includes in the MAPR calculation any fee "imposed for participation in any plan or arrangement for consumer credit,"[115] and expressly provides that such a participation fee "shall be included in the calculation of the MAPR even if that charge would be excluded from the finance charge under Regulation Z."[116]

Here, the facts alleged in the Complaint demonstrate that Defendants' membership fees qualify as "fee[s] imposed for participation in any plan or arrangement for consumer credit" and that as a consequence, they must be included in the MAPR calculation. Covered borrowers were required to enroll in membership programs and pay the membership fees to access the Membership-Program Loans, and they were required to maintain their memberships and continue paying the fees over the

---

[113] *Huntco Pawn Holdings,*, 240 F. Supp. 3d at 211-12 (quoting 10 U.S.C. § 987(h)).
[114] *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 79 Fed. Reg. 58,602, 58,618 (Sept. 29, 2014) (to be codified at 32 C.F.R. Part 232) (footnote omitted) (emphasis added); *see also Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43,560, 43,569, 43,582 (July 22, 2015) (to be codified at 32 C.F.R. Part 232) (containing similar explanation).
[115] 32 C.F.R. § 232.4(c)(1)(iii)(C).
[116] 32 C.F.R. § 232.4(c)(1)(iv).

life of the 12-month installment loans.[117] In contrast, consumers who did not pay membership fees (enrolling instead in other free versions of Defendants' membership program) were not eligible for Defendant's Membership-Program Loans.[118]

Accordingly, Defendants' membership fees are precisely the type of participation fees that the regulation requires to be included in the MAPR—to prevent regulatory evasion. Indeed, DoD's regulatory commentary mentions "membership" fees as a type of "participation fee" to be included in MAPR—stressing the importance of preventing covered credit products from "evad[ing] the 36 percent limit by including low interest rates with high fees associated with origination, *membership*, administration, or other cost that may not be captured in the TILA definition of APR."[119]

Defendants attempt to skirt this clearly applicable regulation by urging an interpretation at odds with the MLA's plain text. The Act and its implementing regulation repeatedly use the term "impose" in relation to the cost of credit to covered borrowers. For example, the MLA regulation provides that the MAPR must include "[a]ny fee *imposed* for participation in any plan or arrangement for consumer credit."[120] Defendants insist that "impose" must have a unique meaning under the MLA: as requiring a measure of "force" or "compulsion." Defendants argue that because the Complaint does not allege that Defendants used such force or compulsion in connection with their membership fees, the Complaint must be defective.

Defendants' attempt to distort the plain meaning of "impose" is unavailing. The term "impose" is not defined, and there is nothing in the text or legislative history to suggest any ambiguity in its meaning or application here. Accordingly, consistent with established canons,

---

[117] Compl. ¶¶ 29-35, 55-56, 62.

[118] Compl. ¶ 49.

[119] *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50,580, 50,587 (Aug. 31, 2007) (to be codified at 32 C.F.R. Part 232) (emphasis added).

[120] 32 C.F.R. § 232.4(c)(1)(iii)(C) (emphasis added); *see also* 32 C.F.R. § 232.4(b) ("A creditor may not *impose* an MAPR greater than 36 percent in connection with an extension of consumer credit that is closed-end credit . . . .") (Emphasis added); 10 U.S.C. § 987(b) ("A creditor . . . may not *impose* an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member.") (Emphasis added).

interpretation of the MLA must proceed under the assumption that "the statutory language . . . carries its plain meaning" with consideration of "the ordinary, common-sense meaning of the words."[121] Applying those principles here, the term "impose" means nothing more than to charge—as in to charge a fee.[122] The Complaint sufficiently alleges that Defendants charged covered borrowers monthly membership fees—as a condition to obtaining loans and during the life of the loans.

Also wrong is Defendants' suggestion that their membership fees were not covered by the regulation because the fees were somehow optional. To the contrary, as alleged in the Complaint, these were compulsory fees that borrowers had to pay to access a loan and continue paying over the life of the loan.[123] If borrowers fell behind on paying fees while they had an active loan, Defendants actively collected the fees (including past, unpaid fees) and engaged in a variety of tactics to extract past and upcoming fee-payments: suspending membership benefits for unpaid fees; taking past, unpaid fees out of borrowers' investment accounts; refusing to release borrowers' investment-account funds unless borrowers paid past-due fees; and refusing to honor borrowers' requests that Defendants' stop ACH withdrawals of membership fees.[124]

Defendants' other semantic contortions are similarly unavailing. Defendants wrongly assert that because they bundled some purported benefits into their paid memberships, the membership fees were not imposed *only* for participation in any plan or arrangement for consumer credit. But Defendants cannot deny that their membership fees were a mandatory precondition of borrowers' access to loans, that borrowers were charged and required to pay the fees over the life of the loans,

---

[121] *See Chen v. Major League Baseball Properties, Inc.,* 798 F.3d 72, 76 (2d Cir. 2015).
[122] This plain meaning is also consistent with TILA's and Regulation Z's usages of the term "impose." Regulation Z uses the term repeatedly as synonymous with "charge," including in its definition of "finance charge" to include "any charge payable directly or indirectly by the consumer and *imposed* directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4 (emphasis added); *see also* 15 U.S.C. § 1605(a) (similar usage in TILA definition of finance charge).
[123] Compl. ¶¶ 29-35, 55-56.
[124] Compl. ¶¶ 35, 39-45.

and that Defendants' collected and sought those membership fees from borrowers. Defendants' bundling of largely worthless benefits into their membership programs does not alter the fact that these fees were imposed for participation in Defendants' loans.

> ### 2. The Complaint sufficiently alleges that Defendants' loans exceeded the MAPR cap.

Defendants attempt to avoid the Complaint's plain allegations that their loans exceeded the MAPR cap[125] by suggesting—without any statutory or regulatory basis—that they should be allowed to subtract some or all of their membership fees from the MAPR calculation to reflect the monetary value of purported membership benefits and that the Complaint's failure to appraise and offset the value of each of these so-called benefits is fatal to the claim. The Court should reject Defendants' attempt to invent a bona-fide-fee exemption for their installment-loan products; no such offset exists in the MLA regulation. And even if there were a legal basis for subtracting some of the membership fees from the MAPR calculation (and there is none), Defendants cannot contend as a matter of law that for each of their loans to covered borrowers, the value of purported benefits was sufficient to offset the $19.99 to $29.00 monthly fee and result in an MAPR within the 36% cap— particularly given the different fees charged over time, the varying loan amounts and APRs offered, and the indeterminate value of the sundry "benefits" purportedly provided during the relevant period.

Woven into Defendants' argument is also the incorrect suggestion that the amount of fees attributable to the MAPR should be the total fees that a particular borrower actually *paid*, rather than the monthly fees *charged* under the contract. According to this specious argument, even if a borrower was contractually obligated to pay $29 over the 12-month life of a 5.99% APR installment loan (totaling $348 for the year), if the borrower didn't pay all $348 in fees owed, the MAPR would only include the amount of fees actually paid.

---

[125] Compl. ¶¶ 59-64.

Such a result would be plainly inconsistent with the MLA's terms and purpose. Determination and disclosure of the MAPR occurs at the inception of the loan—not after the borrower finishes paying off the loan. Congress required DoD to prescribe regulations establishing a "maximum allowable amount of all fees" chargeable to covered borrowers "to be expressed and disclosed to the borrower as a total amount and as a percentage of the principal amount of the obligation, *at the time at which the transaction is entered into*."[126] The statute provides that a credit agreement imposing an MAPR over 36% "is void *from the inception of the contract*,"[127] not retroactively after the loan is paid off and all fee-payments totaled. Defendants' construction would be inconsistent not only with the MLA's terms, but also its dual purpose of ensuring that creditors disclose at origination the actual charges applicable to covered borrowers and preventing creditors from exceeding the 36%-MAPR limit at the loan's inception.[128]

Finally, Defendants wrongly assert that to state a claim that they exceeded the MLA's 36% cap, the Complaint must include specific calculations that input individual APRs, loan amounts, and fees. But Defendants' proposal ignores the fact that the loan terms varied: loan amounts were initially $500 and later ranged between $500 and $1,000; APRs were initially 5.99% and later ranged between 5.99% and 29.99%; and associated membership-fees were initially $29 and were later reduced to $19.99.[129] For the Complaint to state a claim that Defendants' loans exceeded 36% MAPR, it is not necessary to perform a separate MAPR calculation for each possible combination of these varying terms. Rather, it is sufficient, as the Complaint has done, to state in detail the loan

---

[126] 10 U.S.C. § 987(h)(2)(C) (emphasis added).
[127] 32 C.F.R. § 232.9(c) ("Any credit agreement, promissory note, or other contract with a covered borrower that fails to comply with 10 U.S.C. 987 as implemented by this part or which contains one or more provisions prohibited under 10 U.S.C. 987 as implemented by this part is void from *the inception* of the contract.") (Emphasis added); *see also* 10 U.S.C. § 987(f)(3).
[128] TILA, for its part, provides that the finance charge is determined as the sum of all charges *payable* by the borrower and *imposed* by the creditor, *see* 15 U.S.C. § 1605(a); it is not the amount of charges ultimately *paid* by the borrower. The logical extension of Defendants' argument is that a borrower's failure to pay all of the charges owed on a loan would effectively reduce the loan's APR, an absurd result.
[129] Compl. ¶¶ 30-32.

terms offered by Defendants and the fact that inclusion of Defendants' membership fees in the

MAPR calculation—in combination with the loans' stated APRs—results in *all* Membership

Program Loans imposing MAPRs exceeded the MLA's 36% cap.[130]

### C. The Complaint adequately alleges that Defendants violated the MLA's prohibition on mandatory arbitration.

As the Complaint alleges, Defendants extended credit to covered borrowers by way of loan

contracts containing mandatory arbitration clauses without exceptions for covered borrowers—until

at least August 2019.[131] Defendants thereby violated the MLA's mandatory-arbitration prohibition

every time they made such a loan.[132] Defendants' attempt to sidestep this liability through the

introduction of an opt-out clause is unavailing.

### 1. Defendants' proffered arbitration-opt-out clause is not properly before the Court.

Defendants claim that they could not have violated the MLA's mandatory-arbitration

prohibition because their loan contracts allow consumers to opt-out of arbitration (if they mail an

opt-out request within 30 days of entering the contract). But the Complaint does not reference any

such opt-out clause or attach any loan contract. Although the Bureau is eager to litigate this asserted

defense, it is not properly before the Court on Defendants' motion to dismiss.

The Second Circuit has made clear that "[i]n considering a motion to dismiss for failure to

state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the

complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by

reference."[133] A district court "may also consider matters of which judicial notice may be taken

---

[130] *Id.* ¶ 63.
[131] *Id.* ¶ 67.
[132] *See* 10 U.S.C. § 987(e)(3) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute."); 32 C.F.R. § 232.8(c).
[133] *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

under Fed. R. Evid. 201."[134] Here, because the Complaint makes no reference to an opt-out clause, does not attach any documents, and does not incorporate any documents by reference, the only remaining way that this Court could consider the existence of a contractual opt-out clause would be if it were a matter of which the Court could take judicial notice.

But for multiple reasons, the Court cannot take judicial notice of the existence of an opt-out clause in Defendants' loan contracts. "Courts may take judicial notice of facts that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"[135] Here, Defendants simply attach to an attorney declaration[136] what they say is "a sample loan agreement during the relevant time period"[137] and ask the Court to dismiss Count Two based on the truth of matters asserted in the attachment. The Court should decline to consider the attached document as well as Defendants' representations regarding the document or its contents.

Defendants have not established and cannot establish that the "sample" contract attached to the Kim Declaration satisfies the reliability requirements for judicial notice: facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. In motions to dismiss, courts have taken judicial notice of publicly available documents, such as documents "required by law to be filed" with a governmental agency.[138] On its face, the "sample" contract is not a publicly filed document or other similar document from a source whose accuracy cannot reasonably be questioned.

Nor does it represent facts that can be accurately and readily determined. First, contrary to

---

[134] *Id.*; *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court's consideration of "face of the complaint and matters of which the court may take judicial notice" in ruling on motion to dismiss).
[135] *Lewis v. M&T Bank*, No. 21-933, 2022 WL 775758, at *1 (2d Cir. Mar. 15, 2022) (quoting Fed. R. Evid. 201(b)(2)); *see also Kramer*, 937 F.2d at 774.
[136] ECF 57.
[137] Mot. at 36 n.13.
[138] *See Kramer*, 937 F.2d at 774 (judicial notice of public-disclosure documents required by law to be filed with SEC); *see also Lewis,* 2022 WL 775758, at *2 (flood-program documents required by law to be filed with Connecticut Insurance Department (CID), which bore CID stamp and were publicly accessible, considered "not for the truth of the matters asserted [within the filings], but rather to establish the fact of such . . . filings.").

Defendants' representations, the "sample" contract does not appear to be from the period relevant to Count Two. The Bureau alleges that from about the fall of 2017 until at least August 2019, Defendants "made loans to covered borrowers by way of loan contracts requiring the borrowers to submit to arbitration in the case of a dispute, *without exceptions for covered borrowers*."[139] But the proffered contract template *does* contain an exception for Covered Borrowers: "Covered Borrowers, as defined by federal law, will not be required to comply with binding arbitration . . . ."[140] Accordingly, the document Defendants proffer as a "sample" contract used during the period relevant to Count Two was not in fact used during that period.[141]

Second, the "sample" contract may only be a draft. Although it appears to be dated February 7, 2019, it contains provisions that did not appear in actual loan contracts until at least August 2019. And if the "Rev. 1" notation in the document footer stands for "Revision Number 1," this document may have been the first of several contract revisions, not finalized and used until at least August 2019. Lastly, there is no basis upon which the Court could determine from the document whether any of the Defendants actually used the "sample" contract in transactions with covered borrowers—and if so, which of the 37 Defendant Lending Subsidiaries used the "sample" contract, in connection with which loans, during what dates, and with which borrowers.

And even if the Court could take judicial notice of the "sample" contract with its opt-out clause, the Court could not consider it for the purpose for which Defendants proffer it: to prove that "MoneyLion does not *require* covered borrowers to submit to arbitration."[142] The Second Circuit

---

[139] Compl. ¶ 67 (emphasis added). For the instant purposes, all allegations in the Complaint are accepted as true. *See Ashcroft,* 556 U.S. at 678.

[140] ECF 57-1 at 7.

[141] A further indication that the "sample" contract was not used during the relevant period is that it contains a "Statement of the Military Annual Percentage Rate" disclosure, *see id.,* which Defendants did not include in their contracts until at least August 2019. Compl. ¶¶ 70-71.

[142] Mot. at 37. Although a contract is typically not hearsay "because its language binds parties to its terms without regard to the truth of the statements in the contract," *United States v. Connolly,* No. S1 16 CR. 370 (CM), 2018 WL 2411760, at *8 (S.D.N.Y. May 15, 2018), here, Defendants assertions go beyond the contract's terms to their claim that the contract proves that they've never required covered borrowers to submit to arbitration.

plainly does not permit such a hearsay use of documents proffered by a defendant in a motion to dismiss.[143]

### 2. Defendants' opt-out argument fails on the merits.

Even if the Court could consider the impact of an opt-out clause on Count Two, the Complaint states a plausible claim that Defendants unlawfully included in their loan contracts with covered borrowers a provision requiring covered borrowers to submit to arbitration. As the statutory text, structure, and legislative history make clear, the MLA's arbitration prohibition is categorical and unconditional.

The MLA provides that "[i]t shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute."[144] The MLA further provides that "[n]otwithstanding section 2 of title 9 [the Federal Arbitration Act (FAA) provision stating that arbitration agreements are generally enforceable] . . . no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any [covered borrower]."[145]

Defendants cannot escape the MLA's mandatory-arbitration prohibition by purporting to give covered borrowers a chance to opt out if they take certain additional steps within 30 days of the loan's consummation. The MLA's prohibition focuses on the terms of the extension of credit at the time credit is extended. The contracts' default terms required covered borrowers to arbitrate and thereby violated the MLA's plain terms.

---

[143] *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Kramer*, 937 F.2d at 773-774 (to consider truth of matters asserted in document, Rule 12(b) would require the Court "to treat the [instant motion to dismiss] . . . as one for summary judgment under Rule 56, giving the party opposing the motion notice and an opportunity to conduct necessary discovery and to submit pertinent material").
[144] 10 U.S.C. § 987(e)(3); 32 C.F.R. § 232.8(c).
[145] 10 U.S.C. § 987(f)(4) (citing FAA, 9 U.S.C. § 2); *see also* 32 C.F.R. § 232.9(d).

The Second Circuit reached a similar result in *United States v. Moseley*,[146] where the loan contract's default terms violated TILA. Under the contract, the borrower would be charged in excess of the TILA-disclosed amount—unless, after the loan's consummation, the borrower took additional, optional steps set out in the contract.[147] The court focused on TILA's requirement that the creditor disclose "the 'total of payments' under the payment schedule set *at the time of the loan disbursement*—not under an illusory payment schedule achievable only after the borrower undertakes steps described in fine print."[148] Similarly, the MLA's protections apply unconditionally to the contract's terms in the first instance: The focus must be on the contract's default terms at the time of loan consummation and whether they require a covered borrower to submit disputes to arbitration. If so, the extension of credit under such a contract violates the MLA.

Defendants' reading of Section 987(e)(3)'s arbitration prohibition—as permitting arbitration provisions with opt-out clauses—also makes little sense given the statute's accompanying provision that any agreement to arbitrate involving a covered borrower shall be unenforceable.[149] Defendants' construction would thereby render Section 987(e)(3) largely superfluous,[150] ignore the MLA's structure, and produce an absurd result:[151] A mandatory arbitration provision (with an opt-out provision) applicable to covered borrowers would be lawful under Section 987(e)(3) even though unenforceable under Section 987(f)(4).

Instead, this Court should "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole."[152] The only way to harmonize these

---

[146] 980 F.3d 9 (2d Cir. 2020).
[147] *Id.* at 16-17.
[148] *Id.* at 26 (quoting 12 C.F.R. § 226.5(e)).
[149] 10 U.S.C. § 987(f)(4).
[150] *Cf. Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) ("[O]ne of the most basic interpretive cannons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").
[151] *Cf. Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) (courts may examine statutory structure to produce substantive effect that is compatible with the rest of the law and avoids absurd results).
[152] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).

two provisions of the MLA is to interpret Section 987(e)(3) as prohibiting the extension of credit to covered borrowers by way of a contract containing a mandatory arbitration provision applicable to covered borrowers—regardless of the presence of an opt-out clause.

The MLA's legislative history and purpose support this conclusion. Preceding the enactment of the MLA, DoD submitted a report to Congress regarding lending practices that DoD concluded "undermine[ ] military readiness, harm[ ] the morale of troops and their families, and add[ ] to the cost of fielding an all-volunteer fighting force."[153] Among the harmful lending practices identified in the DoD Report was the inclusion of "mandatory arbitration clauses" in contracts with servicemembers and their families.[154] The Report explained that "[b]y eliminating a borrower's right to sue for abusive lending practices, these clauses work to the benefit of payday lenders over consumers."[155] The Report emphasized that service members need to have access to "judicial remedies through the courts for redress" and included among its recommendations to Congress that "[l]oan contracts to Service members should not include mandatory arbitration clauses."[156] In response to the DoD Report, "Congress enacted the MLA."[157]

This legislative history confirms that Congress intended a categorical prohibition—to protect servicemembers and their dependents from a practice that Congress found to harm military readiness and morale. Permitting creditors to include provisions purporting to compel covered borrowers to arbitrate—with a time-limited, negative-option, opt-out clause—would inherently conflict with this underlying purpose. And notwithstanding the unenforceability of such a provision, it would have the effect of deterring covered borrowers from seeking the judicial redress that the MLA intended to protect. A creditor's insertion of an opt-out clause cannot so easily evade this

---

[153] DEPARTMENT OF DEFENSE, *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* at 53 (Aug. 9, 2006), *available at* https://apps.dtic.mil/sti/citations/ADA521462 ("DoD Report").
[154] *See id.* at 14, 46.
[155] *See id.* at 14.
[156] *See id.* at 7, 46, 51.
[157] *Huntco*, 240 F. Supp. 3d at 223.

MLA protection and make lawful what Congress manifestly intended to prohibit unconditionally.

In a roughly analogous context, the Fourth Circuit recently concluded that TILA, as amended by the Dodd-Frank Act, prohibited a mortgage lender's attempt to compel arbitration— even though the arbitration provision contained an opt-out clause.[158] TILA prohibits "appl[ying] or interpret[ing]" any provision of certain contracts relating to residential mortgage loans "so as to bar a consumer from bringing an action in an appropriate district court" alleging a violation of federal law.[159] The court stated that the statute's plain language was "clear and unambiguous: a consumer cannot be prevented from bringing a TILA action in federal district court by a [contractual arbitration] provision."[160] The court (correctly) presumed that a borrower's previous opportunity to opt out of arbitration did not allow the lender to thereafter "bar [the] consumer from bringing an action" in court.[161]

None of the cases cited by Defendants in reference to arbitration-opt-out clauses are instructive.[162] All involved the National Labor Relations Act (NLRA), not the MLA.[163] The plaintiffs in those cases had argued that arbitration agreements were unenforceable because they violated the NRLA's guarantee of the right to engage in collective action.[164] But the Supreme Court has since made clear that the NLRA does not displace the FAA.[165] In contrast, the MLA expressly does.[166]

---

[158] *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180 (4th Cir. 2022).

[159] *See* 15 U.S.C. § 1639c(e)(3).

[160] *Id.* at 186 (citing 15 U.S.C. § 1639c(e)(3)).

[161] *Lyons,* 26 F.4th at 187.

[162] *Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-900-WHP, 2017 WL 3524682, at *8 (S.D.N.Y. Aug. 15, 2017); *Lamour v. Uber Tech., Inc.*, No. 1:16- cv-21449, 2017 WL 878712, *6 (S.D. Fla. Mar. 1, 2017); *Singh v. Uber Tech. Inc.*, 235 F. Supp.3d 656, 673 (D.N.J. 2017).

[163] In their letter brief (ECF 49) (but not in the instant motion), Defendants cited *Garrett v. Monterey Fin. Servs., LLC*, No. CV JKB-18-325, 2018 WL 3579856, at *4 (D. Md. July 25, 2018). After noting that the FAA "reflects a strong federal policy favoring arbitration, and courts are thus required to rigorously enforce agreements to arbitrate," the court briefly considered whether the contract's mandatory arbitration provision violated the MLA (even though the court found that the subject loans weren't subject to the MLA). In one sentence of *dicta*, the court stated, without analyzing the MLA, that the contract did not "require" arbitration because it contained an opt-out clause. The court's gratuitous conclusion is plainly wrong, utterly ignores the MLA's terms and purpose, and is likely inconsistent with the Fourth Circuit's *Lyons* decision.

[164] *See* 29 U.S.C. § 157.

[165] *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1624-1632 (2018).

[166] 10 U.S.C. § 987(f)(4).

Accordingly, the courts' findings in such cases—that an employee entered into arbitration voluntarily or that an employee's opportunity to opt out addressed any procedural unconscionability concerns—have no relevance here.

### 3.   The Complaint need not allege that Defendants compelled any individual covered borrower to arbitrate.

Defendants also argue that Count Two fails to state a claim because the Complaint does not allege that Defendants actually forced any individual covered borrower to arbitrate. Defendants' argument is at odds with the MLA's plain language. As discussed above, the MLA's arbitration prohibition is directed to the *terms* of the extension of credit at the time credit is extended.[167] The prohibited act—which Defendants committed each time they extended credit to covered borrowers until at least August 2019—was the extension of credit under a contract with such a mandatory-arbitration provision. Defendants cannot evade Section 987(e)(3) insisting that, actually, they would not have sought to invoke the mandatory arbitration provision and compelled arbitration against covered borrowers in the event of a dispute. And the Bureau need not identify individual covered borrowers actually forced to arbitrate disputes to state a claim under Count Two.[168]

Limiting application of the statute's arbitration prohibition to instances where a creditor actually compelled arbitration would also defeat the MLA's purpose. As explained above, if creditors could lawfully include contractual terms requiring covered borrowers to arbitrate all disputes (but avoid liability through an undisclosed policy of not enforcing the mandatory arbitration provision against identified covered borrowers), covered borrowers would be deterred from seeking recourse through the courts.

A court rejected a similar argument in the context of an EFTA claim. Although the

---

[167] 10 U.S.C. § 987(e)(3).

[168] To be clear, Defendants do enforce their arbitration provisions against consumers attempting to obtain redress in a judicial forum. *See, e.g., DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148 (9th Cir. 2021) (MoneyLion's motion to compel arbitration); *Barnes v. Equifax Info. Servs., LLC, Trans Union LLC, and MoneyLion, Inc.,* No. 1:20-CV-3013-CAP-CMS, 2021 WL 2471052 (N.D. Ga. Mar. 17, 2021) (same); *Corpening v. MoneyLion Inc.*, No. 319CV00282FDWDSC, 2019 WL 8561889 (W.D.N.C. Sept. 12, 2019) (same).

company-defendant never sought to enforce a prohibited term, either as to the individual plaintiff or customers generally, the court held that the company's non-enforcement did not alter the customer agreement's terms, "the language of which violates . . . EFTA."[169] The court noted that the contract explicitly granted the company a right prohibited by EFTA: to assess penalties if a consumer stopped electronic payments without notifying the company. The court stated that this was "the very thing proscribed under the EFTA, which does not regulate practice, but content—and nothing precludes [the company] from changing course and asserting those rights in the future."[170] So too here. Whether Defendants actually enforced the arbitration provision against any covered borrowers is immaterial.

### D. The Complaint properly alleges that Defendants' contracts lacked MLA disclosures.

As alleged in the Complaint, Defendants failed to include MLA-required disclosures in their loan contracts until at least August 2019 and thereby violated the MLA every time they extended credit to a covered borrower under such contracts. The MLA requires creditors that extend consumer credit to covered borrowers to make certain loan disclosures before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit.[171] As the Complaint alleges, "[t]he mandatory loan disclosure must include a statement of the MAPR applicable to the extension of consumer credit."[172] Until at least August 2019, Defendants "made loans to covered borrowers without making all loan disclosures required by the MLA."[173]

Defendants insist that the Complaint is deficient because it does not specify which MLA disclosures Defendants allegedly failed to make. But the Complaint plainly references the required disclosures—including, specifically, the required statement of MAPR—and alleges that Defendants

---

[169] *Simone v. M & M Fitness LLC*, No. CV-16-01229-PHX-JJT, 2017 WL 1318012, at *4 (D. Ariz. Apr. 10, 2017).
[170] *Id.*
[171] 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a).
[172] Compl. ¶ 70 (citing 10 U.S.C. § 987(c)(1)(A); 32 C.F.R. § 232.6(a)(1)).
[173] Compl. ¶¶ 71-72. Elsewhere the Complaint states that "until at least August 2019, all contracts for loans offered by MLT and the MoneyLion Lending Subsidiaries . . . lacked disclosures required under the MLA. *See* 10 U.S.C. § 987(c); 32 C.F.R. § 232.6." *Id.* ¶ 57.

made loans to covered borrowers without making all MLA-required loan disclosures. That is more than sufficient to state a plausible claim for relief.

**E.  The Complaint states a claim that Defendants violated the CFPA by engaging in deceptive acts and practices against covered borrowers.**

Count Four alleges that because Defendants' loan contracts with covered borrowers failed to comply with the MLA, all of those contracts were void ab initio,[174] and as a consequence, covered borrowers never owed any principal or interest under those contracts and had no obligation to repay any of the loans or pay any of the associated membership fees.[175] Count Four alleges that Defendants engaged in deceptive acts and practices under the CFPA[176] when they serviced and collected on these void loans (and associated membership fees) because Defendants misrepresented their legal entitlement to demand and receive all principal, interest, and fees and misrepresented covered borrowers' legal obligation to pay the full amounts.[177] Defendants argue that Count Four fails to state a claim because it is predicated on nonexistent MLA violations. This argument fails because, as demonstrated above, the Complaint plainly states not one, but three separate MLA violations: exceeding the MAPR cap (Count One); requiring covered borrowers to submit to arbitration (Count Two); and failing to make required loan disclosures (Count Three). Any one of these violations is a sufficient predicate for Count Four.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion to dismiss.

Dated February 14, 2023              Respectfully submitted,
                                     Eric Halperin
                                     *Enforcement Director*
                                     Alusheyi J. Wheeler
                                     *Deputy Enforcement Director*
                                     Kara K. Miller

---

[174] 32 C.F.R. § 232.9(c); *see also* 10 U.S.C. § 987(f)(3).
[175] Compl. ¶¶ 74-76.
[176] 12 U.S.C. § 5536(a)(1)(B).
[177] Compl. ¶¶ 77-79.

*Assistant Litigation Deputy*

/s/Maxwell Peltz
Maxwell S. Peltz (CA Bar No. 183662)
*Admitted Pro Hac Vice*
Lane C. Powell (MI Bar No. P79432)
*Admitted Pro Hac Vice*
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Peltz): 415-633-1328
Telephone (Powell): 415-844-9784
Fax: 703-642-4585
maxwell.peltz@cfpb.gov
lane.powell@cfpb.gov
*Attorneys for the*
*Consumer Financial Protection Bureau*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 14, 2023, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system and that on the same date a true

and accurate copy of the foregoing document was served via the Court's CM/ECF system upon all

counsel of record.

<u>/s/ Maxwell S. Peltz</u>
Maxwell S. Peltz
Attorney for Plaintiff
Consumer Financial Protection Bureau