UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Consumer Financial Protection Bureau,

      Plaintiff,

      v.

MoneyLion Technologies Inc., ML Plus, LLC, MoneyLion of Alabama LLC, MoneyLion of Arizona LLC, MoneyLion of California LLC, MoneyLion of Colorado LLC, MoneyLion of Connecticut LLC, MoneyLion of Delaware LLC, MoneyLion of Florida LLC, MoneyLion of Georgia LLC, MoneyLion of Idaho LLC, MoneyLion of Illinois LLC, MoneyLion of Indiana LLC, MoneyLion of Kansas LLC, MoneyLion of Kentucky LLC, MoneyLion of Louisiana LLC, MoneyLion of Maryland LLC, MoneyLion of Michigan LLC, MoneyLion of Minnesota LLC, MoneyLion of Mississippi LLC, MoneyLion of Missouri LLC, MoneyLion of Nevada LLC, MoneyLion of New Jersey LLC, MoneyLion of New Mexico LLC, MoneyLion of New York LLC, MoneyLion of North Carolina LLC, MoneyLion of North Dakota LLC, MoneyLion of Ohio LLC, MoneyLion of Oklahoma LLC, MoneyLion of Oregon LLC, MoneyLion of South Carolina LLC, MoneyLion of South Dakota LLC, MoneyLion of Tennessee LLC, MoneyLion of Texas LLC, MoneyLion of Utah LLC, MoneyLion of Virginia LLC, MoneyLion of Washington LLC, MoneyLion of Wisconsin LLC, and MoneyLion of Wyoming LLC,

      Defendants.

Case No. 1:22-cv-8308

Judge John P. Cronan

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**Table of Contents**

INTRODUCTION ............................................................................................................................1

STATEMENT OF FACTS .............................................................................................................2

ARGUMENTS AND AUTHORITIES ..........................................................................................4

   I.   Standard of review for a motion to dismiss. ........................................................................4

   II.   Defendants' constitutional arguments are meritless. ..........................................................4

     A.   The Second Circuit has rejected Defendants' attacks on the Bureau's funding. ...................4

     B.   Congress did not violate the nondelegation doctrine when it authorized the Bureau to prosecute unfair, deceptive, and abusive practices. ...........................................................5

   III.   The MLA Rule is valid. .......................................................................................................7

     A.   The MLA Rule is consistent with the Military Lending Act. .........................................7

     B.   Defendants' arbitrary-and-capricious challenge to the MLA Rule is time-barred and substantively fails. .........................................................................................................11

   IV.   The FAC states claims under the MLA and CFPA. ..........................................................14

     A.   The FAC sufficiently alleges that Defendants' loans were offered primarily jfor personal, family, or household purposes. ......................................................................................14

     B.   The FAC sufficiently alleges that Defendants violated the MLA's 36%-MAPR cap. ..........18

       1.   The FAC more than adequately alleges that Defendants' membership fees are participation fees under the MLA. ............................................................................18

       2.   Defendants' other attempts to avoid application of the 36%-MAPR cap are unavailing ...21

     C.   The FAC clearly alleges that Defendants violated the MLA's prohibition on mandatory arbitration. .....................................................................................................................22

     D.   The FAC sufficiently alleges that the arbitration provision also violated the MLA because it imposed an onerous and unreasonable notice requirement for legal action. ..................28

     E.   Defendants' other attempts to avoid application of the MLA's prohibitions against onerous and unreasonable legal notice are equally unavailing. ...........................................................30

       1.   The MLA's plain terms cover Defendants' notice requirements. ...............................30

       2.   Subsection (e)(4)'s prohibition against unreasonable notice as a condition for "legal action" protects covered borrowers' access to courts not arbitral fora. .....................31

     F.   The FAC properly alleges that Defendants' contracts lacked MLA disclosures. .................33

     G.   The FAC states a claim that Defendants violated the CFPA by engaging in deceptive acts and practices against covered borrowers. ............................................................................33

     H.   The Bureau requests permission to amend the FAC if the Court grants Defendants' motion as to any count in the FAC. ..................................................................................34

CONCLUSION ..............................................................................................................................35

**Table of Authorities**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495 (1935) ................................................6

*Acevedo v. Loan Co. of San Diego,* No. 20-CV-1263-BAS-MSB, 2020 WL 4596760 (S.D. Cal. Aug. 10, 2020) ..............................................................................................................................................16

*Arkansas AFL-CIO v. FCC,* 11 F.3d 1430 (8th Cir. 1993) .........................................................................9

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ............................................................................................4, 17, 27

*Bank of Am., N.A. v. FDIC,* 244 F.3d 1309 (11th Cir. 2001) ...................................................................9

*Canonsburg Gen. Hosp. v. Burwell,* 807 F.3d 295 (D.C. Cir. 2015) ........................................................9

*Carroll v. Trump,* 590 F. Supp. 3d 575 (S.D.N.Y. 2022) ........................................................................35

*Consumer Financial Protection Bureau v. Gordon,* 819 F.3d 1179 (9th Cir. 2016) ................................6

*Chen v. Major League Baseball Properties, Inc.,* 798 F.3d 72 (2d Cir. 2015) ..............................20, 32

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984) ..........................................7

*Consumer Financial Protection Bureau v. Law Offices of Crystal Moroney,* 63 F.4th 174 (2d Cir. 2023)1, 4, 6, 7

*Consumer Financial Protection Bureau v. NDG Financial Corp.,* No. 15-CV-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ..................................................................................................17, 22, 27

*Cooper v. Ruane Cunniff & Goldfarb Inc.,* No. 16-900-WHP, 2017 WL 3524682 (S.D.N.Y. Aug. 15, 2017) ...........................................................................................................................................................27

*Cuthill v. Blinken,* 990 F.3d 272 (2d Cir. 2021) .....................................................................................24

*Doctor's Assocs., Inc. v. Distajo,* 66 F.3d 438 (2d Cir. 1995) ...............................................................33

*Encino Motorcars, LLC v. Navarro,* 579 U.S. 211 (2016) ......................................................................11

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612 (2018) ...................................................................................27

*Bergman v. Fidelity Nat. Financial, Inc.,* No. 2:12-cv-05994-ODW(MANx), 2012 WL 6013040 (C.D. Cal. Dec. 3, 2012) ...........................................................................................................................16

*Fischer v. Fannie Mae,* 302 F. Supp. 3d 1327 (S.D. Fla. 2018) ...........................................................18

*Foman v. Davis,* 371 U.S. 178 (1962) .....................................................................................................35

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000) ...........................24

*Garrett v. Monterey Financial Services,* No. CV JKB-18-325, 2018 WL 3579856 (D. Md. July 25, 2018).26

*Gibson v. Ashcroft,* No. 01-cv-9400, 2002 WL 461579 (S.D.N.Y. Mar. 26, 2002) .....................................9

*Gilliam v. Levine,* 562 F. Supp. 3d 614 (C.D. Cal. 2021) ......................................................................16

*Golla v. Neovasc, Inc.,* No. 22-361-CV, 2023 WL 2469770 (2d Cir. Mar. 13, 2023) ...............................35

*Huntco Pawn Holdings v. U.S. Dep't of Defense,* 240 F. Supp. 3d 206 (D.D.C. 2016) ...........................18, 24

*In re Cherrett,* 873 F.3d 1060, 1067 (9th Cir. 2017) ..............................................................................17

*James Kine & Sons, Inc. v. Indem. Ins. Co. of North Am.,* 178 F. Supp. 146, 148 (S.D.N.Y. 1959) ............33

*Karpova v. Snow,* 497 F.3d 262 (2d Cir. 2007) ......................................................................................12

*Krishtul v. VSLP United, LLC,* No. 10-0909-RER, 2014 WL 940941 (E.D.N.Y. Mar. 11, 2014).........18

*Lyons v. PNC Bank, Nat'l Ass'n,* 26 F.4th 180 (4th Cir. 2022) ..............................................................26

*Mauro v. Countrywide Home Loans, Inc.,* 727 F. Supp. 2d 145 (E.D.N.Y. 2010) ................................16

*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184 (2d. Cir. 2007) .....................................................35

*Metcalf v. TransPerfect Glob., Inc.,* No. 19-CV-10104 (AJN), 2020 WL 7028644 (S.D.N.Y. Nov. 30, 2020) ..............................................................................................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)...................12

*MQDC, Inc. v. Steadfast Ins. Co.*, No. 12-CV-1424 ERK MDG, 2013 WL 6388624 (E.D.N.Y. Dec. 6, 2013) ...............................................................................................................................33

*Optimus Commc'ns v. MPG Assocs., Inc.*, 841 F. Supp. 2d 722 (E.D.N.Y. 2012) .......................33

*Perez-Guzman v. Lynch*, 835 F.3d 1066 (9th Cir. 2016) ..............................................................11

*Phoenix Companies, Inc. v. Concentrix Ins. Admin. Solns. Corp.*, 554 F. Supp. 568, 585 (S.D.N.Y. 2021)...4

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) .........................................................................15

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ...........................................................24

*Ry. Lab. Executives' Ass'n v. ICC*, 784 F.2d 959 (9th Cir. 1986) ..................................................9

*Sai Kwan Wong v. Doar*, 571 F.3d 247 (2d Cir. 2009) ................................................................11

*Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100 (2d Cir. 2016) .............18

*Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286 (2d Cir. 2006) ............................................11

*SEC v. Chenery*, 318 U.S. 80 (1943) ..............................................................................................9

*Simone v. M & M Fitness LLC*, No. CV-16-01229-PHX-JJT, 2017 WL 1318012 (D. Ariz. Apr. 10, 2017) ..................................................................................................................................28

*Singh v. Uber Tech. Inc.*, 235 F. Supp.3d 656 (D.N.J. 2017)........................................................27

*Thorns v. Sundance Properties*, 726 F.2d 1417 (9th Cir.1984) ...................................................16

*Touby v. United States*, 500 U.S. 160 (1991) ................................................................................6

*United States v. Bruce*, 950 F.3d 173 (3d Cir. 2020) .....................................................................5

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ........................................................................7

*United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020)....................................................................23

*United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008) ..................................................................5

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014) ...................................................................20

*W. Virginia v. EPA*, 142 S. Ct. 2587 (2022)...................................................................................7

*Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) .................................................6

*Yakus v. United States*, 321 U.S. 414 (1944) .................................................................................6

## Statutes

9 U.S.C. § 2 .....................................................................................................................................23

10 U.S.C. § 987 ........................................................................................................................passim

12 U.S.C. § 5481 .............................................................................................................................15

12 U.S.C. § 5497 ...............................................................................................................................4

12 U.S.C. § 5511 ...............................................................................................................................7

12 U.S.C. § 5531 ...........................................................................................................................3, 5

12 U.S.C. § 5531 ...............................................................................................................................5

12 U.S.C. § 5536 ......................................................................................................................3, 5, 34

15 U.S.C. § 1605 .............................................................................................................................20

15 U.S.C. § 1606 ...............................................................................................................................8

15 U.S.C. § 1639c ...........................................................................................................................26

15 U.S.C. § 1692a ...........................................................................................................................17

15 U.S.C. § 45 ...................................................................................................................................6

28 U.S.C. § 2401 .............................................................................................................................11

29 U.S.C. § 157 ...............................................................................................................................27

**Regulations**

12 C.F.R. § 226.4 ................................................................................................................20
12 C.F.R. § 226.5 ................................................................................................................23
12 C.F.R. § 1022.24 ............................................................................................................30
12 C.F.R. § 232.3 ................................................................................................................14
12 C.F.R. § 232.4 .......................................................................................................3, 18, 19
12 C.F.R. § 232.6 ..........................................................................................................3, 33
12 C.F.R. § 232.8 ..........................................................................................................3, 28
12 C.F.R. § 232.9 ...............................................................................................3, 23, 29, 33

**Other Authorities**

DEPARTMENT OF DEFENSE, *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006) ...................................................................24, 31, 32

*Limitations on Terms of Consumer Credit Extended to Servicemembers and Dependents*, 72 Fed. Reg. 50,580-01 (Aug. 31, 2007) ..........................................................................................................19, 30

*Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 79 Fed. Reg. 58,602 (Sept. 29, 2014) ........................................................................................................................19

*Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43,560, 43570 (July 22, 2015) ...............................................................................9, 10, 11, 12, 13, 18

## INTRODUCTION

The Bureau's action seeks to enforce protections for active-duty servicemembers and their dependents (covered borrowers) under the Military Lending Act (MLA) and to enforce protections for all U.S. consumers under the Consumer Financial Protection Act (CFPA). The Bureau alleges that Defendants violated the MLA by overcharging covered borrowers, requiring them to submit to arbitration, imposing onerous and unreasonable notice requirements for filing legal actions, and failing to provide disclosures. And the Bureau further alleges that Defendants violated the CFPA by engaging in unfair, deceptive, and abusive acts and practices involving their customers.

All asserted grounds for dismissing the First Amended Complaint (FAC) are meritless. Defendants argue that the Bureau is suing them using funding that Congress granted in violation of the Appropriations Clause and that Congress unconstitutionally delegated legislative power to the Bureau in authorizing the Bureau's funding. But the Second Circuit recently rejected both arguments in *Consumer Financial Protection Bureau v. Law Offices of Crystal Moroney*.[1] The court explained that, because the Bureau's funding structure is Congressionally authorized and bound by specific statutory provisions, it does not offend the Appropriations Clause. And because Congress provided an intelligible principle to guide the agency's budget-setting and spending, the Bureau's funding does not violate the nondelegation doctrine.[2] Defendants' additional nondelegation-doctrine argument— that Congress unconstitutionally empowered the Bureau to prosecute unfair, deceptive, and abusive financial practices—also fails because the nondelegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power such as the Bureau's instant enforcement action.

Defendants next contend that the MLA Rule is invalid to the extent that it requires certain fees (including participation fees like the membership fees that Defendants charge) to be included in

---

[1] 63 F.4th 174, 181, 184 (2d Cir. 2023), *petition for cert. pending*, No. 22-1233 (U.S.).

[2] *Id.* at 181, 184.

the calculation of the Military Annual Percentage Rate (MAPR). But Defendants have failed to show, as they must, that the MLA Rule is either manifestly contrary to the statute or arbitrary and capricious. And Defendants' arbitrary-and-capricious challenge also fails because it is time-barred, having been brought more than six years after the Department of Defense (DoD) issued the 2015 MLA Rule.

Defendants' contention regarding the primary purpose for which they offered their loans is meritless. It is abundantly clear from the FAC and Defendants' own admissions that the loans— typically $500 payable over one year—were offered primarily as personal consumer loans, not as commercial loans. Also, contrary to Defendants' assertions, the FAC sufficiently alleges that Defendants exceeded the MLA's 36%-MAPR cap.[3] By requiring covered borrowers to pay membership fees to access Defendants' loans and continuing to charge those monthly fees during the life of the loans—on top of interest-rate charges—Defendants breached this covered-borrower protection.

Defendants' attempt to evade the MLA's categorical prohibition against requiring covered borrowers to submit to arbitration is also unavailing. Defendants' mandatory arbitration provision applied to covered borrowers without exception. Insertion of a 30-day opt-out clause did not cure this violation. Indeed, the opt-out clause—which foreclosed covered borrowers' access to judicial redress unless they delivered a notice to Defendants within 30 days of taking out a loan— constituted an onerous and unreasonable legal-notice requirement in further violation of the MLA.

## STATEMENT OF FACTS

As detailed in the FAC, Defendants MoneyLion Technologies Inc. and the MoneyLion Lending Subsidiaries, all New York-based small-dollar lenders, violated the MLA every time they extended credit to a covered borrower. Covered borrowers could not take out a MoneyLion

---

[3] *See* 10 U.S.C. § 987(b).

installment loan without paying monthly "membership fees" of between $19.99 and $29; borrowers had to pay the fees before taking out the loan and throughout the life of the loan.[4] When these fees are combined with the loans' interest-rate charges, as dictated by the MLA's MAPR-calculation provision, total charges to covered borrowers exceeded the MLA's 36%-MAPR limit.[5] Defendants' contracts also included mandatory arbitration clauses without exceptions for covered borrowers, lacked MLA disclosures, and foreclosed borrowers' access to redress in court unless they had delivered a notice to Defendants within 30 days of taking out the loan.[6] And when Defendants sought to collect loans and fees from covered borrowers, Defendants violated the CFPA: falsely representing to borrowers that they owed those amounts even though there was no such repayment obligation because the loans were illegal and therefore void from the loans' inception under the MLA.[7]

As alleged in the FAC, Defendants' unlawful practices extended beyond covered borrowers. Defendants attracted consumers with promises of low-APR installment loans and then trapped many consumers—particularly those behind on loan payments—in costly membership programs that provided few benefits other than the loans themselves.[8] Defendants misled many consumers by telling them at the time of enrollment that they could cancel their memberships for any reason when that was not true, and in many instances, Defendants went to great lengths to extract unpaid membership fees from consumers, even those who had paid off their loans.[9] By engaging in these and other practices detailed in the FAC, Defendants committed unfair, deceptive, and abusive acts and practices in violation of the CFPA.[10]

---

[4] First Amended Complaint, ECF 65 ("FAC") ¶¶ 1, 29, 30, 31, 32, 34, 37, 56, 62-67, 92.
[5] FAC ¶¶ 1, 62-67; *see* 10 U.S.C. § 987(b); 32 C.F.R. § 232.4(b), (c)(1)(iii)(C).
[6] *Id.* ¶¶ 57-60, 70, 74-77, 80-82, 85-86; *see* 10 U.S.C. § 987(c), (e); 32 C.F.R. §§ 232.6(a), 232.8(c)-(d).
[7] FAC ¶¶ 91-93; *see* 10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c).
[8] FAC ¶¶ 2, 3, 49-52.
[9] *Id.* ¶¶ 36-43, 52, 81-86.
[10] *Id.* ¶¶ 88-116; *see* 12 U.S.C. §§ 5531, 5536, 5564.

## ARGUMENTS AND AUTHORITIES

I.    **Standard of review for a motion to dismiss.**

In reviewing the sufficiency of a complaint, the Court accepts all well-pleaded allegations as true and construes those allegations in the light most favorable to the nonmoving party.[11] While the FAC must contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,"[12] the Bureau is not required to meet a heightened pleading standard. The FAC must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[13]

II.   **Defendants' constitutional arguments are meritless.**

A.   **The Second Circuit has rejected Defendants' attacks on the Bureau's funding.**

Defendants' arguments that the Bureau's statutory method of funding[14] violates the Appropriations Clause and non-delegation doctrine are now squarely foreclosed by Circuit precedent, as Defendants acknowledge. In *CFPB v. Law Offices of Crystal Moroney, P.C.*, the Second Circuit held that because "the CFPB's funding structure was authorized by the CFPA—a statute passed by Congress and signed into law by the President"—it satisfies the Appropriations Clause's straightforward requirement "that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[15] Rejecting the non-delegation claim as well, the court held that "[u]nder the nondelegation doctrine's lenient standard, Congress has plainly provided an intelligible principle to guide the CFPB in setting and spending its budget."[16] Defendants' objections to the Bureau's funding thus provide no grounds for dismissing this public enforcement action.

---

[11] *See Phoenix Companies, Inc. v. Concentrix Ins. Admin. Solns. Corp.*, 554 F. Supp. 568, 585 (S.D.N.Y. 2021).
[12] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[13] *See id.*
[14] Congress authorized the Bureau by statute to draw up to a capped amount from the Federal Reserve System's earnings each year to spend on its operations. *See* 12 U.S.C. § 5497(a), (c).
[15] 63 F.4th at 181.
[16] *Id.* at 183-84.

**B.  Congress did not violate the nondelegation doctrine when it authorized the Bureau to prosecute unfair, deceptive, and abusive practices.**

Defendants further contend that the Bureau's authority to bring civil enforcement actions to address unfair, deceptive, or abusive acts or practices (UDAAPs) is unconstitutional for lack of an intelligible principle. But the nondelegation doctrine does not apply to the Bureau's exercise of executive authority in bringing suit to enforce a statutory prohibition that Congress itself enacted. "[T]he non-delegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power."[17] (Defendants reference the Bureau's separate rulemaking authority under 12 U.S.C. § 5531(b) to issue regulations regarding the identification and prevention of UDAAPs, but no such regulations are at issue here.)

 While Defendants resist this conclusion, they are unable to muster any case applying the non-delegation doctrine to an action brought to enforce a statutory prohibition. Defendants err in suggesting that, when the Bureau files suit to enforce the statutory prohibitions on unfair, deceptive, and abusive acts or practices, it is engaged in a legislative act. Far from claiming for itself the authority to define what qualifies as unfair, deceptive, or abusive, the Bureau, when it files suit, is simply seeking to enforce the established definitions of those terms that Congress enacted into law.

Even on its own terms, Defendants' argument fails because the statutory prohibitions on unfair, deceptive, and abusive acts or practices provide more-than-sufficient intelligible principles.[18] The statute defines at length and with great specificity what constitutes an "unfair" or "abusive" act or practice.[19] These detailed definitions provide at least as clear of an intelligible principle as the list of "five 'objectives' and six 'primary functions' for the CFPB" that the Second Circuit found were

---

[17] *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020) (rejecting non-delegation challenge to government's filing of information seeking enhanced sentence); *see also United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008) ("It is well established that the decision as to what federal charges to bring against any given suspect is within the province of the Executive Branch of the government.").
[18] *See* 12 U.S.C. §§ 5531, 5536(a).
[19] *Id.* § 5531(c)-(d).

"plainly" sufficient in *Law Offices of Crystal Moroney*, a decision that Defendants simply ignore.[20] And

the prohibition on "deceptive" practices is comparable to numerous other provisions that the

Supreme Court has upheld, such as instructions for agencies to set air quality standards "requisite to

protect the public health"[21]; to take action "necessary to avoid an imminent hazard to the public

safety"[22]; and to fix "fair and equitable" prices.[23] If anything, what is meant by "deceptive" practices

is even clearer than some of the other provisions that the Supreme Court has upheld because its

meaning is informed by decades of precedent involving the similar prohibition in the Federal Trade

Commission Act.[24] Even *A.L.A. Schechter Poultry Corp. v. United States*, on which Defendants rely,

specifically contrasted the FTC's permissible authority to regulate "unfair methods of competition"

with the "much broader" delegation in the National Industrial Recovery Act that the Court held

unconstitutional.[25]

Defendants resort to claiming that something more than an "intelligible principle," of the

kind the Supreme Court has repeatedly upheld, was required here. That assertion is unsupported by

any authority.[26] And Defendants' position is directly contradicted by the Second Circuit's conclusion

in *Law Offices of Crystal Moroney* that to impose "additional requirements" to satisfy the non-delegation

doctrine would be "at odds with the Supreme Court's guidance that Congress' articulation of an

'intelligible principle' directing the agency's exercise of legislative authority is all that is required."[27]

---

[20] 63 F.4th at 184.

[21] *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 465, 472-76 (2001).

[22] *Touby v. United States*, 500 U.S. 160, 163, 165-67 (1991).

[23] *Yakus v. United States*, 321 U.S. 414, 426-27 (1944).

[24] *See, e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 n.7 (9th Cir. 2016) ("adopt[ing]" the "established meaning" of term "'deceptive act or practice' . . . in the context of the [FTC] Act") to analyze the Bureau's statute); *see also* 15 U.S.C. § 45(a).

[25] 295 U.S. 495, 532-34 (1935).

[26] Defendants cite *Whitman*, 531 U.S. at 471, but that case confirmed that the non-delegation doctrine requires only that Congress "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform," *id.* at 472.

[27] 63 F.4th at 184 n.2. Defendants go even further astray with their passing reference to the "major questions doctrine." *See* Defs.' Memo. of Law in Supp. of Mot. to Dismiss, ECF 69 ("Mot.") at 11-12. "[I]n certain extraordinary cases," the Supreme Court recently said, an agency "must point to clear congressional authorization for the power it claims." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609-09 (2022). Even if this were the kind of "extraordinary case" to which that doctrine might apply (it is not), Congress could not have been clearer that it intended and authorized the Bureau to

### III.   The MLA Rule is valid.

#### A.  The MLA Rule is consistent with the Military Lending Act.

Where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law" and the rule "claiming deference was promulgated in the exercise of that authority," as is the case with notice-and-comment rulemaking, that rule is entitled to *Chevron* deference.[28] Congress made such an express delegation in the MLA: The statute empowers DoD to "prescribe regulations" that "establish . . . [t]he method for calculating the applicable annual rate of interest" (*i.e.*, the MAPR) on covered loans.[29] Accordingly, DoD's rule providing that participation fees are included in the MAPR calculation must be given "controlling weight" unless it is manifestly contrary to the statute or arbitrary and capricious.[30] It is neither.

Defendants contend that the MLA Rule's inclusion of participation fees in the MAPR calculation conflicts with the statute because (1) the MLA defines "annual percentage rate" to have the same meaning as in section 107 of the Truth in Lending Act (TILA), as implemented by regulations of the administering agency, and (2) TILA's implementing regulation does not include participation fees in its annual percentage rate (APR) calculation. This argument misses the mark.

For one, Defendants are wrong to broadly assert that the APR under the MLA must have the same meaning as in TILA and Regulation Z. In fact, the MLA's definition of "annual percentage rate" says only that the term must have "the same meaning" as in a single, specific section of TILA, Section 107.[31] And that section does not specify what charges are included in the calculation of the APR. Rather, that section speaks to the computational method for calculating the APR based on the "finance charge" (*i.e.*, the cost of the credit) and the amount financed (*i.e.*, the amount of credit

---

[28] address unfair, deceptive, and abusive practices in the consumer financial marketplace. *See, e.g.*, *Law Offices of Crystal Moroney*, 63 F.4th at 183 ("Congress specified five 'objectives' for the CFPB, including that . . . 'consumers are protected from unfair, deceptive, or abusive acts.'" (quoting 12 U.S.C. § 5511(b)).

[28] *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 230 (2001) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)).

[29] 10 U.S.C. § 987(h)(2)(B).

[30] *Chevron*, 467 U.S. at 844.

[31] 10 U.S.C. § 987(i)(4) (cross-referencing Section 107 of TILA, codified at 15 U.S.C. § 1606).

extended).[32] A separate section of TILA governs what fees and charges are included in the "finance charge."[33] Hence, the language in the first sentence of the MLA's definition of "annual percentage rate"[34] stating that that term has the same meaning as in Section 107 of TILA merely indicates that the MAPR should be calculated using the same computational methodology as set forth in TILA and its implementing regulations. It has no bearing on what charges are included or excluded.[35]

The second sentence in the MLA's definition of "annual percentage rate" removes any doubt on that issue. That sentence states that the term "annual percentage rate" includes "all fees and charges, including charges and fees . . . for ancillary products sold in connection with the credit transaction" and specifies that "such fees and charges shall be included in the calculation of the annual percentage rate."[36] This sentence makes clear that, for purposes of calculating the MAPR, "all fees and charges" may be included even if they would not be included under TILA. And further underscoring the appropriateness of including participation fees in the calculation of the "annual percentage rate of interest," the MLA defines "interest" to include "all cost elements associated with the extension of credit" as well as "any ancillary product sold with any extension of credit."[37]

Indeed, the only way to give effect to both the first and second sentences of the MLA's definition of "annual percentage rate" is to understand them as the Bureau does: the term has the "same meaning" as TILA as far as the computational method goes, but "all fees and charges" can be included in that calculation under the MLA, even if the same fees or charges would not be included under TILA. By contrast, under Defendants' interpretation, the second sentence of the MLA's definition has no effect: On Defendants' view, the annual percentage rate cannot account for fees

---

[32] *See id.*

[33] *See id.* § 1605 ("Determination of finance charge").

[34] *Id.* § 987(i)(4).

[35] MoneyLion's citation to a dictionary definition of "meaning," Mot. at 14, does nothing to save its theory. The "annual percentage rate" under the MLA has the same "meaning"—that is, the same "significance, import, or implication" (MoneyLion's cited definition)—as Section 107 of TILA because the APR is calculated using the same computational methodology. TILA says nothing about what charges are included or excluded when doing that computation.

[36] 10 U.S.C. § 987(i)(4).

[37] *Id.* § 987(i)(3).

and charges that are not included under TILA—a reading directly contrary to the second sentence's statement that the rate "includes *all* fees and charges."

Defendants contend that the Bureau cannot rely on Section 987(i)(4)'s reference to all fees and charges now because DoD did not rely on it in promulgating the MLA Rule. The case on which Defendants rely for this argument, *SEC v. Chenery*, holds that agency action "must be judged by the standards which the [agency] itself invoked."[38] But, as courts of appeals have held, that principle from *Chenery* does not apply to statutory interpretation questions like the one here.[39]

In any event, Defendants' argument is also wrong on the facts: DoD did rely on Section 987(i)'s reference to "all fees and charges" in determining that participation fees should be included in the MAPR calculation. The discussion in the preamble to the Rule regarding the inclusion of participation fees in the MAPR expressly cites the statutory "provisions that define 'annual percentage rate' and 'interest,'" *i.e.*, Sections 987(i)(3) & (4).[40] And, while discussing other charges that are not included under TILA but are included in the MAPR, the preamble explains (1) that "the definition of 'interest' in the MLA . . . generally (and subject to the Department's rulemaking authorities) must include '*all* cost elements associated with the extension of credit, *including* fees'" and (2) that "the MLA defines the 'annual percentage rate' of interest . . . as '*all* fees and charges.'"[41] The preamble also noted that the statutory definition of "annual percentage rate" was "ambiguous"

---

[38] 318 U.S. 80, 89, 89 (1943).

[39] *See, e.g., Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) (explaining that "*Chenery* only limits judicial review of factual determinations or policy judgments"; it "does not apply to legal principles" (cleaned up)); *Bank of Am., N.A. v. FDIC*, 244 F.3d 1309, 1319 (11th Cir. 2001) (noting great weight of authority holding that *Chenery* does not apply "to agency post-hoc rationalizations involving the kind of pure questions of statutory analysis that are involved under the first prong of the *Chevron* analysis"); *Arkansas AFL-CIO v. FCC*, 11 F.3d 1430, 1440 (8th Cir. 1993) ("[T]he Supreme Court clearly limited *Chenery* to situations in which the agency failed to make a necessary determination of fact or of policy."); *Ry. Lab. Executives' Ass'n v. ICC*, 784 F.2d 959, 969 (9th Cir. 1986) (holding that court is not bound under *Chenery* to "only judge the propriety of an agency decision on the grounds invoked by the agency" where "the issue in dispute is the interpretation of a federal statute"); *see also Gibson v. Ashcroft*, No. 01-cv-9400, 2002 WL 461579, at *5 (S.D.N.Y. Mar. 26, 2002) (explaining that *Chenery* is limited "to situations in which the agency failed to make a necessary determination of fact or of policy" and, thus, "the fact that the agency states an incorrect legal rationale is" not a proper basis to overturn an agency action).

[40] Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43,560, 43,570 (July 22, 2015) (to be codified at 32 C.F.R. Part 232).

[41] *Id.* at 43,581 (citing 10 U.S.C. § 987(i)(3),(4)) (emphasis in original).

precisely because it "first provides that the term 'annual percentage rate' has the same meaning as
implemented in Regulation Z, but, second, provides that the term 'includes all fees and charges,'"
including various charges that "Regulation Z for years has excluded from the disclosures of APR."[42]
In other words, in promulgating the Rule, DoD relied on the exact statutory provisions that the
Bureau cites here. This is hardly a made-for-litigation-only argument, as Defendants contend.

Second, Defendants argue that the Bureau's position here actually conflicts with the
reasoning of the MLA Rule because the Rule's exclusion of bona fide participation fees from the
MAPR for credit cards means that DoD necessarily rejected the view that the "all fees and charges"
sentence mandates including bona fide participation fees in the MAPR for other credit products.
That mischaracterizes the Bureau's position. The Bureau does not claim that the MLA *mandates* the
inclusion of participation fees in the MAPR, just that it *permits* it. In enacting the Rule, DoD
correctly recognized that the MLA's definitions of "interest" and "annual percentage rate" are
"broad" and "ambiguous."[43] And the MLA expressly grants DoD the authority and discretion to
clarify the meaning of these terms by regulation.[44] DoD's decision to exclude participation fees from
the MAPR for credit cards, while including them in the MAPR for other credit products, was a
proper exercise of that discretion. For that reason, DoD acted within the authority Congress granted
it in including participation fees in the MAPR for some credit products even if was not required to
do so by the statute.

Third, Defendants argue that DoD's reading makes the statute "internally inconsistent"
insofar as Section 987(i)(4) requires the term "annual percentage rate" to have the same meaning as
in Regulation Z and immediately thereafter requires "all fees and charges" to be included, unlike in

---

[42] *Id.* at 43568 & n.82.
[43] 80 Fed. Reg. at 43,570; *see also id.* at 43,568 & n. 82.
[44] 10 U.S.C. § 987(h)(2)(B); *see also* 80 Fed. Reg. at 43,568 (noting that while some of the MLA's provisions "are
ambiguous," "the law contemplates that the Department prescribe regulations to carry out the law through a process
that involves the Department exercising its discretion").

Regulation Z. But, as explained above, nothing in the statutory text requires the APR applicable to covered borrowers to be calculated in the exact same way as the APR in Regulation Z: The MLA merely adopts the computational method set forth in Section 107 of TILA, which says nothing about which charges are included or excluded.

### B. Defendants' arbitrary-and-capricious challenge to the MLA Rule is time-barred and substantively fails.

While "substantive" challenges to a rule (such as a claim that a rule "exceeds the scope of the agency's substantive authority") "have no time bars, challenges to the procedural lineage of agency regulations . . . will not be entertained outside the time period provided by statute," even where (as here) the challenge is raised "as a defense to an agency enforcement proceeding."[45] Defendants' arbitrary-and-capricious challenge—essentially a claim that DoD failed to provide "adequate justification" or a "reasonable explanation" for its decision to treat credit cards differently from other types of credit—is such a "procedural" challenge.[46] That challenge is governed by a six-year statute of limitations,[47] which begins to run "upon issuance of the regulation."[48] DoD issued the MLA Rule on July 22, 2015,[49] so the time for challenging it on arbitrary-and-capricious grounds expired six years later on July 21, 2021, and Defendants cannot raise that challenge now.

Moreover, the MLA Rule easily withstands a "narrow" review under the arbitrary-and-capricious standard.[50] Under that standard, the Court must uphold an agency's action as long as the

---

[45] *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 293 (2d Cir. 2006).

[46] *See Schiller*, 449 F.3d at 297 (treating claims that an agency failed to "engage in reasoned decisionmaking" or failed to "provide[] an adequate justification for its decision" as procedural); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (describing rule that agency "give adequate reasons for its decisions" as a "procedural"). MoneyLion (at 17 n.5) characterizes its arbitrary-and-capricious challenge as substantive but offers no defense of that characterization, and the sole case it cites holds to the contrary. *Schiller*, 449 F.3d at 297.

[47] 28 U.S.C. § 2401 ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). *See also Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077 (9th Cir. 2016) ("Procedural challenges to agency rules under the Administrative Procedure Act are subject to the general six-year limitations period in the U.S. Code.").

[48] *Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009); *accord Perez-Guzman*, 835 F.3d at 1077.

[49] 80 Fed. Reg. 43,560 (2015).

[50] *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

agency "examine[d] the relevant data" and set out "a satisfactory explanation including a rational connection between the facts found and the choice made."[51] A rule is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," and in conducting arbitrary-and-capricious review, "a court is not to substitute its judgment for that of the agency."[52]

The MLA Rule's inclusion of participation fees in the MAPR calculation for most credit products easily withstands arbitrary-and-capricious review. The MLA Rule includes fees in the MAPR because if fees were excluded from the MAPR calculation, "a creditor would have a strong incentive to evade the interest-rate limit by shifting the costs of a credit product by offering an interest rate below that limit and imposing (or increasing) . . . fees."[53] And, moreover, "from the perspective of the covered borrower who is the focus of protection under [the MLA], the financial institution's own apportioning of revenue among the various 'fees' and 'interest' does not change the key fact that it is all part of an aggregate bundle of costs."[54]

Defendants complain that DoD did not provide "adequate justification" for its decision to exclude such fees from the MAPR calculation for credit cards but not for other credit products. But that purported legal argument is really a policy disagreement that provides no support for deeming the MLA Rule arbitrary and capricious.[55] DoD thoroughly explained its reasoning for exempting certain credit-card fees from the MAPR calculation.[56] For one, DoD expressed a concern that including all credit-card fees in the MAPR "likely would result in dramatic changes to the terms,

---

[51] *State Farm*, 463 U.S. at 43.
[52] *Id.*
[53] 80 Fed. Reg. at 43,569.
[54] *Id.*
[55] *See State Farm*, 463 U.S. at 43.
[56] *See* 80 Fed. Reg. at 43,572-76.

conditions, and availability of [credit-card] products to Service members and their families."[57] DoD explained that credit cards often have "pricing mechanisms that, in part, account for the value of products or services delivered through the cardholder's use of the card itself" and that charges for "specific products or services which may be imposed upon the covered borrower's own choices regarding the use of the card" could "meaningfully be distinguished from the cost of borrowing itself." It therefore chose to exclude such charges from the MAPR calculation for credit cards given that including them could result in "unusually adverse consequences" for credit-card issuers and covered borrowers alike, such as card issuers having to "significantly re-structure their current products, services, and pricing mechanisms" for borrowers covered by the MLA—"without a corresponding benefit" to those borrowers. DoD also reasoned that "credit card products warrant special consideration . . . because comparable protections for consumers who use these products separately apply under the CARD Act."[58]

Defendants object that DoD's reasoning also "applies to other types of consumer credit" (like Defendant's product). In particular, Defendants claim that, like credit cards, other credit products can include fees "expressly tie[d] to specific products or services" that are distinct from the "cost of borrowing itself."[59] But this misunderstands DoD's reasoning. DoD did not exempt such fees for credit cards solely because those fees could "meaningfully be distinguished"[60] from charges for the credit itself; rather, the fact that such fees could be distinguished was one of multiple factors that, taken together, supported exempting those fees for credit cards. Taking into consideration the multiple factors, DoD exempted those fees for credit cards because including them would have been disruptive: credit cards commonly have those sorts of pricing structures, and issuers would have to dramatically revamp their products (or stop offering them to servicemembers and their families

---

[57] *Id.* at 43,572.
[58] *Id.*
[59] Mot. at 18 (quoting 80 Fed. Reg. at 43,572).
[60] 80 Fed. Reg. at 43,572.

altogether) if those sorts of charges were included in the APR calculation.[61] DoD concluded that this result was not warranted, particularly given that another law, the CARD Act, provides protections to credit card borrowers. Defendants offer no basis to second-guess this reasoning.

Defendants also contend that the protections for credit-card borrowers in the CARD Act do not warrant treating credit cards differently under the MLA. They claim that the CARD Act's protections—which include a requirement that credit-card issuers assess consumers' ability to repay before opening an account as well as limits on late fees and other fees—are not "comparable" to the MLA's protections because they are both more stringent and more lenient. But DoD never claimed that the protections offered by the CARD Act and the MLA Rule were coterminous. Instead, DoD considered the existence of the CARD Act's consumer protections for credit cards in striking the right "balance[]" between "the interests of limiting credit practices that have an adverse impact on covered borrowers" and not "unduly impeding the availability of credit that is benign or beneficial to those borrowers."[62] In other words, because the CARD Act provided credit-card borrowers important protections, DoD deemed it unnecessary for credit-card issuers to include bona fide fees in the calculation of the APR that would be subject to the MLA's 36%-MAPR cap.

## IV.   The FAC states claims under the MLA and CFPA.

### A.   The FAC sufficiently alleges that Defendants' loans were offered primarily for personal, family, or household purposes.

When creditors offer loans primarily for personal, family, or household purposes, they are subject to consumer protections under the MLA and CFPA.[63] Consistent with these jurisdictional standards, the FAC alleges facts showing that Defendants offered their loans to consumers primarily for these purposes. Defendants' assertions to the contrary are without merit.

---

[61] *See id.*
[62] *Id.* at 43,573.
[63] *See* 32 C.F.R. § 232.3(f)(1)(i) ("offered or extended to a covered borrower primarily for personal, family, or household purposes"); 12 U.S.C. § 5481(5)(A) ("offered or provided for use by consumers primarily for personal, family, or household purposes").

As the FAC alleges, Defendants used their online platform to "attract[] consumers with promises of low-APR installment loans."[64] Defendants initially offered a $500 ML Plus Loan payable over 12 months.[65] Defendants later offered a $500-$1,000 "Credit-Builder Loan" also payable over 12 months but where borrowers received only a portion of the loan amount at origination with the remainder deposited into a "credit-reserve account." Defendants only released the amount in the credit-reserve account after borrowers had paid off the loan (ostensibly to help them build their credit).[66] Bundled with the loans were a variety of purported benefits targeted at consumers seeking personal loans, including "monthly credit reporting" of their loan payments to credit bureaus, credit-monitoring tools, and a "members-only Facebook Group" page.[67] Accordingly, the terms and marketing of the loans make clear that Defendants offered these loans primarily as personal-consumer loans, not commercial loans.

Defendants' admissions in their memoranda of law—which this Court may consider as party admissions[68]—further support this conclusion. Defendants claim to "improve [their] customers' lives by giving them access to financial products that many people have the luxury of taking for granted,"[69] by "allow[ing] [their] customers to build their credit histories, while saving and investing for their retirement and their families,"[70] and making loans available to "many families that would otherwise not have access to them from traditional banks."[71] Thus, by their own admissions, Defendants offered the loans primarily for personal, household, or family purposes.

Additionally, the loan amounts leave no doubt that Defendants offered these loans primarily

---

[64] FAC ¶ 2.
[65] FAC ¶ 30.
[66] FAC ¶¶ 32-33.
[67] FAC ¶¶ 49-50.
[68] *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact."); *see also Metcalf v. TransPerfect Glob., Inc.*, No. 19-CV-10104 (AJN), 2020 WL 7028644, at *6 (S.D.N.Y. Nov. 30, 2020) (citing *Purgess* and denying 12(b)(6) motion based in part on Defendant's admission).
[69] Defs.' Memo. of Law in Supp. of Mot. to Dismiss (original complaint), ECF 58, at 1.
[70] *Id.*
[71] Mot. at 1.

as personal-consumer loans. In an analogous context, courts have considered the loan amount (among other factors) in determining whether a loan is a consumer-credit transaction covered by TILA—or a business loan not covered by TILA.[72] Smaller loans are presumed to be for personal purposes; larger loans for a non-personal, business purpose.[73] Applying this test, courts have determined that loans far exceeding $100,000 were still relatively small and therefore likely for personal purposes.[74] Here, it strains credulity to suggest that Defendants offered $500 loans for anything other than personal purposes. And even after Defendants began offering "Credit-Builder Loans" of up to $1,000, Defendants disbursed less than the full amount at origination, with the remainder deposited into a "credit-reserve account" that was inaccessible to borrowers until loan payoff.

Defendants next attempt to evade application of the MLA and CFPA by turning the jurisdictional question on its head. Referring to a line of cases applying the Fair Debt Collection Practices Act (FDCPA)[75] (and some cases applying TILA), Defendants insist that jurisdiction depends not on the purpose for which the loans were offered but on the primary motive of each individual borrower when he or she incurred the debt, including the circumstances surrounding each borrower's decision to take out the loan and how each borrower actually used the loan. Under this manufactured standard, for the government to adequately allege that a lender violated the CFPA or MLA when it extended tens or hundreds of thousands of loans, the government's complaint must include particularized factual allegations for each and every loan, showing that the individual

---

[72] See *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010) (citing *Thorns v. Sundance Properties,* 726 F.2d 1417, 1419 (9th Cir.1984)).

[73] *Thorns*, 726 F.2d at 1419.

[74] *Gilliam v. Levine*, 562 F. Supp. 3d 614, 623 (C.D. Cal. 2021) ("Here, the loan was for $150,000, which is relatively small."); *see also Bergman v. Fidelity Nat. Financial, Inc.,* No. 2:12-cv-05994-ODW(MANx), 2012 WL 6013040, at *4 (C.D. Cal. Dec. 3, 2012) ("The Court therefore has no basis in the record to determine whether $626,250 is so disproportionately higher than an average personal loan that it suggests a business purpose."); *cf. Acevedo v. Loan Co. of San Diego*, No. 20-CV-1263-BAS-MSB, 2020 WL 4596760, at *4 (S.D. Cal. Aug. 10, 2020) at *4 (finding $1.2 million loan sufficiently large to suggest business purpose).

[75] 15 U.S.C. § 1692a(5).

borrower's primary purpose for taking out the loan was personal and not commercial.

Such borrower-level specificity is not and cannot be the standard. As this Court made clear in *CFPB v. NDG Financial Corp.*, the "CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations."[76] Accordingly, the FAC need not allege facts relating to any individual borrower's purpose for taking out a loan or how the borrower ultimately used the loan. It must only plausibly allege that Defendants offered the loans primarily as personal-consumer loans, which it does.

Cases cited by Defendants do not support their position. For example, in *In re Cherrett*, the Ninth Circuit reviewed whether a borrower's primary purpose for obtaining a specific loan satisfied "the statutory requirements for a Chapter 7 bankruptcy filing."[77] This is not relevant to or instructive for the Court's inquiry into the sufficiency of the Bureau's allegations here. Similarly, *Krishtul v. VSLP United, LLC* did not involve the adequacy of a complaint's allegations. There, in a plaintiff's private action under TILA, the court concluded that "[b]ased solely on the weight of the evidence submitted at trial," the defendant was not a creditor under TILA.[78] Other cases cited by Defendants are equally inapplicable because they involved complaints that lacked any supporting factual recitations—or contained allegations demonstrating that the loans were actually for business and not personal purposes.[79]

---

[76] No. 15-CV-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) (rejecting defendants' contention "that *Iqbal* and *Twombly* require the CFPB to identify specific consumers targeted by the payday lending scheme in order to survive a motion to dismiss").

[77] 873 F.3d 1060, 1067 (9th Cir. 2017).

[78] No. 10-0909-RER, 2014 WL 940941 at *11 (E.D.N.Y. Mar. 11, 2014).

[79] *See Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100, 102 (2d Cir. 2016) (noting that complaint failed to contain any factual allegations supporting the inference that the debt arose from a consumer transaction and instead contained facts affirmatively suggesting the opposite—that the debt was instead for a business purpose); *Fischer v. Fannie Mae*, 302 F. Supp. 3d 1327, 1332 (S.D. Fla. 2018) (examining but disregarding plaintiff's arguments regarding purpose for which he incurred the debt because he "fail[ed] to rebut the unambiguous allegations in the Complaint which assert that the loan was obtained for purposes of a business investment property.").

**B. The FAC sufficiently alleges that Defendants violated the MLA's 36%-MAPR cap.**

    **1. The FAC more than adequately alleges that Defendants' membership fees are participation fees under the MLA.**

Defendants claim that the FAC fails to plausibly allege that their membership fees were "participation" fees that must be included in the loans' MAPR under the MLA.[80] But the history and text of the MLA Rule make clear that Defendants' membership fees, as described in the FAC, are precisely the type of fees that DoD intended to include in the MAPR calculation.

When Congress directed DoD to prescribe regulations to carry out the MLA, it specifically charged DoD to include "'[t]he method for calculating the applicable annual percentage rate of interest on such obligations'" and "'[a] maximum allowable amount of all fees, and the types of fees, associated with any such extension of credit.'"[81] The DoD crafted the regulation governing MAPR calculations specifically to prevent creditors from using fees to circumvent the MLA's 36% cap:

> [T]he Department recognizes that, under Regulation Z, a wide range of charges that a creditor may impose in connection with a credit product are excluded as "finance charges," particularly an application fee and a participation fee. If these exclusions from the definition of finance charge were to be maintained in the context of consumer credit covered under the MLA, *a creditor would have a strong incentive to evade the interest-rate limit of 10 U.S.C. 987(b) by shifting the costs of a credit product by lowering the interest rate and imposing (or increasing) one or more of these excluded fees. To guard against this obvious result, the Department specifically has included any application fee and any participation fee as charges that generally must be included in the MAPR.*[82]

Accordingly, the MLA's implementing regulation specifically includes in the MAPR calculation any fee "imposed for participation in any plan or arrangement for consumer credit," and provides that such a participation fee "shall be included in the calculation of the MAPR even if that charge would be excluded from the finance charge under Regulation Z."[83]

Here, the facts alleged in the FAC demonstrate that Defendants' membership fees qualify as

---

[80] *See* 32 C.F.R. § 232.4(c)(1)(iii)(C), (c)(1)(iv).
[81] *Huntco Pawn Holdings v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206, 211-12 (D.D.C. 2016) (quoting 10 U.S.C. § 987(h)).
[82] 79 Fed. Reg. 58,602, 58,618 (Sept. 29, 2014) (footnote omitted) (emphasis added); *see also* 80 Fed. Reg. at 43,569, 43,582 (July 22, 2015) (containing similar explanation).
[83] 32 C.F.R. § 232.4(c)(1)(iii)(C), (c)(1)(iv).

"fee[s] imposed for participation in any plan or arrangement for consumer credit" and that as a consequence, they must be included in the MAPR calculation. To access Membership-Program Loans, covered borrowers were required to enroll in membership programs and pay monthly membership fees, and borrowers were required to continue paying those fees over the life of the 12-month installment loans. In contrast, Defendants offered free membership programs—i.e., with no monthly membership fees—but MoneyLion customers who enrolled in those free membership programs were not eligible to take out Defendants' installment loans.[84]

Accordingly, Defendants' membership fees were precisely the type of participation fees that the regulation requires be included in the MAPR to prevent regulatory evasion. Indeed, DoD's regulatory commentary mentions "membership" fees as a type of "participation fee" to be included in the MAPR. DoD stressed the importance of preventing covered credit products from "evad[ing] the 36 percent limit by including low interest rates with high fees associated with origination, *membership*, administration, or other cost that may not be captured in the TILA definition of APR."[85]

In an attempt to skirt this clearly applicable regulation, Defendants urge an interpretation of the word "impose" that is at odds with the MLA's plain text, context, and overall statutory scheme. The MLA and its implementing regulation repeatedly use the term "impose" in relation to the cost of credit to covered borrowers. For example, the MLA regulation provides that the MAPR must include "[a]ny fee *imposed* for participation in any plan or arrangement for consumer credit."[86] Disregarding the statute's context and purpose, Defendants urge a hyperbolic definition of "impose:" requiring "an element of force" against covered borrowers. According to Defendants, because the FAC does not include such a use-of-force allegation, the FAC fails to show that

---

[84] FAC ¶¶ 1, 29, 30, 31, 32, 34, 37, 49, 56, 62-67, 92.
[85] 72 Fed. Reg. 50,580-01, 50,587 (Aug. 31, 2007) (emphasis added).
[86] 32 C.F.R. § 232.4(c)(1)(iii)(C) (emphasis added); *see also* 32 C.F.R. § 232.4(b) ("A creditor may not *impose* an MAPR greater than 36 percent in connection with an extension of consumer credit that is closed-end credit . . . .") (Emphasis added); 10 U.S.C. § 987(b) ("A creditor . . . may not *impose* an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a [covered borrower].") (Emphasis added).

Defendants "imposed" the fees. This distortion is unavailing.

Statutory interpretation proceeds "under the assumption that the statutory language, unless otherwise defined, carries its plain meaning" with consideration of "the ordinary, common-sense meaning of the words."[87] "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[88] Applying these principles here, the undefined term "impose" means nothing more than to charge a compulsory fee, which Defendants plainly did.[89]

And contrary to Defendants' characterizations, payment of the membership fees was not optional. Defendants would not extend a loan unless the borrower had enrolled and begun paying membership fees. And Defendants sought payment of every monthly fee during the life of the loan, telling borrowers that all fees—including any past, unpaid fees—were due and owed on their accounts.[90] If borrowers got behind on monthly fees, Defendants "suspended" their memberships— restricting borrowers' access to benefits, account functionality, and borrower funds in other accounts—while continuing to charge monthly fees during suspension and not lifting suspension until the borrower paid all past, unpaid fees.[91] When borrowers sought to pause Defendants' ACH withdrawals of membership fees, Defendants refused borrowers' requests.[92] And even after loan payoff, Defendants continued to seek any unpaid fees from borrowers, refusing to cancel memberships until borrower had paid all past-due fees, taking unpaid fees out of borrowers' investment accounts, and refusing to release borrowers' investment-account funds unless borrowers paid past-due fees.[93]

---

[87] *See Chen v. Major League Baseball Properties, Inc.,* 798 F.3d 72, 76 (2d Cir. 2015).

[88] *Util. Air Regul. Grp. v. E.P.A.,* 573 U.S. 302, 320 (2014).

[89] This plain meaning is also consistent with TILA's and Regulation Z's usages of the term "impose." Regulation Z uses the term repeatedly as synonymous with "charge," including in its definition of "finance charge" to include "any charge payable directly or indirectly by the consumer and *imposed* directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4 (emphasis added); *see also* 15 U.S.C. § 1605(a) (similar usage in TILA definition of finance charge).

[90] FAC ¶ 35, 37, 92.

[91] FAC ¶¶ 44-48, 51.

[92] FAC ¶ 43.

[93] FAC ¶¶ 37, 39.

Defendants also wrongly assert that because they bundled some purported benefits into their paid memberships, the membership fees were not imposed *only* or *solely* for participation in any plan or arrangement for consumer credit. But Defendants cannot deny that payment of membership fees was a mandatory precondition of borrowers' access to loans, that borrowers were charged and required to pay the fees over the life of the loans, and that Defendants' collected and sought those membership fees from borrowers.[94] That borrowers who paid fees and accessed loans were also presented with largely worthless benefits bundled into the membership programs is of no moment. Indeed, Defendants' attempt to end-run MLA protections—by trying to allocate some or all of the compulsory membership fees to such largely worthless add-ons and thereby evade the MAPR cap— is precisely the type of predatory conduct that the DoD sought to prevent by including such fees in the calculation of the MAPR.

## 2. Defendants' other attempts to avoid application of the 36%-MAPR cap are unavailing.

Defendants contend that they should be allowed to subtract some or all of their membership fees from the MAPR calculation to reflect the monetary value of purported membership benefits and that the FAC's failure to appraise and offset the value of each of these so-called benefits is fatal to the claim. The Court should reject Defendants' attempt to invent a bona-fide-fee exemption for their installment-loan products; no such offset exists in the MLA Rule. And even if there were a legal basis for subtracting some of the membership fees from the MAPR calculation, Defendants have no basis to contend that for each of their loans to covered borrowers, the value of purported benefits was sufficient to offset the $19.99 to $29.00 monthly fee and result in an MAPR within the 36% cap—particularly given the different fees charged over time, the varying loan amounts and APRs offered, and the indeterminate value of the sundry "benefits" purportedly provided during the

---

[94] FAC ¶¶ 1, 29, 30, 31, 32, 34, 37, 56, 62-67, 92.

relevant period.

Defendants also wrongly assert that to state a claim that they exceeded the MLA's 36% cap, the FAC must include specific calculations that input individual APRs, loan amounts, and fees. Such separate and individualized MAPR calculations for each and every possible combination of these varying terms in each loan extended by Defendants is simply not required to state a claim. Again, this court considered and rejected such an argument in *CFPB v. NDG*.[95] Rather, it is sufficient, as the FAC has done, to state in detail the loan terms offered by Defendants and the fact that inclusion of Defendants' membership fees in the MAPR calculation—in combination with the loans' stated APRs—results in *all* Membership Program Loans imposing MAPRs over the MLA's 36% cap.[96]

### C. The FAC clearly alleges that Defendants violated the MLA's prohibition on mandatory arbitration.

As the MLA's text, structure, and legislative history make clear, the arbitration prohibition is categorical and unconditional. The statute does not permit creditors to end-run this important covered-borrower protection through the insertion of a time-limited opt-out clause. Here, the contracts' default terms required covered borrowers to arbitrate and thereby violated the MLA's plain terms.

The Second Circuit reached a similar result in *United States v. Moseley*,[97] where the loan contract's default terms violated TILA. Under that contract, the borrower would be charged in excess of the TILA-disclosed amount—unless, after the loan's consummation, the borrower took additional, optional steps set out in the contract.[98] The court focused on TILA's requirement that the creditor disclose "the 'total of payments' under the payment schedule set *at the time of the loan disbursement*—not under an illusory payment schedule achievable only after the borrower undertakes

---

[95] 2016 WL 7188792 at *13-15 (rejecting defendant's argument that by failing to identify specific loans or consumers affected, the CFPB's complaint failed to give fair notice of the conduct alleged).
[96] FAC ¶¶ 65-66.
[97] 980 F.3d 9 (2d Cir. 2020).
[98] *Id.* at 16-17.

steps described in fine print."[99]

Similarly, the MLA's subsection (e) protections apply to the contract's terms at the time the "creditor . . . extend[s] consumer credit to a covered member or a dependent of such a member."[100] Subsection (e)'s protections are not undone by events after that extension. The focus must be on the contract's default terms at the time of loan consummation and whether they require a covered borrower to submit disputes to arbitration. Here, Defendants' contracts contained mandatory arbitration provisions without exceptions for covered borrowers. Accordingly, Defendants' extension of credit to covered borrowers under such contracts violated the MLA.

Defendants' contention that subsection (e)(3) authorizes contractual arbitration provisions applicable to covered borrowers (as long as there's an opt-out clause) is also untenable in light of a separate MLA provision. Subsection (f)(4) provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any [covered borrower]."[101] Defendants' proposed application would render subsection (e)(3)'s prohibition largely inoperative and superfluous,[102] ignore the MLA's structure, and produce an absurd result,[103] where an arbitration provision is lawful under subsection (e)(3) even though unenforceable under subsection (f)(4). This interpretation would defeat the MLA's statutory scheme and its clear purpose: to prevent covered borrowers from being or becoming required to arbitrate. Instead, this Court should "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole"[104]—as prohibiting the extension of credit to covered borrowers by way of a contract containing a mandatory arbitration provision applicable to covered borrowers regardless of

---

[99] *Id.* at 26 (quoting 12 C.F.R. § 226.5(e)).
[100] 10 U.S.C. § 987(e).
[101] 10 U.S.C. § 987(f)(4) (citing FAA, 9 U.S.C. § 2); *see also* 32 C.F.R. § 232.9(d).
[102] *Cf. Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) ("[O]ne of the most basic interpretive cannons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").
[103] *Cf. Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021) (courts may examine statutory structure to produce substantive effect that is compatible with the rest of the law and avoids absurd results).
[104] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).

the presence of an opt-out clause.

The MLA's legislative history support this conclusion. Preceding the enactment of the MLA, DoD submitted a report to Congress regarding lending practices that DoD concluded "undermine[ ] military readiness, harm[ ] the morale of troops and their families, and add[ ] to the cost of fielding an all-volunteer fighting force."[105] Among the harmful lending practices identified in the DoD Report was the inclusion of "mandatory arbitration clauses" in contracts with servicemembers and their families.[106] The report explained that "[b]y eliminating a borrower's right to sue for abusive lending practices, these clauses work to the benefit of payday lenders over consumers."[107] The report emphasized that service members need to have access to "judicial remedies through the courts for redress"[108] and included among its recommendations to Congress that "[l]oan contracts to Service members should not include mandatory arbitration clauses."[109] In response to the DoD Report, "Congress enacted the MLA."[110]

This legislative history confirms that Congress intended a categorical prohibition—to protect servicemembers and their dependents from a practice that Congress found to harm military readiness and morale. Permitting creditors to include provisions purporting to compel covered borrowers to arbitrate—even with time-limited, negative-option, opt-out clauses—would inherently conflict with this underlying purpose. And notwithstanding the unenforceability of such a provision, it would have the effect of deterring covered borrowers from seeking the judicial redress that the MLA intended to protect. Here, Defendants' arbitration provision contained no exception for covered borrowers and lacked any MLA disclosures during the relevant period. Accordingly, a covered borrower who wished to sue Defendants for unlawful practices but who had not opted out

---

[105] DEPARTMENT OF DEFENSE, *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* at 53 (Aug. 9, 2006), *available at* https://apps.dtic.mil/sti/citations/ADA521462 ("DoD Report").
[106] *Id.* at 14, 46, 51.
[107] *Id.* at 14.
[108] *Id.* at 46.
[109] *See id.* at 7, 46, 51.
[110] *Huntco*, 240 F. Supp. 3d at 223.

of arbitration in time would read the contract as categorically precluding their access to relief in federal court (or any state court above small claims).

The MLA's mandatory-arbitration prohibition must also be construed within the context of the statute's other safeguards against creditor-imposed barriers to judicial redress. In addition to the arbitration prohibition (and separate provision rendering arbitration agreements unenforceable), the MLA prohibits creditors from imposing onerous legal-notice provisions in the case of a dispute, demanding unreasonable notice from the borrower as a condition for legal action, or requiring borrowers to waive the right to legal recourse under applicable State or Federal law.[111] These provisions make clear that Congress intended to prohibit any contractual barriers to covered borrowers' access to the courts. Defendants' insertion of an opt-out clause cannot so easily evade this MLA protection and make lawful what Congress manifestly intended to prohibit unconditionally—as Defendants' must have recognized when they inserted an exception for covered borrowers in about August 2019.

In a analogous context, the Fourth Circuit concluded that TILA, as amended by the Dodd-Frank Act, prohibited a mortgage lender's attempt to compel arbitration—even though the arbitration provision contained an opt-out clause.[112] TILA prohibits "appl[ying] or interpret[ing]" any provision of certain contracts relating to residential mortgage loans "so as to bar a consumer from bringing an action in an appropriate district court" alleging a violation of federal law.[113] The court stated that the statute's plain language was "clear and unambiguous: a consumer cannot be prevented from bringing a TILA action in federal district court by a [contractual arbitration] provision."[114] The court (correctly) presumed that a borrower's previous opportunity to opt out of arbitration did not allow the lender to thereafter "bar [the] consumer from bringing an action" in

---

[111] 10 U.S.C. § 987(e)(2)-(4).
[112] *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180 (4th Cir. 2022).
[113] *See* 15 U.S.C. § 1639c(e)(3).
[114] 26 F.4th at 186.

court.[115]

The cases cited by Defendants in reference to arbitration-opt-out clauses are not persuasive or even instructive. Of these, the only case referencing the MLA, *Garrett v. Monterey Fin. Servs.,* lacks any analysis of the statute and seems to have applied the wrong standard. Before taking up the MLA, the court noted that the Federal Arbitration Act (FAA) "reflects a strong federal policy favoring arbitration," that "courts are thus required to rigorously enforce agreements to arbitrate," and that there is a "heavy presumption of arbitrability."[116] Without acknowledging that this FAA presumption expressly does not apply to the MLA,[117] the court briefly considered whether the contract's mandatory arbitration provision violated the MLA (even though the court found that the subject loans weren't subject to the MLA) and in one sentence of *dicta* stated that the contract did not "require" arbitration because it contained an opt-out clause. This gratuitous conclusion is plainly wrong, utterly ignores the MLA's terms and purpose, and is likely inconsistent with the Fourth Circuit's *Lyons* decision.

The remaining two cases relied upon by Defendants[118] involved the National Labor Relations Act (NLRA), not the MLA. The plaintiffs in those cases had argued that arbitration agreements were unenforceable because they violated the NRLA's guarantee of the right to engage in collective action.[119] But the Supreme Court has since made clear that the NLRA does not displace the FAA.[120] In contrast, the MLA expressly does.[121] Accordingly, the courts' findings in such cases— that an employee entered into arbitration voluntarily or that an employee's opportunity to opt out addressed any procedural unconscionability concerns—have no relevance here.

---

[115] *Lyons*, 26 F.4th at 186-87 (citing 15 U.S.C. § 1639c(e)(3)).
[116] No. CV JKB-18-325, 2018 WL 3579856 at *3 (D. Md. July 25, 2018).
[117] *See* 10 U.S.C. § 987(f)(4) (expressly exempting MLA from FAA's presumption favoring arbitration).
[118] *Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-900-WHP, 2017 WL 3524682, at *8 (S.D.N.Y. Aug. 15, 2017); *Singh v. Uber Tech. Inc.*, 235 F. Supp.3d 656, 673 (D.N.J. 2017).
[119] *See* 29 U.S.C. § 157.
[120] *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1624-1632 (2018).
[121] 10 U.S.C. § 987(f)(4).

Also unavailing is Defendants argument that Count Two fails to state a claim because the FAC does not mention any individual covered borrower forced to arbitrate. Defendants' argument is inconsistent with the standards enunciated by this Court and is at odds with the MLA's plain language. First, as discussed above, Defendants urge a pleading standard that is inconsistent with *CFBP v. NDG*, not required by *Iqbal* or *Twombly*, and nonsensical in the context of a governmental enforcement action.

Second, the Bureau's claim does not depend on Defendants actually having forced a covered borrower to arbitrate. As discussed above, the MLA's arbitration prohibition is directed to the *terms* of the extension of credit at the time credit is extended, not on some future contingent event. Defendants' position that a violation depends on whether a creditor later compels a borrower to arbitrate a dispute—months or years after the loan's consummation—is simply not supported by the statute's plain text. Rather, the prohibited act—which Defendants committed each time they extended credit to covered borrowers until about August 2019—was the extension of credit under a contract with such a mandatory-arbitration provision. Limiting application of the statute's arbitration prohibition to instances where a creditor actually compelled arbitration would also defeat the MLA's purpose. As explained above, if creditors could lawfully include contractual terms requiring covered borrowers to arbitrate all disputes (but avoid liability through an undisclosed policy of not enforcing the mandatory arbitration provision against identified covered borrowers), covered borrowers would be deterred from seeking recourse through the courts.

A court rejected a similar argument in the context of an EFTA claim.[122] Although the company-defendant never sought to enforce a prohibited term, either as to the individual plaintiff or customers generally, the court held that the company's non-enforcement did not alter the customer agreement's terms, "the language of which violates . . . EFTA."[123] The court noted that the contract

---

[122] *See Simone v. M & M Fitness LLC*, No. CV-16-01229-PHX-JJT, 2017 WL 1318012 (D. Ariz. Apr. 10, 2017).
[123] *Id.* at *4.

explicitly granted the company a right prohibited by EFTA: to assess penalties if a consumer stopped electronic payments without notifying the company. The court stated that this was "the very thing proscribed under the EFTA, which does not regulate practice, but content—and nothing precludes [the company] from changing course and asserting those rights in the future."[124] So too here. Whether Defendants actually enforced the arbitration provision against any covered borrowers is immaterial.

### D. The FAC sufficiently alleges that the arbitration provision also violated the MLA because it imposed an onerous and unreasonable notice requirement for legal action.

The FAC alleges in Counts Three and Four that Defendants' arbitration provision, including its opt-out clause, violated the MLA's prohibitions on onerous or unreasonable notice requirements for legal action. The MLA prohibits creditors from (a) requiring borrowers to submit to arbitration or imposing on borrowers "onerous legal notice provisions in the case of a dispute" or (b) demanding "unreasonable notice from . . . borrower[s] as a condition for legal action."[125]

Here, Defendants' arbitration provision precluded covered borrowers from filing a lawsuit in any court (other than in small-claims court) unless, within fewer than 30 days of taking out the loan, the borrowers had mailed a written notice rejecting the arbitration provision. (To be effective, the notice had to be delivered to Defendants at a Utah P.O. box within 30 days of the loan, meaning that borrowers would have had to mail the notice within *fewer* than 30 days.) But by the time of a dispute, this deadline for mailing the notice would in most cases have passed or been days from passing, making it impossible or nearly impossible for borrowers to access the courts.[126] This short period for mailing the notice, the context in which borrowers were presented with the requirement (as a provision within a larger loan contract), and the implications for missing the deadline

---

[124] *Id.*
[125] 10 U.S.C. § 987(e)(3), (e)(4); *see also* 32 C.F.R. § 232.8(c), (d).
[126] FAC ¶¶ 58-59, 74-76.

(surrender of an MLA-protected right to redress in the courts) together rendered the notice requirement onerous and unreasonable. The FAC thus sufficiently alleges that Defendants violated subsection (e)(3)'s dual prohibitions against requiring arbitration or imposing onerous legal notice provisions in the case of a dispute (Count Three) and subsection 987(e)(4)'s prohibition against demanding unreasonable notice as a condition for legal action (Count Four).

Defendants unconvincingly contend, based on standards inapplicable to the MLA, that these counts should be dismissed because Defendants' notice requirement was reasonable as a matter of law. But Defendants again rely on cases applying the FAA—and its presumption favoring arbitration—which the MLA explicitly eschews.[127] The question of whether it was reasonable to require covered borrowers to mail a notice within fewer than 30 days of entering a loan contract to preserve access to a right specifically protected under the MLA cannot so easily be dispensed based on inapplicable case law. Defendants' notice provision was not reasonable as a matter of law.

Similarly, the Fair Credit Reporting Act regulation referenced by Defendants also has no bearing here. Defendants suggest that because this inapplicable regulation allows companies to give consumers 30 days to opt out of affiliate marketing,[128] the same 30-day period must also, as a matter of law, dictate what is reasonable here. Not so. There is no universal regulatory standard for what is "reasonable," precisely because it depends on a number of factors, including context, the notice period, and the rights at stake. The DoD clearly saw it this way, stating that it had purposefully "not included specific examples in the final rule of what constitutes 'onerous legal notice' or 'unreasonable notice'" and "that in so far as necessary, the scope of the ['unreasonable notice'] provision is more appropriately determined on a case-by-case basis."[129]

---

[127] 10 U.S.C. § 987(f)(4); 32 C.F.R. § 232.9(d).
[128] 12 C.F.R. § 1022.24.
[129] 72 Fed. Reg. at 50,589-90.

**E. Defendants' other attempts to avoid application of the MLA's prohibitions against onerous and unreasonable legal notice are equally unavailing.**

**1. The MLA's plain terms cover Defendants' notice requirements.**

Defendants assert that MLA subsection (e)(3) does not apply because they did not require borrowers to give notice related to any specific dispute. But the MLA's terms are not so restrictive. Here, under the contract terms, once a dispute arose, covered borrowers would be denied access to the courts and required to arbitrate unless they had provided timely notice rejecting arbitration. The fact that delivery of the notice would in most instances have had to precede such a dispute does not mean that the notice requirement isn't covered by subsection (e)(3)'s prohibitions. Indeed, the necessity of pre-dispute notice in most instances contributed to the notice requirement's onerousness. This type of legal notice requirement is precisely what the DoD recommended that Congress eliminate, so that "Service members [could] maintain full legal recourse against unscrupulous lenders."[130] Accordingly, the phrase "in the case of a dispute" does not restrict application of subsection (e)(3) to instances where a dispute has already arisen; it simply describes the purpose of this prophylactic measure.

Defendants similarly argue that they did not demand "unreasonable notice . . . as a condition for legal action" under subsection (e)(4) because (a) the provision did not impose any condition on a covered borrower's ability to bring a legal action and (b) the provision did not require advance notice that the borrower was going to sue. The first argument is wrong, and the second is a non sequitur. Unless a covered borrower delivered a notice rejecting arbitration within 30 days of the contract, the borrower was barred from filing an action in federal court or any state court other than small claims. The notice was unequivocally a condition for taking legal action. And contrary to Defendants' assertion, there is nothing in subsection (e)(4) suggesting that "notice as a condition for legal action" means or is restricted to some manner of advance notice of intent to sue.

---

[130] *Id.*

Defendants also blithely assert that covered borrowers could always sue in small claims court (or just submit to arbitration) irrespective of whether they delivered timely notice. But such a result would contravene the plain terms of subsection (e)(4) and defeat the statute's purpose of maintaining covered borrowers' "full legal recourse against unscrupulous lenders."[131]

### 2.   Subsection (e)(4)'s prohibition against unreasonable notice as a condition for "legal action" protects covered borrowers' access to courts not arbitral fora.

Defendants cannot escape application of MLA subsection (e)(4) by asserting that arbitration is a form of "legal action" to which covered borrowers always had access under the contracts, regardless of whether they timely delivered an opt-out notice. Contrary to this suggestion, the MLA's terms, structure, and purpose make clear that "legal action" means a legal action in court and does not include arbitration. As discussed above, the DoD recommended to Congress that it protect covered borrowers' "full legal recourse" and "[p]rohibit provisions in loan contracts that require Service members and family members to waive their rights to take legal action." In response, Congress enacted protections in subsection (e), including a prohibition on unreasonable notice as a condition for "legal action," a prohibition on requiring waiver of "the right to legal recourse" under applicable state or federal law, and a prohibition on imposing onerous "legal notice" provisions.[132] All of these protections—read as a coherent regulatory scheme and construed to fit all parts into an harmonious whole—use the term "legal" to mean the same thing: proceedings in court.[133] Under Defendants' theory (that "legal" includes arbitration), a lender would not violate section (e)(2)'s prohibition on requiring covered borrowers to waive their right to "legal recourse" under federal and state law if the creditor required waiver of the right to bring civil actions but allowed borrowers to arbitrate. This is plainly not what "legal" means under the MLA. Rather, "legal action," according to its "ordinary, common-sense meaning" within the context of the MLA's "overall statutory

---

[131] DoD Report at 7, 51.
[132] 10 U.S.C. § 987(e)(2)-(4).
[133] *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

scheme,"[134] must refer only to civil actions, not arbitration proceedings.

The legislative history supports this conclusion. It was decidedly not DoD's concern to remove barriers to *arbitration*. Mandatory arbitration, according to the DoD, was a *barrier* to full legal recourse, not a *form* of legal recourse. To maintain service members' "full legal recourse against unscrupulous lenders," the DoD Report recommended eliminating "mandatory arbitration clauses or onerous notice provisions."[135] The DoD Report referenced arbitration clauses as "eliminat[ing] borrowers' opportunity to obtain legal recourse"[136] and observed that "[b]ecause most predatory lenders require borrowers to waive their rights to go to court to resolve disputes and instead submit borrower to private adjudication through mandatory arbitration, Service members need to have recourse . . . to judicial remedies through the courts for redress."[137] Accordingly, it would defy both the terms and intent of the MLA to interpret "legal action" to include arbitration and permit creditors to impose legal-notice requirements that effectively barred covered borrowers' access to the courts as long as there were no such barriers to arbitration.

Courts in other contexts have contrasted "legal action" to arbitration. For example, in *Doctor's Assocs., Inc. v. Distajo*, the Second Circuit referenced arbitration as "a condition precedent to the institution of legal action."[138] And in *James King & Son, Inc. v. Indem. Ins. Co. of N. Am.*, the court noted that an agreement "provid[ing] that arbitration shall be a condition precedent to legal action is valid in New York State."[139] To be sure, courts have occasionally interpreted contractual references to "legal action" as encompassing arbitration—primarily to give effect to unclear contractual provisions.[140] But these cases are not at all persuasive in construing the MLA's statutory terms.

---

[134] *See Chen*, 798 F.3d at 76; *Util. Air Regul. Grp.*, 573 U.S. at 320.

[135] DoD Report at 7, 51.

[136] *Id.* at 21.

[137] *Id.* at 46.

[138] 66 F.3d 438, 457 (2d Cir. 1995).

[139] 178 F. Supp. 146, 148 (S.D.N.Y. 1959).

[140] *See, e.g., Optimus Comm'ns v. MPG Assocs., Inc.*, 841 F. Supp. 2d 722, 725 (E.D.N.Y. 2012) ("[T]he context of the [contractual] provision makes it clear that 'legal action' refers to arbitration, not a court action."); *MQDC, Inc. v. Steadfast*

### F.  The FAC properly alleges that Defendants' contracts lacked MLA disclosures.

As alleged in the FAC, Defendants failed to include MLA-required disclosures in their loan contracts until about August 2019 and thereby violated the MLA every time they extended credit to a covered borrower under such contracts. The MLA requires creditors that extend consumer credit to covered borrowers to make certain loan disclosures before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit.[141] As the FAC alleges, "[t]he mandatory loan disclosure must include a statement of the MAPR applicable to the extension of consumer credit."[142] Until about August 2019, Defendants "made loans to covered borrowers without making all loan disclosures required by the MLA."[143] Defendants insist that the FAC is deficient because it does not specify which MLA disclosures Defendants allegedly failed to make. But the FAC plainly references the required disclosures—including, specifically, the required statement of MAPR—and alleges that Defendants made loans to covered borrowers without making all MLA-required loan disclosures. That is more than sufficient to state a claim for relief.

### G.  The FAC states a claim that Defendants violated the CFPA by engaging in deceptive acts and practices against covered borrowers.

Count Six alleges that because Defendants' loan contracts with covered borrowers failed to comply with the MLA, all of those contracts were void when originated, and, as a consequence, covered borrowers never owed any principal or interest under those contracts and had no obligation to repay any of the loans or pay any of the associated membership fees.[144] Count Six alleges that Defendants engaged in deceptive acts and practices under the CFPA[145] when they serviced and

---

*Ins. Co.,* No. 12-CV-1424 ERK MDG, 2013 WL 6388624, at *9 (E.D.N.Y. Dec. 6, 2013) ("[T]he [contract's] limitations provision [relating to] 'legal action' . . . when read together with the arbitration provisions, must refer to arbitration rather than litigation."). *Cf. Doctor's Assocs.,* at 442 ("According to the arbitration clause, no party may take legal action against the other in connection with the franchise agreement without first attempting to arbitrate the dispute.").

[141] 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a).

[142] FAC ¶ 85 (citing 10 U.S.C. § 987(c)(1)(A); 32 C.F.R. § 232.6(a)(1)).

[143] FAC ¶ 86; *see also* FAC ¶ 60.

[144] FAC ¶¶ 90-91 (citing 32 C.F.R. § 232.9(c); 10 U.S.C. § 987(f)(3)).

[145] FAC ¶ 89 (citing 12 U.S.C. § 5536(a)(1)(B)).

collected on these void loans (and associated membership fees) because Defendants misrepresented their legal entitlement to demand and receive all principal, interest, and fees and misrepresented covered borrowers' legal obligation to pay the full amounts.[146] Defendants argue that Count Six fails to state a claim because it is predicated on nonexistent MLA violations. But this argument fails because, as demonstrated above, the FAC plainly states multiple separate MLA violations, any one of which is a sufficient predicate for Count Six.

### H. The Bureau requests permission to amend the FAC if the Court grants Defendants' motion as to any count in the FAC.

If the Court grants Defendants' motion as to any count in the FAC, the Bureau requests permission—consistent with the "usual practice" in this Circuit[147]—to amend the FAC to correct any identified deficiencies, including through amplification of factual allegations. Defendants' contention that such leave should be denied is baseless.

Although "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party,"[148] none of these circumstances is present here. After Defendants filed their original motion to dismiss[149] but before the Court ruled on that motion, the Bureau requested that Defendants stipulate to the filing of a FAC, which Defendants did based on an agreed-upon briefing schedule for the instant motion to dismiss.[150] The Bureau has not previously requested that the Court grant leave to amend, and the Court has not previously found a Bureau complaint to be deficient. No scheduling order has yet been entered. Accordingly, there is no basis to conclude that the Bureau has engaged in bad faith or dilatory tactics, that amendment of the FAC after a ruling on a motion to dismiss would unduly delay these

---

[146] FAC ¶¶ 92-94.
[147] *Golla v. Neovasc, Inc.*, No. 22-361-CV, 2023 WL 2469770, at *3 (2d Cir. Mar. 13, 2023).
[148] *Carroll v. Trump*, 590 F. Supp. 3d 575, 578 (S.D.N.Y. 2022) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d. Cir. 2007) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).
[149] ECF 56.
[150] ECF 64.

proceedings, or that Defendants have been or would be prejudiced. And as Defendants' original motion to dismiss was never ruled upon, there is no basis for Defendants' contention that the Bureau has previously failed to cure deficiencies by amendments or that amendment of the FAC would be futile.

## CONCLUSION

For these reasons, the Bureau respectfully requests that the Court deny Defendants' motion to dismiss.

Dated August 18, 2023          Respectfully submitted,
Eric Halperin
*Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

<u>/s/Maxwell Peltz</u>
Maxwell S. Peltz (CA Bar No. 183662)
*Admitted Pro Hac Vice*
Lane C. Powell (MI Bar No. P79432)
*Admitted Pro Hac Vice*
David Dudley (NY Reg. No. 3056546)
*Admitted Pro Hac Vice*
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Peltz): 415-633-1328
Telephone (Powell): 415-844-9784
Telephone (Dudley): 202-435-9284
Fax: 703-642-4585
maxwell.peltz@cfpb.gov
lane.powell@cfpb.gov
david.dudley@cfpb.gov
*Attorneys for the Consumer Financial Protection Bureau*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 18, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and that on the same date a true and accurate copy of the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

<u>/s/ Maxwell S. Peltz</u>
Maxwell S. Peltz
Attorney for Plaintiff
Consumer Financial Protection Bureau