UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                                     :
CONSUMER FINANCIAL PROTECTION BUREAU,                                :
                                                                     :
                                    Plaintiff,                       :
                                                                     :
                    -v-                                              :        22 Civ. 8308 (JPC)
                                                                     :
MONEYLION TECHNOLOGIES INC. *et al.*,                                :        OPINION AND ORDER
                                                                     :
                                    Defendants.                      :
                                                                     :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      An effective military requires not only guns and tanks, but a financially secure fighting

force as well. So in 2006, Congress enacted the Military Lending Act ("MLA") to protect active

duty servicemembers and their families from predatory lenders. Among other protections, the

MLA caps the annual percentage rate of interest for loans made to military borrowers at 36% and

leaves it to the Department of Defense to adopt regulations determining how that rate should be

calculated. The MLA also contains provisions aimed at protecting military borrowers' access to

the courts in the event of a dispute with their creditor, including restrictions on arbitration clauses

and legal notice provisions. And to keep military borrowers informed regarding their rights and

obligations, the MLA requires lenders to issue a host of financial disclosures when making loans.

      In this civil enforcement action, the Consumer Financial Protection Bureau (the "Bureau")

alleges that a group of companies collectively referred to as "MoneyLion" made loans to military

borrowers that violated the MLA and its implementing regulations. The Bureau also claims that

MoneyLion's lending practices negatively impacted consumers more broadly, and in doing so

violated the Consumer Financial Protection Act's ("CFPA") prohibition on unfair, deceptive, or abusive acts and practices.

Seeing things differently, MoneyLion moves to dismiss the Bureau's First Amended Complaint in full for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). According to MoneyLion, the Bureau's suit is based on an unconstitutional delegation of legislative power and premised in part on a regulation that itself violates the MLA. And even setting those issues aside, MoneyLion says, the Bureau has not plausibly described any way in which the company's lending practices actually ran afoul of the MLA or the CFPA.

For the reasons described below, the Court grants MoneyLion's motion as to Counts Two, Three, Four, and Five of the First Amended Complaint, and as to the portions of Count Six that depend on the same alleged violations underlying those Counts, and otherwise denies the motion. The Bureau may, if it chooses, file a second amended complaint, but only to fix its allegations regarding Count Five and the portion of Count Six that depends on the same alleged violations underlying Count Five.

## I. Background

### A. Statutory and Regulatory Background

This case involves two federal statutes, the MLA and the CFPA. Congress enacted the MLA in response to a report issued by the Department of Defense, which found that "[p]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." Dep't of Def., *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 53 (2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf (last visited March 24, 2025) (hereinafter "DoD

Report"); *see* John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 670, 120 Stat. 2083, 2266-69 (2006) (codified as amended at 10 U.S.C. § 987).

As requested by the Department of Defense, the MLA principally protects active duty servicemembers and their dependents by making it illegal for creditors to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to" those persons.  10 U.S.C. § 987(b); *see* DoD Report at 7.  By regulation, the term "consumer credit" means "credit offered or extended to a covered borrower primarily for personal, family, or household purposes." 32 C.F.R. § 232.3(f)(1).  The statute defines the term "interest" to include "all cost elements associated with the extension of credit," 10 U.S.C. § 987(i)(3), and similarly defines "annual percentage rate" to encompass "all fees and charges, including charges and fees for single premium credit insurance and other ancillary products sold in connection with the credit transaction," *id.* § 987(i)(4).  The MLA's definition of "annual percentage rate" also incorporates the definition of that term provided in Section 107 of the Truth in Lending Act ("TILA"), which provides in part:

> The annual percentage rate applicable to any extension of consumer credit shall be determined, in accordance with the regulations of the Bureau,
>
>> (1) in the case of any extension of credit other than under an open end credit plan, as
>>
>>> (A) that nominal annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed, calculated according to the actuarial method of allocating payments made on a debt between the amount financed and the amount of the finance charge, pursuant to which a payment is applied first to the accumulated finance charge and the balance is applied to the unpaid amount financed; or
>>>
>>> (B) the rate determined by any method prescribed by the Bureau as a method which materially simplifies computation while retaining reasonable accuracy as compared with the rate determined under subparagraph (A).

> (2) in the case of any extension of credit under an open end credit plan, as the quotient (expressed as a percentage) of the total finance charge for the period to which it relates divided by the amount upon which the finance charge for that period is based, multiplied by the number of such periods in a year.

15 U.S.C. § 1606(a); *see* 10 U.S.C. § 987(i)(4) ("The term 'annual percentage rate' has the same meaning as in [15 U.S.C. § 1606], as implemented by regulations of the Board of Governors of the Federal Reserve System.").[1]

The MLA makes the Department of Defense responsible for prescribing regulations that determine how to calculate the "annual percentage rate of interest" under Section 987(b). 10 U.S.C. § 987(h)(2)(B) (directing the Department of Defense to establish "[t]he method for calculating the applicable annual percentage rate of interest on such obligations, in accordance with the limit established under this section"); *id.* § 987(h)(1) ("The Secretary of Defense shall prescribe regulations to carry out this section.").

In July 2015, invoking that grant of rulemaking authority, the Department of Defense promulgated a regulation (the "2015 Rule") that specifies which cost elements should count toward Section 987(b)'s 36% cap, which the regulation refers to as the "military annual percentage rate," or "MAPR" for short. Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560 (July 22, 2015) (codified at 32 C.F.R. § 232); *see* 32 C.F.R. § 232.3(p) (defining the MAPR as "the cost of the consumer credit expressed as an annual rate"). As relevant to this case, the regulation provides that "[t]he charges for the MAPR shall include, as

---

[1] At the time of the MLA's enactment, the Board of Governors of the Federal Reserve System was responsible for promulgating regulations under TILA. As part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Congress amended TILA to transfer that authority to the Bureau. *See* Pub. L. No. 111-203, § 1100A(1)-(2), 124 Stat. 1376, 2107 (2010). Neither party has attributed any significance to the fact that Congress did not update Section 987(i)(4) to refer to regulations promulgated by the Bureau. *See* 10 U.S.C. § 987(i)(4) (2023).

applicable to the extension of consumer credit[,] . . . [a]ny fee imposed for participation in any

plan or arrangement for consumer credit." 32 C.F.R. § 232.4(c)(1)(iii)(C). The parties refer to

these charges as "participation fees." *See* Dkt. 69 ("Motion") at 2; Dkt. 70 ("Opposition") at 1.

The MLA affords protections to military borrowers beyond the 36% MAPR cap itself.

Among other things, the statute makes it unlawful for any creditor to extend a loan to a covered

borrower with respect to which "the creditor requires the borrower to submit to arbitration or

imposes onerous legal notice provisions in the case of a dispute," 10 U.S.C. § 987(e)(3), or "the

creditor demands unreasonable notice from the borrower as a condition for legal action," *id.*

§ 987(e)(4).[2] And in addition to preventing creditors from requiring covered borrowers to submit

---

[2] In full, Section 987(e) provides:

(e) Limitations.—It shall be unlawful for any creditor to extend consumer credit to
a covered member or a dependent of such a member with respect to which—

(1) the creditor rolls over, renews, repays, refinances, or consolidates any
consumer credit extended to the borrower by the same creditor with the
proceeds of other credit extended to the same covered member or a
dependent;

(2) the borrower is required to waive the borrower's right to legal recourse
under any otherwise applicable provision of State or Federal law, including
any provision of the Servicemembers Civil Relief Act (50 U.S.C. 3901 et
seq.);

(3) the creditor requires the borrower to submit to arbitration or imposes
onerous legal notice provisions in the case of a dispute;

(4) the creditor demands unreasonable notice from the borrower as a
condition for legal action;

(5) the creditor uses a check or other method of access to a deposit, savings,
or other financial account maintained by the borrower, or the title of a
vehicle as security for the obligation;

(6) the creditor requires as a condition for the extension of credit that the
borrower establish an allotment to repay an obligation; or

(7) the borrower is prohibited from prepaying the loan or is charged a
penalty or fee for prepaying all or part of the loan.

10 U.S.C. § 987(e).

to arbitration, the statute independently provides that notwithstanding the Federal Arbitration Act, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." *Id.* § 987(f)(4).

The second statute relevant to this case is the CFPA, through which Congress created the Bureau and defined its powers. The CFPA makes it unlawful for "any covered person . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). A "covered person" under the CFPA means "any person that engages in offering or providing a consumer financial product or service." *Id.* § 5481(6)(A). In turn, the statute defines the term "consumer financial product or service" to include credit loans that are "offered or provided for use by consumers primarily for personal, family, or household purposes," as well as collecting debt relating to any such loans. *Id.* § 5481(5)(A), (15)(A)(i), (15)(A)(x).[3] And finally, the CFPA includes as covered persons any affiliates of a covered person that provide material services to such person in connection with the offering or provision of a consumer financial product or service. *Id.* § 5481(6)(B), (26)(A).

The cornerstone of the CFPA is its grant of enforcement and rulemaking authority to the Bureau. As relevant here, that authority includes the power "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(a). The statute

---

[3] The term "consumer financial product or service" also includes, among other things, the following activities: "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer," 12 U.S.C. § 5481(15)(A)(iv); and "providing payments or other financial data processing products or services to a consumer by any technological means," *id.* § 5481(15)(A)(vii).

further authorizes the Bureau to "commence a civil action" seeking "all appropriate legal and equitable relief including a permanent or temporary injunction" against "any person [who] violates a Federal consumer financial law." *Id.* § 5564(a). In doing so, the Bureau "may act in its own name and through its own attorneys in enforcing any provision of [the CFPA], rules thereunder, or any other law or regulation, or in any action, suit, or proceeding to which the Bureau is a party." *Id.* § 5564(b). Finally, the Bureau "may compromise or settle any action if such compromise is approved by the court." *Id.* § 5564(c).

## B.    Factual Background[4]

MoneyLion[5] prides itself on making "financial products available to many families that would otherwise not have access to them from traditional banks," thereby giving "consumers, including military families, the opportunity to build their credit histories, their savings and their investments." Motion at 1.

---

[4] The following facts, which are assumed true solely for purposes of this Opinion and Order, are taken from the Bureau's First Amended Complaint, Dkt. 65 ("Am. Compl."). *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

[5] This Opinion and Order uses the designation "MoneyLion" to refer collectively to the following entities named as Defendants in this litigation: MoneyLion Technologies Inc., ML Plus, LLC, MoneyLion of Alabama LLC, MoneyLion of Arizona LLC, MoneyLion of California LLC, MoneyLion of Colorado LLC, MoneyLion of Connecticut LLC, MoneyLion of Delaware LLC, MoneyLion of Florida LLC, MoneyLion of Georgia LLC, MoneyLion of Idaho LLC, MoneyLion of Illinois LLC, MoneyLion of Indiana LLC, MoneyLion of Kansas LLC, MoneyLion of Kentucky LLC, MoneyLion of Louisiana LLC, MoneyLion of Maryland LLC, MoneyLion of Michigan LLC, MoneyLion of Minnesota LLC, MoneyLion of Mississippi LLC, MoneyLion of Missouri LLC, MoneyLion of Nevada LLC, MoneyLion of New Jersey LLC, MoneyLion of New Mexico LLC, MoneyLion of New York LLC, MoneyLion of North Carolina LLC, MoneyLion of North Dakota LLC, MoneyLion of Ohio LLC, MoneyLion of Oklahoma LLC, MoneyLion of Oregon LLC, MoneyLion of South Carolina LLC, MoneyLion of South Dakota LLC, MoneyLion of Tennessee LLC, MoneyLion of Texas LLC, MoneyLion of Utah LLC, MoneyLion of Virginia LLC, MoneyLion of Washington LLC, MoneyLion of Wisconsin LLC, and MoneyLion of Wyoming LLC. *See* Am. Compl. at 2.

Since late 2017, MoneyLion has offered consumer loans that require borrowers to be enrolled in its paid membership programs and pay regular membership fees. Am. Compl. ¶ 29. The first loan product of this type was MoneyLion's "ML Plus Loan," which was a twelve-month installment loan of $500 with an APR of 5.99%. *Id.* ¶ 30. To access the ML Plus Loan, consumers also had to enroll in the "ML Plus Membership Program" and pay a monthly membership fee of $29. *Id.* ("Only consumers who had paid the membership fee and were current on membership-fee payments could take out the ML Plus Loan."). Thus, consumers who received an ML Plus Loan were responsible both for making their monthly loan payment (usually around $43) as well as paying their monthly $29 membership fee. *Id.* ¶ 31. In addition, MoneyLion required ML Plus Loan borrowers to pay a separate monthly deposit of $50 that the company "used to partially secure the loan." *Id.*

In 2019, MoneyLion rebranded the ML Plus Loan as a "Credit Builder Loan." *Id.* ¶ 32. The Credit Builder Loan was "a 12-month installment loan of $500 to $1,000 at APRs between 5.99% and 29.99%." *Id.* Similar to the ML Plus Loan, consumers had to join MoneyLion's "Credit Builder Plus Membership Program" and pay a monthly membership fee of $19.99 to access the Credit Builder Loan. *Id.* But instead of making consumers pay an additional $50 monthly deposit, the terms of the Credit Builder Loan only disbursed a portion of the total loan amount upfront and deposited the remainder into a "credit reserve account," which was only released to the borrower once the loan had been fully paid off. *Id.* ¶ 33. MoneyLion has offered both its ML Plus Loan and its Credit Builder Loan to active duty servicemembers and their dependents as well as to the general public. *Id.* ¶¶ 29-30, 65.

MoneyLion's membership programs offered consumers little of value beyond the opportunity to take out loans. In addition to being able to take out loans, members were invited to

join an exclusive "Facebook Group" and received access to "credit-monitoring tools." *Id.* ¶ 49. MoneyLion also touted "monthly credit reporting," "automated deposits into investment account[s]," and "rewards" programs as further benefits offered under its membership programs. *Id.* ¶ 50 (alteration in original). The members-only Facebook Group, however, was later discontinued, and the credit-monitoring tools were included in free memberships as well until mid-2019. *Id.* ¶ 49. The monthly credit reporting feature and automated deposits were similarly lacking in substance: the former amounted to "nothing more than routine reporting to credit bureaus regarding a borrower's loan payments and account status," and the latter was "simply the means by which [MoneyLion] collected consumers' mandatory investment-account contributions—deposited into investment accounts to which consumers did not always have access." *Id.* ¶ 50. MoneyLion's rewards program, too, provided "little benefit to consumers" because it "simply offset (in some circumstances) part of consumers' monthly membership-fee obligation" and was often "not immediately available to consumers." *Id.* ¶ 51. And consumers whose memberships had been "suspended" could not earn any rewards, *id.*, despite still being charged the full monthly membership fee, *id.* ¶ 44.

While MoneyLion promised consumers at the outset that they could cancel their memberships for any reason, MoneyLion often made it difficult for them to do so. For example, MoneyLion "maintained a policy prohibiting consumers with unpaid loan balances from canceling their memberships." *Id.* ¶ 36. Even worse, MoneyLion did not allow many consumers to cancel their memberships if they had any prior unpaid membership fees—even if the loan itself had been paid off in full. *Id.* ¶¶ 37-38. And in some instances, MoneyLion would not release the funds in a consumer's investment or credit-reserve account—even after the loan had been paid off—if the borrower had unpaid membership fees. *Id.* ¶ 39.

All loan agreements that MoneyLion offered during this period contained an arbitration clause. *Id.* ¶¶ 57-59. Specifically, MoneyLion's arbitration provisions "requir[ed] that all claims arising from or relating to the loan contract or loan be resolved by binding arbitration." *Id.* ¶ 57. The loan agreements, however, contained a provision that allowed borrowers to opt-out of arbitration "by 'delivering a written notice' to a post office box address in Utah within 30 days of the date of the loan contract." *Id.* ¶ 58. If a borrower failed to do so, "they were precluded from filing a lawsuit in any court (other than small claims court) relating to their contract or loan." *Id.* ¶ 59. This arbitration provision did not carve out military borrowers until around August 2019. *Id.*

Prior to around August 2019, MoneyLion's loan agreements "also lacked disclosures required under the MLA." *Id.* ¶ 60 (citing 10 U.S.C. § 987(c); 32 C.F.R. § 232.6).

## C.  Procedural History

After investigating MoneyLion's lending practices, the Bureau filed this enforcement action against the company on September 29, 2022. Dkt. 1. Through its nine-count First Amended Complaint, the Bureau charges MoneyLion with offering loans to military borrowers that exceeded the 36% MAPR cap in violation of the MLA (Count One), Am. Compl. ¶¶ 61-67; requiring military borrowers to submit to arbitration in violation of the MLA (Count Two), *id.* ¶¶ 68-71; imposing onerous legal-notice provisions (in the form of the arbitration clause) in the case of a dispute in violation of the MLA (Count Three), *id.* ¶¶ 72-77; demanding unreasonable notice (again in the form of the arbitration clause) as a condition for legal action in violation of the MLA (Count Four), *id.* ¶¶ 78-83; failing to make certain required disclosures to military borrowers in violation of the MLA (Count Five), *id.* ¶¶ 84-87; engaging in deceptive acts and practices by seeking to collect on

loan agreements that are void under the MLA in violation of the CFPA (Count Six), *id.* ¶¶ 88-94;[6]

engaging in deceptive acts and practices relating to restrictions on membership cancellation in

violation of the CFPA (Count Seven), *id.* ¶¶ 95-101; engaging in unfair acts and practices relating

to charging membership fees after consumers requested cancellation in violation of the CFPA

(Count Eight), *id.* ¶¶ 102-110; and engaging in abusive acts and practices relating to the

membership-program loans in violation of the CFPA (Count Nine), *id.* ¶¶ 111-116.  The Bureau

seeks monetary and injunctive relief against MoneyLion based on these alleged violations, as well

as other forms of relief.  *Id.* at 32-33.

On July 11, 2023, MoneyLion moved to dismiss the First Amended Complaint in full.

Dkts. 68-69.  The Bureau opposed that motion on August 18, 2023, Dkt. 70, and MoneyLion

replied two weeks later, Dkt. 71 ("Reply").  Thereafter, the parties filed supplemental briefs

concerning the impact of the Supreme Court's recent decisions in *Loper Bright Enterprises v.*

*Raimondo*, 603 U.S. 369 (2024), and *Corner Post, Inc. v. Board of Governors of the Federal*

---

[6] Count Six is premised on the theory that MoneyLion continued to service and collect on loan agreements that, by virtue of the company's alleged violations of the MLA and its implementing regulations, were void under the statute.  Am. Compl. ¶¶ 88-94; *see* 10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c).  Specifically, Count Six is based on the following alleged violations:

(1) imposing MAPRs over 36%, 10 U.S.C. § 987(b); 32 C.F.R. § 232.4(b); (2) requiring covered borrowers to submit to arbitration, 10 U.S.C. § 987(e)(3); 32 C.F.R. § 232.8(c); (3) imposing onerous legal-notice provisions in the case of a dispute, *id.*; (4) demanding unreasonable notice from covered borrowers as a condition for legal action, 10 U.S.C. § 987(e)(4); 32 C.F.R. § 232.8(d); and (5) failing to make loan disclosures required by the MLA, 10 U.S.C. § 987(c); 32 C.F.R. § 232.6(a).

Am. Compl. ¶ 91.  Count Six therefore survives only to the extent that MoneyLion plausibly violated an underlying statutory or regulatory provision on which that count is based.

*Reserve System*, 603 U.S. 799 (2024), on MoneyLion's Motion.  Dkts. 88-89.[7]  The Court held

oral argument regarding MoneyLion's Motion on January 13, 2025.  *See* Dkt. 106.

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In other words,

the Rule 12(b)(6) plausibility standard requires factual allegations sufficient to "'raise a reasonable

expectation that discovery will reveal evidence' of the wrongdoing alleged."  *Citizens United v.*

*Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556).

These factual allegations, however, "must be enough to raise a right to relief above the

speculative level."  *Twombly*, 550 U.S. at 555.  Indeed, the plausibility standard requires "more

than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

Determining whether a complaint states a plausible claim is a "context-specific task that requires

the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Although

a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in

the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it "need not consider

conclusory allegations or legal conclusions couched as factual allegations," *Dixon v. von*

---

[7] On December 1, 2023, the Court stayed this action pending the Supreme Court's decision in *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024) ("*CFSA*").  Dkt. 80.  On May 30, 2024, following the Supreme Court's resolution of *CFSA* in the Bureau's favor, the parties filed a joint status letter in which MoneyLion withdrew its challenge to the constitutionality of the Bureau's funding structure.  Dkt. 86.

*Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).  As a result, a complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### III.  Discussion

Through its motion to dismiss, MoneyLion assails this enforcement action on a variety of grounds.  As to Counts Six through Nine, which charge the company with violations of the CFPA's prohibition on unfair, deceptive, or abusive acts and practices, MoneyLion argues that the statute unconstitutionally delegates legislative authority to the Bureau.  Motion at 10-12.  As to Count One and a portion of Count Six, which depend on whether MoneyLion's loans to military borrowers violated the 36% MAPR cap, the company argues that the 2015 Rule's treatment of participation fees is contrary to the MLA and is arbitrary or capricious.  *Id.* at 13-20.  And apart from those legal challenges, MoneyLion also contends for several reasons that the First Amended Complaint fails to plausibly allege that the company's lending practices violated either the MLA or the CFPA.  *Id.* at 20-35.  The Court addresses each argument in turn.

**A.    The Bureau's Authority to Enforce the CFPA Does Not Violate the Nondelegation Doctrine.**

MoneyLion begins by arguing that the CFPA unconstitutionally delegates legislative authority to the Bureau to "define what constitutes an unfair, deceptive, or abusive act or practice" and fails to cabin that discretion through an "intelligible principle."  *Id.* at 10.  In MoneyLion's view, that violation requires dismissal of Counts Six through Nine.  *Id.* at 12.  But because MoneyLion's challenge is directed at an exercise of the Bureau's executive authority, the nondelegation doctrine cannot support the dismissal of those claims.

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of

Representatives." U.S. Const. art. I, § 1. Implicit in Article I's vesting of lawmaking power in Congress is an understanding that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825)). But when federal agencies, though formally part of the executive branch, seek to implement federal statutes by promulgating "legislative rules" that purport to "have the force of law," they can be said to act in at least a quasi-legislative capacity. *Hill v. Del. N. Cos. Sportservice, Inc.*, 838 F.3d 281, 290 (2d Cir. 2016); *City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 312 (2013) (Roberts, C.J., dissenting). When Congress delegates authority to federal agencies to promulgate such regulations, the Supreme Court has therefore required it to "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (internal quotation marks omitted). Absent such a limiting principle, an agency's freewheeling enactment of rules that purport to govern regulated entities in a prospective manner would usurp the legislative function that Article I reserves exclusively to Congress.

Federal agencies, however, do not always (or even usually) act in a legislative capacity when implementing the statutes that Congress has enacted. For instance, Congress may—and by necessity must—authorize agencies to enforce substantive prohibitions contained in federal statutes, such as by commencing judicial proceedings for redress of past violations. *See Gundy*, 588 U.S. at 135 (explaining that Congress "may confer substantial discretion on executive agencies to . . . enforce the laws"). In that posture, the agency's role in implementing the statute is akin to "the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect." *United States v. LaBonte*, 520 U.S. 751, 762 (1997). And in doing so, the

agency exercises executive power to enforce preexisting statutory obligations, not Congress's power to enact prospective standards of conduct. *Cf. Greenlaw v. United States*, 554 U.S. 237, 246 (2008) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." (internal quotation marks omitted)).

An agency's exercise of enforcement discretion, to be sure, will be guided by the agency's policy objectives and informed by its view of what the statute requires of regulated entities. But even so, courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75 (internal quotation marks omitted); *see also Touby v. United States*, 500 U.S. 160, 165 (1991) ("Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors."). After all, "no statute can be entirely precise," and as a result "some judgments involving policy considerations[] must be left to the officers executing the law." *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting). And most importantly, the degree of policymaking and interpretation that necessarily informs an agency's decision to commence civil enforcement proceedings does not transform such a quintessentially executive action into an unconstitutional exercise of delegated legislative power. Accordingly, Congress's grant of authority to an agency to commence judicial proceedings for the enforcement of preexisting legal obligations imposed by a federal statute does not implicate the nondelegation doctrine. *See United States v. Bruce*, 950 F.3d 173, 175-76 (3d Cir. 2020) ("[T]he non-delegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power.").

Counts Six through Nine involve Congress's grant to the Bureau (and the Bureau's exercise) of executive—not legislative—power, so the nondelegation doctrine is irrelevant. The

Bureau initiated this suit pursuant to the CFPA's grant of "[l]itigation authority," which empowers the agency to "commence a civil action . . . seek[ing] all appropriate legal and equitable relief" for violations of federal consumer financial laws. 12 U.S.C. § 5564(a); *see also id.* § 5531(a). And as relevant to Counts Six through Nine, the Bureau seeks to enforce the substantive provisions of the CFPA itself—specifically its prohibition against unfair, deceptive, or abusive acts and practices—not any regulation that the Bureau promulgated pursuant to that statute. *See* Am. Compl. ¶¶ 88-116 (charging direct violations of 12 U.S.C. §§ 5531(a), 5531(c), 5531(d)(2)(A), 5531(d)(2)(B), 5536(a)(1)(B)).[8]

It may be true, as MoneyLion points out, that in bringing a case like this one the Bureau necessarily "claims for itself the authority first to define what qualifies as 'unfair, deceptive, or abusive,' and then to enforce its own definition of those open-ended terms." Motion at 12 (quoting 12 U.S.C. § 5531(a)-(b)). But as discussed above, whatever degree of legal interpretation and policymaking inheres in the Bureau's decision to file an enforcement action under the CFPA is no different in principle than the judgments any prosecutor must make in determining whether a given set of facts justifies a prosecution under the federal criminal laws. *See* U.S. Dep't of Just., *Justice Manual* § 9-27.220 (2023) (stating that a prosecutor should not file criminal charges unless the prosecutor determines that "the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction" and providing other discretionary grounds for declining prosecution). In adjudicating an enforcement action

---

[8] As noted, certain portions of Count Six rely on MoneyLion's alleged underlying violations of the Department of Defense's regulations implementing the MLA. *See* Am. Compl. ¶¶ 90-91. But MoneyLion does not challenge Congress's delegation of rulemaking authority to the Department of Defense, or the agency's exercise of that authority, on nondelegation grounds. Nor has MoneyLion advanced any argument that Count Six's partial reliance on the Department of Defense's regulations has any relevance to the question of whether the Bureau exercised legislative power in asserting that cause of action.

under the CFPA, a federal court, of course, will not defer to the Bureau's interpretation of the statute's substantive provisions any more than it would defer to the Department of Justice's view of what a criminal law means. But that is simply the merits issue of whether MoneyLion in fact violated the CFPA provisions it is being charged under, not a question of whether the nondelegation doctrine prevents the Bureau from bringing those claims in the first place.

In the end, the CFPA's grant of power to the Bureau to bring civil actions to enforce the statute's substantive provisions, just like Congress's grant of power to the Department of Justice to prosecute federal offenses, "is not a delegation of legislative power," and therefore the Bureau's filing of Counts Six through Nine "does not implicate the non-delegation doctrine." *Bruce*, 950 F.3d at 176. Accordingly, the Court declines to dismiss Counts Six through Nine on nondelegation grounds.

**B.    The 2015 Rule's Treatment of Participation Fees Does Not Violate the APA.**

Shifting gears, MoneyLion contends that the 2015 Rule is invalid and must be disregarded under the Administrative Procedure Act ("APA") because its inclusion of participation fees in the MAPR calculation is inconsistent with the language of the MLA and otherwise arbitrary or capricious. Motion at 13.

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although APA challenges to agency rules are often brought as pre-enforcement suits, *see generally Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967), the statute also makes agency action reviewable "in civil or criminal proceedings for judicial enforcement" like this case, 5 U.S.C. § 703. For the reasons described below, however, MoneyLion's APA challenges are unpersuasive.

### 1. The 2015 Rule's Inclusion of Participation Fees Is Consistent with the MLA.

The first prong of MoneyLion's APA challenge concerns the 2015 Rule's consistency (or lack thereof) with the text of the MLA—the statute it purports to implement.  It is well settled that "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (internal quotation marks omitted).  Under the APA, therefore, it "remains the responsibility of the court to decide whether the law means what the agency says." *Loper Bright*, 603 U.S. at 392 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring)).  So even when "the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395.  In doing so, courts must construe all relevant statutory provisions using the same "traditional tools of statutory construction" they would rely on in other contexts, while still observing "due respect for the views of the Executive Branch." *Id.* at 401-04.  The Court's task, therefore, is to determine whether the Department of Defense acted within "the boundaries of [its] delegated authority" under the MLA in promulgating the challenged portion of the 2015 Rule.  *Id.* at 395 (internal quotation marks omitted).

Under these principles, MoneyLion argues that the 2015 Rule's inclusion of participation fees in the MAPR calculation is inconsistent with the MLA's definition of "annual percentage rate." 10 U.S.C. § 987(i)(4).  As MoneyLion points out, the MLA provides that "[t]he term 'annual percentage rate' has the same meaning as in [15 U.S.C. § 1606], as implemented by regulations of the Board of Governors of the Federal Reserve System," 10 U.S.C. § 987(i)(4).  Motion at 13-14.  As described above, Section 1606, a section of TILA, provides a methodology for calculating the annual percentage rate of open and closed credit products that relies in part on a variable known as the "finance charge."  15 U.S.C. § 1606.  Section 1606 does not itself state which fees and

18

charges are included in the finance charge, but Regulation Z, which implements TILA, excludes "[f]ees charged for participation in a credit plan" from the total amount of the finance charge. 12 C.F.R. § 1026.4(c)(4). Accordingly, MoneyLion argues that because Regulation Z excludes participation fees from the amount of the finance charge used to calculate the annual percentage rate of credit products under Section 1606, the 2015 Rule's inclusion of such fees for purposes of calculating the MAPR contradicts the MLA's command that the term "annual percentage rate" have the "same meaning" as in Section 1606, 10 U.S.C. § 987(i)(4). Motion at 14-15.

The Bureau reads the statute differently.[9] In the Bureau's view, Section 987(i)(4) "merely indicates that the MAPR should be calculated using the same computational methodology as set

---

[9] According to MoneyLion, the Court must disregard the Bureau's construction of Section 987(i)(4) under the *Chenery* doctrine because the Department of Defense did not recite exactly the same interpretive arguments when it issued the 2015 Rule. Motion at 15-16; *see Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (per curiam) ("[I]f the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

The *Chenery* doctrine, however, only applies when a court is reviewing "a determination or judgment which an administrative agency alone is authorized to make." *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 119 (2d Cir. 2005) (quoting *Chenery*, 332 U.S. at 196); *see also Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) ("*Chenery* only limits judicial review of factual determinations or policy judgments that the agency alone is authorized to make." (cleaned up)); *RNS Servs., Inc. v. Sec'y of Lab., Mine Safety & Health Admin. (MSHA)*, 115 F.3d 182, 184 n.1 (3d Cir. 1997) (explaining that the *Chenery* doctrine does not apply when "no factual or other determination that Congress sought to 'exclusively entrust' to the [agency] is being intruded upon by the courts"). And *Loper Bright* made clear that in reviewing the consistency of an agency's regulation with the statute it purports to implement, "courts, not agencies, will decide '*all* relevant questions of law'" and directed courts going forward to "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 392, 394 (quoting 5 U.S.C. § 706). The *Chenery* doctrine, therefore, does not limit what interpretive arguments the Court may consider in determining the meaning of the MLA and assessing whether the 2015 Rule is consistent with that meaning.

In any event, the Department of Defense *did* rely on Section 987(i)(4), Section 987(i)(3), Section 987(h)(2)(B), and related provisions in promulgating the 2015 Rule, so there would be no *Chenery* problem with considering the Bureau's interpretive arguments regarding the effect of those provisions or its counterarguments to MoneyLion's reading thereof. *See* 80 Fed. Reg. at

forth in TILA and its implementing regulations" and therefore "has no bearing on what charges are included or excluded." Opposition at 8. The Bureau also points out that the second sentence of Section 987(i)(4) states that for purposes of that section, the term "annual percentage rate" "includes all fees and charges," 10 U.S.C. § 987(i)(4). Opposition at 9. That sentence, the agency says, "makes clear that, for purposes of calculating the MAPR, 'all fees and charges' may be included even if they would not be included under TILA." *Id.* at 8. MoneyLion, by contrast, maintains that the "all fees and charges" language refers solely to those cost elements that Regulation Z includes within the finance charge variable for purposes of TILA. Motion at 16 ("[T]he only plausible conclusion is that Congress intended 'all fees and charges' to include only those fees and charges that TILA and Regulation Z permit in the APR calculation . . . .").

Although MoneyLion's position that Section 987(i)(4)'s "same meaning" language incorporates Regulation Z's exceptions to the finance charge might be plausible in isolation, it is ultimately untenable in light of the text, structure, and context of the MLA as a whole.

To begin, the textual problem with MoneyLion's argument is that it loses sight of the language that Congress used in establishing the MLA's MAPR cap. In capping the MAPR at 36%, the MLA does not refer solely to the "annual percentage rate" as defined in Section 987(i)(4), but to the "annual percentage rate *of interest*." 10 U.S.C. § 987(b) (emphasis added). The Department of Defense's authority to implement the MAPR cap similarly refers to "[t]he method for calculating the applicable annual percentage rate *of interest*." *Id.* § 987(h)(2)(B) (emphasis added). And the MLA defines the term "interest" to include "all cost elements associated with the

---

43570 (referring to "the provisions that define 'annual percentage rate' and 'interest'" and to its rulemaking authority to establish "the method for computing the MAPR" as the legal basis for including participation fees); *see also id.* at 43581 & nn.195-199.

extension of credit" without textually or structurally tying that definition of interest back to the fees and charges included under TILA and Regulation Z. *Id.* § 987(i)(3).

The MLA's use of two separately defined terms to establish the MAPR cap and delegate rulemaking power to the Department of Defense indicates that Congress did not, as MoneyLion does, view Section 987(i)(4) as fully resolving the question of which cost elements are included in the MAPR calculation. And from a syntactical perspective, the use of the phrase "annual percentage rate" in conjunction with the phrase "of interest" suggests that Congress viewed the former as referring to a computational formula and the latter as referring to a set of cost elements that would be included in that calculation. Under that view, it is likely that the second sentence of Section 987(i)(4) does not, as MoneyLion says, function as a belt-and-suspenders clarification by Congress that the MAPR calculation is limited to those fees and charges included under TILA and Regulation Z, but was instead intended to make just the opposite point clear: that despite borrowing TILA and Regulation Z's computational formula, the MAPR's cost elements would *not* be so limited. Accordingly, a straightforward, harmonious reading of the MLA's text supports the Bureau's view that the Department of Defense has the authority to prescribe regulations that include cost elements in the method for calculating the MAPR even if those same cost elements would not be included under TILA and Regulation Z.

MoneyLion's reading of Section 987(i)(4) is also "at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (alteration and internal quotation marks omitted); *see also City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." (internal

quotation marks omitted)); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (explaining that courts are "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law" (internal quotation marks omitted)).

As noted, Congress expressly delegated authority to the Department of Defense to promulgate regulations that "establish . . . [t]he method for calculating the applicable annual percentage rate of interest" for loans covered by the MLA. 10 U.S.C. § 987(h)(2)(B). The parties agree, however, that Section 987(i)(4) means at least that the computational formula for the MAPR calculation must track the basic methodology provided by TILA and Regulation Z. *See id.* § 987(i)(4); Motion at 14-15; Opposition at 7-8. But if Section 987(i)(4) *also* means that the MAPR calculation can include only those fees and charges allowed under TILA and Regulation Z, it is difficult to see what, if anything, would remain of Congress's clear delegation of authority to the Department of Defense to "establish" the method for calculating the annual percentage rate of interest. *See Establish,* Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to institute (as a law)," "to bring into existence," or to "bring about, effect"). In other words, if MoneyLion is correct that TILA and Regulation Z essentially occupy the field of the MAPR definition both as to the computational formula and the permissible cost elements by virtue of Section 987(i)(4), there would have been little or nothing left for Congress to delegate to the Department of Defense under Section 987(h)(2)(B).

Adopting MoneyLion's reading of Section 987(i)(4) would therefore render Section 987(h)(2)(B) at least "insignificant," if not "inoperative." *Corley*, 556 U.S. at 314. And to be clear, "[t]he problem here is no odd word or stray phrase, which might have escaped Congress's notice," but an entire "subparagraph [that] is so evidently designed to serve a concrete function." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024). Without "clear evidence that Congress

intended [such] surplusage," courts will reject "an interpretation of [a] statute that would render an entire subparagraph meaningless." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018); *see also King v. Burwell*, 576 U.S. 473, 498 (2015) (explaining that "in every case [courts] must respect the role of the Legislature, and take care not to undo what it has done"). Indeed, courts are duty-bound to "identify and respect [congressional] delegations of authority" and must therefore assume that Congress intended express delegations of rulemaking power (like any operative statutory provision) to have genuine effect. *Loper Bright*, 603 U.S. at 404, 413 (stressing that "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation"). As a result, the Court will not lightly adopt a reading of Section 987(i)(4) that eviscerates the Department of Defense's statutorily designated role in implementing the MLA's MAPR cap.

The broader context of the MLA further counsels against an interpretation of the statute that would minimize, if not eliminate, the Department of Defense's role in implementing the MAPR cap. Congress enacted the MLA as part of Title 10's regulation of the "Armed Forces" under a subtitle referring to "General Military Law," and based the statute on a list of specific policy prescriptions set forth in the Department of Defense's report concerning the risk that predatory lending posed to military readiness and troop morale. *See* DoD Report at 4-9. It is therefore unsurprising that Congress vested primary authority for promulgating regulations to implement the MLA and its central safeguard, the MAPR cap, in the Department of Defense. *See* 10 U.S.C. § 987(h)(1) ("The [Department of Defense] shall prescribe regulations to carry out this section."); *id.* § 987(h)(2)(B) (directing the Department of Defense to "establish . . . [t]he method for calculating the applicable annual percentage rate of interest"); *id.* § 987(h)(2)(E) (authorizing

the Department of Defense to prescribe "[s]uch other criteria or limitations as the [agency] determines appropriate, consistent with the provisions of this section").

The agency responsible for implementing TILA's definition of "annual percentage rate," however, is not the Department of Defense, but the Bureau itself (and formerly, the Board of Governors of the Federal Reserve System). *See* 15 U.S.C. §§ 1602(b), 1606(a). So if MoneyLion is correct that Section 987(i)(4) conclusively resolves the question of which cost elements may be included in the MAPR calculation, then in effect the agency with primary authority for implementing one of the MLA's key protections for military borrowers is not the Department of Defense at all, but the Bureau. Instead of the Department of Defense exercising independent authority under Section 987(h)(2)(B) to determine what amounts should count towards the MAPR, the Bureau would in every instance have the final word by virtue of its rulemaking authority under TILA. Thus, under MoneyLion's interpretation, the Department of Defense would not simply have to "consult" with the Bureau regarding the MAPR cap as the MLA provides, 10 U.S.C. § 987(h)(3)(E), but to positively *yield* to it regarding that critical protection. Notwithstanding the Bureau's expertise in the realm of consumer finance, it is difficult to imagine that Congress would so completely subordinate the authority of the Department of Defense to the Bureau on the implementation of what is arguably the most important provision in a statute designed to protect military readiness and troop morale. *See* DoD Report at 9.

Taking a step back, there is nothing particularly surprising about the fact that the cost elements included in the MAPR calculation would be more expansive than those included under TILA and Regulation Z. The entire reason that Congress enacted the MLA in the first place was to provide an enhanced package of financial protections to military borrowers that are not available to consumers more broadly. Indeed, prior to the MLA's enactment, the Department of Defense

24

emphasized that additional statutory protections were necessary precisely *because* predatory lenders were targeting military borrowers through "schemes designed to circumvent existing laws." DoD Report at 4.

One type of scheme that the Department of Defense highlighted was lenders' use of additional fees and charges "to evade ceilings" imposed by law. *Id.* at 7. The Department of Defense was especially concerned that lenders could use such additional fees and charges to "indirectly" impose, charge, or collect rates that exceeded the 36% cap that it was asking Congress to enact through the MLA. *Id.* For that reason, the Department of Defense explained that the 36% cap "must include *all* cost elements associated with the extension of credit" and did not in any way suggest that Congress should limit the MLA to those fees and charges included under existing laws like TILA. *Id.* Congress adopted the Department of Defense's language verbatim in the MLA's definition of "interest," indicating that the MLA's MAPR cap was intended to sweep in a broader set of fees and charges than those included under TILA and Regulation Z. 10 U.S.C. § 987(i)(3) (defining "interest" to include "all cost elements associated with the extension of credit").

The Court does not pretend that the Bureau's reading of the MLA is perfect or that the statute is "a *chef d'oeuvre* of legislative draftsmanship." *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 320 (2014). Here, MoneyLion raises a fair point that under the Bureau's approach, there may be tension between Congress's delegation of authority to the Department of Defense to establish the method for calculating the MAPR and Section 987(i)(4)'s directive that "all fees and charges . . . *shall* be included in the calculation of the annual percentage rate." 10 U.S.C. § 987(i)(4) (emphasis added); Reply at 4. But as explained above, it is far from clear that the second sentence of Section 987(i)(4) operates as a limit on the Department of Defense's rulemaking authority, as opposed to a clarification that despite borrowing TILA's computational

formula, the MLA is not limited to the specific cost elements included under TILA and Regulation Z. This case is also not about whether the Department of Defense violated the MLA in *excluding* certain cost elements from the MAPR calculation, but whether it erred by *including* participation fees. So even if the Department of Defense was obligated to include every fee and charge in the MAPR calculation, that conclusion would not show that it was inconsistent with the text of the MLA for the Department to include participation fees for loan products of the sort that MoneyLion was allegedly offering.

At the end of the day, the Court must favor the interpretation of the MLA that does the least amount of violence to the statutory text and structure while furthering—rather than frustrating—the statute's manifest purpose. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) ("A textually permissible interpretation that furthers rather than obstructs the [statute's] purpose should be favored."). To that end, whatever awkwardness may remain in the second sentence of Section 987(i)(4) is surely preferable to dismissing the separate textual function of Section 987(i)(3)'s definition of "interest," reading the Department of Defense's role in implementing the MAPR cap out of the statute's structure, and ignoring the MLA's manifest purpose of preventing unscrupulous lenders from evading the MAPR cap by shifting the cost of credit to accompanying fees and charges.

Accordingly, the Court rejects MoneyLion's substantive APA challenge and holds that the 2015 Rule's inclusion of participation fees in the MAPR is consistent with the MLA.

## 2. MoneyLion's Arbitrary-or-Capricious Challenge Is Timely But Unpersuasive.

MoneyLion next argues that even if the 2015 Rule is consistent with the MLA, the Rule must be set aside because it is arbitrary or capricious. Motion at 17-20.

At the outset, the Bureau argues that the Court cannot reach the merits of MoneyLion's arbitrary-or-capricious challenge because that challenge is time barred. Opposition at 11; Dkt. 89

at 3-4.  As the Bureau points out, suits challenging agency action under the APA are subject to a six-year statute of limitations.  *See* 28 U.S.C. § 2401(a).  In its Opposition, the Bureau maintained that because more than six years had passed since the 2015 Rule was promulgated and because MoneyLion's arbitrary-or-capricious challenge is "procedural" in nature, that challenge is untimely.  Opposition at 11.  The Supreme Court, however, subsequently clarified that a claim subject to Section 2401(a) only "accrues when the plaintiff has the right to assert it in court—and in the case of the APA, that is when the plaintiff is injured by final agency action."  *Corner Post*, 603 U.S. at 804.  In the wake of *Corner Post*, MoneyLion argues that its challenge is timely because it first suffered injury under the 2015 Rule when it started offering the loans that are the subject of this enforcement action in late 2017, which is less than six years before it moved to dismiss this action.  Dkt. 88 at 3.

The statute of limitations, however, is irrelevant at this stage for a more fundamental reason than whether an APA arbitrary-or-capricious challenge is "substantive" or "procedural" in nature or the precise date when MoneyLion first became injured by the 2015 Rule.  Section 2401, titled "Time for commencing action against United States," provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  But this case does not involve a "civil action commenced against the United States."  *Id.*  It is instead an enforcement suit commenced *by* the Bureau *against* a private party in which no counterclaims have yet been asserted.  *See generally* Am. Compl.; *cf. United States v. Est. of Hage*, 810 F.3d 712, 720 (9th Cir. 2016) (applying Section 2401(a) to a counterclaim asserted under the APA).  Indeed, MoneyLion's APA challenge, which is presented solely as a basis for dismissal in a motion brought under Rule 12(b)(6) and seeks no relief beyond dismissal of parts of the instant suit, is neither a "civil action" nor a "right of action"

at all.  *See CTS Corp. v. Waldburger*, 573 U.S. 1, 16 (2014) (explaining that a "civil action" is a "civil suit stating a legal cause of action" (internal quotation marks omitted)); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 820 (6th Cir. 2015) (Sutton, C.J.) ("A 'right of action,' as understood when Congress enacted 28 U.S.C. § 2401(a), is a legal right to maintain an action, growing out of a given transaction or state of facts and based thereon." (emphasis and internal quotation marks omitted)). The Bureau's statute-of-limitations theory elides this basic point.

The Bureau is also wrong to suggest that if the six-year statute of limitations for MoneyLion to bring a pre-enforcement suit challenging the 2015 Rule has lapsed, MoneyLion would be barred from contesting the 2015 Rule as a defense to this later enforcement action. Opposition at 11; Dkt. 89 at 4 (the Bureau arguing that MoneyLion was "'injured' for purposes of the statute of limitations and could have brought suit at least as of . . . October 3, 2016").

The APA reflects a strong and well-settled presumption in favor of judicial review of agency action.  *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018).  Consistent with that presumption, the APA guarantees parties the right to challenge regulations in civil and criminal proceedings for their enforcement unless "prior, adequate, and exclusive opportunity for judicial review is provided by law." 5 U.S.C. § 703.  And when Congress has sought to overcome that default rule, it has typically done so through unmistakable language expressly precluding subsequent judicial review.  *See, e.g.*, 33 U.S.C. § 1369(b)(2) ("Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement."); *id.* § 2717(a) (similar); 42 U.S.C. § 7607(b)(2) (similar); *id.* § 9613(a) (similar).  Here, by contrast, nothing in the text or structure of Section 2401(a)—which, again, is the U.S. Code's default statute of limitations for suits against the United

States—suggests that a pre-enforcement APA challenge subject to its six-year time bar is the "exclusive opportunity for judicial review" of Department of Defense regulations. Accordingly, the status of MoneyLion's ability to challenge the 2015 Rule though an affirmative suit or counterclaim has no bearing on its right to do so through a motion to dismiss that seeks no relief beyond dismissal of portions of this enforcement action and asserts no legal right beyond the right to avoid civil liability predicated on an allegedly invalid regulation.

In support of its contention that Section 2401(a) can be applied to preclude a challenge to agency action raised as a pure defense, such as in a motion to dismiss, the Bureau leans on the Second Circuit's decision in *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286 (2d Cir. 2006). Opposition at 11 & n.24. But the Bureau's reliance on *Schiller* illustrates why courts "don't read precedents like statutes." *Herr*, 803 F.3d at 819. In that case, the Second Circuit quoted a statement by the D.C. Circuit that "challenges to the procedural lineage of agency regulations, whether raised by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an agency enforcement proceeding, will not be entertained outside the time period provided by statute." *Schiller*, 449 F.3d at 293 (quoting *JEM Broad. Co. v. Fed. Commc'ns Comm'n*, 22 F.3d 320, 325 (D.C. Cir. 1994)) (emphasis and alteration omitted).

Neither *Schiller* nor *JEM Broadcasting Co.*, however, involved the assertion of a statute of limitations to preclude a defendant from raising an APA challenge as ground for dismissal of an enforcement action against them. In *Schiller*, the Securities and Exchange Commission ("SEC"), as *amicus curiae*, suggested that the plaintiff in a private securities class action was too late in challenging a regulation that by its terms precluded the plaintiff's claim. *Id.* at 293 & n.7. The SEC, however, "[did] not specify what statute it [thought] might impose a time bar in [that] case," and the parties provided only "scant" briefing on the timeliness question, so the court declined to

resolve the issue. *Id.* at 293-94 & n.7. Meanwhile, in *JEM Broadcasting Co.*, the D.C. Circuit held that a petition seeking to attack the regulation that an adverse agency order was based on was untimely under the Hobbs Act. *JEM Broad. Co.*, 22 F.3d at 324-26; *see* 28 U.S.C. § 2344 ("Any party aggrieved by [a final order made reviewable under 28 U.S.C. § 2342] may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.").[10] Accordingly, neither *Schiller* nor *JEM Broadcasting Co.* provides any support for the Bureau's position that Section 2401(a) applies to an APA challenge presented as a pure defense to liability, like as a basis for dismissal under Rule 12(b)(6).[11] So because the Bureau has not identified any other applicable time bar, the Court addresses the merits of MoneyLion's arbitrary-or-capricious challenge.

Although MoneyLion's arbitrary-or-capricious challenge is not time-barred, it comes up short on the merits. As noted, a court must "hold unlawful and set aside agency action" determined

---

[10] It is noteworthy that the D.C. Circuit's comment that challenges to regulations raised "as a defense to an agency enforcement proceeding" could be time-barred was made in the context of the Hobbs Act, which vests "exclusive jurisdiction" in the courts of appeals "to determine the validity of" certain agency orders and rules and requires challenges to be brought within sixty days of their issuance. 28 U.S.C. §§ 2342, 2344; *see generally PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 10-28 (2019) (Kavanaugh, J., concurring). But regardless of whether the Hobbs Act's sixty-day review period precludes a defensive "challenge" to a covered order or rule in a later enforcement action, a question that the Supreme Court may provide insight on this term in *McLaughlin Chiropractic Associates v. McKesson Corp.*, No. 23-1226, no provision of federal law suggests a similar outcome with respect to defensive APA challenges that could have been brought as pre-enforcement actions subject to Section 2401(a)'s general six-year statute of limitations. *See* 5 U.S.C. § 703 ("Except to the extent that *prior, adequate, and exclusive* opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement." (emphasis added)).

[11] In a later case, *Sai Kwan Wong v. Doar*, the Second Circuit held that Section 2401(a)'s six-year statute of limitations had expired "regardless of the fact that [the plaintiff] now claims to raise the issue as a defense to defendants' enforcement of the regulation." 571 F.3d 247, 263 (2d Cir. 2009). *Sai Kwan Wong*, however, was a civil action by the regulated party against a federal agency. *See id.* at 250. So despite the plaintiff's attempt to escape the limitations period by characterizing his affirmative suit as raising a "defense," his APA claim fit comfortably within the plain language of Section 2401(a). *See id.* at 250-55, 263.

to be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). But the APA's requirement that agency action not be arbitrary or capricious is as deferential as it sounds: the "narrow" judicial review of an agency's substantive decisionmaking contemplated by the APA is only to "ensure[] that the agency has acted within a zone of reasonableness and . . . has reasonably considered the relevant issues and reasonably explained [its] decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Thus, a court will only find that the agency acted arbitrarily or capriciously if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024) (internal quotation marks omitted).

MoneyLion contends that the 2015 Rule's inclusion of participation fees in the MAPR calculation for credit products like the loans at issue in this case is arbitrary or capricious because the Rule excludes those same fees from the MAPR calculation for credit card accounts. Motion at 17; *compare* 32 C.F.R. § 232.4(c)(1)(iii) (generally including participation fees in the MAPR calculation for closed-end credit products), *with id.* § 232.4(d)(1) (excluding such fees from the MAPR calculation for credit card accounts). And the Department of Defense's explanation for that disparate treatment, MoneyLion says, cannot withstand scrutiny under the APA. Motion at 17; *see Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

31

The Court agrees with the Bureau that the Department of Defense's rationale for including participation fees in the MAPR calculation for closed-end credit products survives MoneyLion's arbitrary-or-capricious challenge.  In requiring participation fees to be included in the MAPR calculation through the 2015 Rule, the Department of Defense explained that "from the perspective of the covered borrower who is the focus of protection under [the MLA], the financial institution's own apportioning of revenue among the various 'fees' and 'interest' does not change the key fact that it is all part of an aggregate bundle of costs 'associated with the extension of credit.'"  80 Fed. Reg. at 43569 (quoting 10 U.S.C. § 987(i)(3) (defining the term "interest")).  As a result, the Department of Defense was worried that if participation fees "were to be excluded from the elements that must be included in the calculation of the MAPR," then lenders "would have a strong incentive to evade the interest-rate limit by shifting the costs of a credit product by offering an interest rate below that limit and imposing (or increasing) one or more of those fees."  *Id.* Similarly, the Department of Defense feared that unless fees like application and processing fees were accounted for, lenders would use them to "obtain revenue that replaces (or pre-funds) periodic interest revenue, particularly for a covered borrower whose creditworthiness is low."  *Id.* In essence, allowing unscrupulous lenders to bypass the MAPR cap through participation fees or similar charges would undermine the very reason Congress enacted the MLA in the first place, to "thwart high cost lending to Service members and their families."  *Id.* at 43570.  This rationale closely tracks one of the Department of Defense's requests for the MLA itself, which was to "include *all* cost elements associated with the extension of credit" so as to prevent lenders from "evad[ing]" the 36% cap by tacking on additional fees and charges.  DoD Report at 7.

The Department of Defense also set forth a lengthy explanation as to why it was requiring participation fees to be included in the MAPR calculation for closed-end loan products but not for

credit card accounts.  The Department of Defense explained that "unlike the vast majority of credit products that are amenable to straightforward pricing mechanisms relating to the cost of the funds borrowed[,] . . . credit provided through a credit card account can be provided subject to pricing mechanisms that, in part, account for the value of products or services delivered through the cardholder's use of the card itself." 80 Fed. Reg. at 43572.  In simpler terms, "the cost of the funds borrowed in a credit card account can be segregated from the fees that a creditor expressly ties to specific products or services for using the credit card itself," making it unnecessary to include such fees in the MAPR calculation itself.  *Id.*  At the same time, the Department of Defense warned that treating credit card accounts as identical to other types of credit products for purposes of which cost elements are included in the MAPR calculation "could result in unusually adverse consequences to both creditors and covered borrowers."  *Id.*  Finally, the Department of Defense acknowledged that credit card accounts "warrant special consideration under the MLA because comparable protections for consumers who use these products separately apply under the [Credit Card Accountability Responsibility and Disclosure Act of 2009 (the "CARD Act")]."  *Id.*

MoneyLion's attacks on the Department of Defense's reasoning are unpersuasive.  First, MoneyLion argues that the Department of Defense's view that participation fees for credit cards can "meaningfully be distinguished from the cost of borrowing itself" applies with equal force to other credit products.  Motion at 18 (quoting 80 Fed. Reg. at 43572).  But the Department of Defense explained why that is not so.  For instance, the Department of Defense observed that, "from a consumer's perspective," credit cards "generally are subject to periodic interest-rate charges (i.e., the cost of the funds borrowed), plus participation fees and transaction-based fees that may vary, depending on the consumer's use of the card."  80 Fed. Reg. at 43572.  As an example, the Department of Defense cited foreign transaction fees, which are "imposed upon the

covered borrower's own choices regarding the use of the card" and therefore "can be segregated from the interest charge that the creditor may impose for the funds loaned to make that purchase." *Id.* The Department of Defense explained that because borrowers would distinguish between the periodic interest owed on their actual purchases and other fees associated with their use of the credit card, including participation fees and the like in the MAPR calculation was not necessary in the credit card context. *See id.* By contrast, the Department of Defense explained that when it came to other credit products, borrowers would view such fees as "part of an aggregate bundle of costs 'associated with the extension of credit,'" and that there was therefore a risk that participation fees would be used to shift the cost of credit away from periodic interest in a manner that would effectively evade the MAPR cap. *See id.* at 43569 (quoting 10 U.S.C. § 987(i)(3)). This distinction, which is based in part on a plausible view of the perspectives of military borrowers and their reasonable expectations, is not arbitrary or capricious.

Second, MoneyLion assails the Department of Defense's reliance on the CARD Act on the ground that the Act "does not provide protections comparable to the [2015 Rule]." Motion at 19. As the Department of Defense explained, however, the CARD Act "generally prohibits a card issuer from opening a credit card account or increasing the credit limit on an existing account without considering the consumer's ability to repay the amount borrowed on the account." 80 Fed. Reg. at 43572. The CARD Act also "limits penalty fees on credit cards, including late-payment and over-the-limit fees," and further "limits the total amount of fees that may be charged on an account in its first year." *Id.* Although MoneyLion is correct that these protections do not parallel those provided in the MLA, it was not arbitrary or capricious for the Department of Defense to conclude that these "substantial," though asymmetrical, "protections to consumer-cardholders" lessened the need to apply the same restrictions applicable to other credit products to credit cards.

*Id.* So while reasonable minds may differ as to whether the CARD Act's protections adequately compensate for the exclusion of participation fees from the MAPR calculation for credit cards, the existence of that sort of substantive policy disagreement is not enough to render the Department of Defense's judgment arbitrary or capricious under the APA. *See Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016) (noting that a court's role in review for arbitrary or capricious action is "to ensure that the [agency] engaged in reasoned decisionmaking" and not "to render [a] judgment[] on which reasonable minds can differ").

Finally, MoneyLion fails to meaningfully address the Department of Defense's concern that applying the same standards to credit cards "could result in unusually adverse consequences to both creditors and covered borrowers" in that context. 80 Fed. Reg. at 43572. As the Department of Defense explained, requiring financial institutions to include participation fees in the MAPR calculation for credit card products would "likely" require them to "significantly restructure their current products, services, and pricing mechanisms when providing credit cards to Service members and their families—without a corresponding benefit to those covered borrowers." *Id.* MoneyLion suggests in passing that this concern "appl[ies] equally to other types of credit," Reply at 7, but that unsupported assertion does not demonstrate that the Department of Defense's reasoning was arbitrary or capricious.

What the record ultimately reveals is that there may have been a number of reasonable ways to "implement[] the protections of the MLA in a manner that balances the interests of limiting credit practices that have an adverse impact on covered borrowers without unduly impeding the availability of credit that is benign or beneficial to those borrowers." 80 Fed. Reg. at 43573. Some, like MoneyLion, may believe that it is unfair for the Department of Defense not to treat credit cards the same way as other credit products. And on the opposite end of the spectrum, some may

believe that in fact the relevant policy considerations "justify a wholesale exclusion from the definition of consumer credit for credit card accounts" and that the Department of Defense actually treated credit cards too harshly in generally subjecting them to the MLA. *Id.* at 43572. The Department of Defense ultimately adopted a middle position—providing a "qualified exclusion from the requirements relating to the computation of the MAPR for a credit card account for a fee that is both 'bona fide' and 'reasonable' for that type of fee" and only a temporary exemption for credit cards from the MLA's definition of "consumer credit." *Id.* at 43573.

In the end, it is not for this Court to say whether the Department of Defense struck the correct regulatory balance. Instead, what matters for this case is that MoneyLion has not shown that, in including participation fees in the MAPR calculation for the extension of consumer credit, the Department of Defense relied on any factors that Congress did not intend it to consider, entirely failed to consider the relevant issues, offered an explanation that runs contrary to the evidence, or reached a conclusion that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Am. Cruise Lines*, 96 F.4th at 286. And in light of the Department of Defense's plausible explanation for its decision not to include those same fees in the MAPR calculation for credit cards, MoneyLion has not demonstrated that the Department of Defense's chosen regulatory line was "patently unreasonable" or lacking in any "relationship to the underlying regulatory problem." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013) (internal quotation marks omitted) (holding that the agency "plainly satisfie[d]" the APA's standard where it sought to address the "most severe" aspect of the regulatory problem). Accordingly, the Court rejects MoneyLion's arbitrary-or-capricious challenge to the 2015 Rule.

**C.      The First Amended Complaint States a Plausible Claim for Relief on Most Counts.**

MoneyLion contends that regardless of whether its constitutional and APA-based challenges to the Bureau's enforcement action have merit, the First Amended Complaint fails to state any claim for relief.  Motion at 20-21.  MoneyLion points to a variety of alleged pleading defects, including that the Bureau fails to allege that the company's loans were made for consumer—as opposed to business—purposes, that the Bureau does not allege that any of MoneyLion's loans in fact exceeded the MAPR cap or that the arbitration clause in MoneyLion's loan agreements violated the MLA, and that the First Amended Complaint fails to identify any disclosure violations on MoneyLion's part.  *Id.* at 21-35.  For the reasons stated below, the Court concludes that the First Amended Complaint states a plausible claim for relief as to Counts One and Seven through Nine and as to portions of Count Six, but not as to Counts Two through Five and as to the portions of Count Six that rely on the same underlying violations as those four Counts.

> **1.    MoneyLion Plausibly Offered the Loans for Primarily Personal, Family, or Household Purposes.**

MoneyLion's first challenge to the First Amended Complaint's pleading sufficiency is also its broadest.  The company contends that the Bureau fails to plausibly allege that the loans at issue in this case were made for primarily personal, family, or household purposes, a prerequisite for each of the Bureau's causes of action under the MLA and the CFPA.  *Id.* at 21; *see* 32 C.F.R. § 232.3(f)(1) (defining "consumer credit" for purposes of the MLA and the 2015 Rule as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes"); 12 U.S.C. § 5481(5)(A) (defining a "consumer financial product or service" for purposes of the CFPA as a financial product or service that is "offered or provided for use by consumers primarily for personal, family, or household purposes").  According to MoneyLion, this pleading defect

requires the dismissal of every cause of action alleged in the First Amended Complaint. Motion at 23.

The Second Circuit has not developed a systematic test for determining whether a financial product is offered "primarily for personal, family, or household purposes" under the MLA or the CFPA. In construing similar language contained in analogous provisions of other federal statutes, however, most courts have understood the function of the "personal, family, or household purposes" language as distinguishing between loans made for consumer-oriented purposes (which are covered) from loans made for business, commercial, or similar profit-seeking reasons (which are not covered). *See, e.g.*, *Paushok v. Ganbold*, No. 21-964, 2022 WL 1421844, at *2-3 (2d Cir. May 5, 2022) (summary order) (construing the Fair Debt Collection Practices Act); *In re Cherrett*, 873 F.3d 1060, 1067-68 (9th Cir. 2017) (construing the Bankruptcy Code); *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 337-43 (S.D.N.Y. 2023) (construing the Electronic Fund Transfer Act); *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153-54 (E.D.N.Y. 2010) (construing TILA). And in determining whether a given debt or loan falls on the consumer or business side of the line, courts typically consider the totality of the circumstances surrounding the transaction, including the purpose of the transaction and its size. *See Mauro*, 727 F. Supp. 2d at 153.

Following this approach, the Court concludes that the Bureau has sufficiently alleged that the loans at issue were made primarily for personal, family, or household purposes. The First Amended Complaint targets MoneyLion's Credit Builder Loan program and its predecessor, the ML Plus Loan. Am. Compl. ¶¶ 30, 32. MoneyLion's branding of these loans, particularly the Credit Builder Loan, suggests an effort to appeal to consumers' personal financial goals as opposed to their entrepreneurial ambitions. Similarly, the perks that MoneyLion offered as part of its

38

membership programs—access to an exclusive Facebook Group, credit-monitoring tools, and a "rewards" program—are more suggestive of a consumer-oriented financial product than a business-oriented one.  And consistent with that focus, the amounts available to consumers under these loans were small: just $500 under the ML Plus Loan and $500 to $1,000 under the Credit Builder Loan, only a portion of which was disbursed at origination under the latter program.  *Id.* ¶¶ 30, 32-33.  These relatively modest loan amounts further indicate that the loans were not intended (either by MoneyLion or the borrowers who took them out) for business or other profit-seeking activities.  In addition, the First Amended Complaint alleges that many consumers paid for the required membership fees to access these loans "via recurring ACH withdrawals from their *personal* bank accounts," suggesting that the loans were not primarily for business purposes.  *Id.* ¶ 43 (emphasis added).  Finally, while the factual allegations in the First Amended Complaint suffice by themselves to plead that the loans at issue were offered primarily for personal, family, or household purposes, it is not lost on the Court that MoneyLion's very own Motion boasts that the company's membership programs "make[] financial products available to many families" and "give consumers, including military families, the opportunity to build their credit histories, their savings and their investments," while remaining conspicuously silent as to whether the company offered any business loans through those programs.  Motion at 1.

Accordingly, the Court concludes that the First Amended Complaint plausibly alleges that the loans at issue were made primarily for personal, family, or household purposes.  And because MoneyLion offers no further grounds for dismissal of Counts Seven through Nine other than the nondelegation issue discussed above, the Court denies its Motion as to those Counts.

### 2. The First Amended Complaint Plausibly Alleges that MoneyLion's Loans Exceeded the MAPR Cap.

MoneyLion next asserts that the First Amended Complaint fails to plausibly allege that the loans at issue in this case actually exceeded the 36% MAPR cap. Motion at 25. That contention has two parts. First, that the Bureau's pleading was required to identify specific loans that MoneyLion issued with an MAPR of more than 36%. *Id.* And second, that the membership fees MoneyLion charged in connection with the loans do not meet the regulatory definition of a participation fee, and therefore cannot be included in the MAPR calculation. *Id.* For the reasons discussed below, neither argument has merit.

### i. The Bureau Was Not Required to Identify Specific Loans that Exceeded the MAPR Cap.

Assuming that MoneyLion's membership fees are properly included in the MAPR calculation, the First Amended Complaint plausibly alleges that the company issued loans exceeding the 36% cap.

The First Amended Complaint alleges that the loans at issue were offered at APRs of up to 29.99%, Am. Compl. ¶¶ 30, 32, and that MoneyLion offered its membership program loans to military and non-military borrowers alike, *id.* ¶¶ 29, 65. The First Amended Complaint also alleges that anyone seeking to obtain such a loan was required to enroll in MoneyLion's membership program and pay a monthly membership fee that was as high as $29 for the ML Plus Loan and $19.99 for the Credit Builder Loan. *Id.* ¶¶ 30, 32. Those fees were almost as high as the monthly loan payments themselves. *Id.* ¶ 31. And MoneyLion required consumers to continue making those hefty membership payments throughout the duration of their loans. *Id.* ¶ 34 ("While a consumer had an active Membership-Program Loan, [MoneyLion] automatically renewed the consumer's membership and continued charging the monthly membership fee."); *id.* ¶ 36 ("[MoneyLion] maintained a policy prohibiting consumers with unpaid loan balances from

canceling their memberships."). Finally, the Bureau contends that the MLA and the 2015 Rule require the full amount of these membership fees be included in the MAPR calculation. *Id.* ¶¶ 63-65. The Bureau alleges that based on these facts, MoneyLion issued loans to military borrowers with MAPRs exceeding 36%. *Id.* ¶¶ 65-67.

Assuming that the Bureau's position regarding the inclusion of MoneyLion's membership fees is correct, these factual allegations, at minimum, demonstrate a reasonable expectation that discovery will turn up evidence supporting the Bureau's claim that MoneyLion offered membership program loans with MAPRs above 36%. *Id.* ¶ 66; *see Citizens United*, 882 F.3d at 380 (explaining that the plausibility standard requires only factual allegations sufficient to "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged" (quoting *Twombly*, 550 U.S. at 556)).

MoneyLion's contention that the Bureau, in addition to the facts described above, was required to identify specific loans and set forth evidence demonstrating with mathematical precision that they exceeded the MAPR cap is a nonstarter. In the lone case that MoneyLion cites in support of that proposition, the district court dismissed a Bureau complaint that did not allege any facts "tending to show that [industry] standards were violated" or that "consumers were injured or likely to be injured." *Consumer Fin. Prot. Bureau v. Intercept Corp.*, No. 16 Civ. 144 (RRE), 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) ("The complaint lacks factual allegations that would support a finding that [the defendant] interfered with consumers' ability to understand the terms of their dealings with [the defendant's] clients or that would support a finding that [the defendant] took unlawful advantage of consumers."). Here, by contrast, the First Amended Complaint is replete with factual allegations that provide a plausible account of how MoneyLion's

loans could have exceeded the 36% MAPR cap and how consumers were injured by the company's allegedly unlawful lending practices.

Neither Federal Rule of Civil Procedure 8, under which the Bureau need only "give [MoneyLion] fair notice of what the claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (alteration and internal quotation marks omitted), nor the MLA and the CFPA impose any heightened pleading requirement or require the Bureau, at this stage, to prove that specific loans exceeded the MAPR cap. *See Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 15 Civ. 5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) ("Defendants are incorrect that *Iqbal* and *Twombly* require the [Bureau] to identify specific consumers targeted by the payday lending scheme in order to survive a motion to dismiss. The CFPA does not require the [Bureau] to identify individual consumers in its complaint, and [Rule 8] does not require any plaintiff to identify the proof that undergirds a complaint's allegations."). Instead, whether the Bureau will be able to prove that MoneyLion in fact issued loans to military borrowers with MAPRs exceeding 36% is a matter for discovery. For now, it is enough that the First Amended Complaint plausibly alleges that MoneyLion issued loans to military borrowers that, when its membership program fees are included in the MAPR calculation, exceeded the MLA's 36% cap.

> ### ii. The First Amended Complaint Plausibly Alleges that the 2015 Rule Requires MoneyLion to Include Its Membership Fees Within the MAPR Calculation.

The Bureau's theory of how MoneyLion's loans exceeded the MAPR cap requires treating the company's membership program fees as participation fees under the 2015 Rule. Am Compl. ¶¶ 63-65. The provision of the 2015 Rule that the Bureau relies on states, in relevant part, that the MAPR calculation must include "[a]ny fee imposed for participation in any plan or arrangement

42

for consumer credit." 32 C.F.R. § 232.4(c)(1)(iii)(C). MoneyLion contends that its membership fees fall outside of this provision for two reasons, neither of which is persuasive.

First, MoneyLion argues that its membership fees are not "imposed" under Section 232.4(c)(1)(iii)(C). Because the term "imposed" is not specifically defined in either the MLA or the Department of Defense's regulations, that term is given its ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). But while it may be reasonable for MoneyLion to look to contemporaneous dictionaries as evidence of the ordinary meaning of "imposed," *see id.* at 566-67, its choice of definitions misses the mark.

In MoneyLion's view, "the 'ordinary, common-sense meaning' of 'imposed' necessarily incorporates force or authority, not merely an option." Motion at 27. So because "consumers voluntarily choose" to sign up for its membership program and the associated loan agreements, MoneyLion claims it does not "impose" the resulting fees on its consumers. *Id.* MoneyLion's force-or-authority interpretation of "imposed," however, fails to appreciate that because "many words have more than one ordinary meaning, one should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 187 (2d Cir. 2021) (cleaned up) (quoting Scalia & Garner, *supra*, at 70).

The relevant context here is consumer financial protection. Specifically, this case involves a regulation that implements a consumer protection statute by specifying the cost elements that must be included in an interest-rate calculation for loans made to military borrowers. The regulation prevents "creditors" from making loans to military borrowers that exceed the 36% MAPR cap, a term that generally encompasses any person who is "[e]ngaged in the business of extending consumer credit." 32 C.F.R. § 232.3(i)(1). And the creditors against whom the regulation is directed are, by and large, private financial institutions that lend money pursuant to

routine consumer contracts—not feudal armies that "levy" or "inflict" financial obligations on a helpless population through "force," Motion at 26-27 (quoting *Impose*, OED Online (3d ed. Dec. 2022); *Impose*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)), or federal judges who have the "authority," backed by the power of the executive branch, to mandate a criminal sentence, *see United States v. Martin*, 974 F.3d 124, 138 (2d Cir. 2020) (discussing the force-or-authority understanding of "impose" in the context of the First Step Act).  It therefore makes no sense to understand the 2015 Rule's use of "impose" to require a showing that the creditor used "force" or "authority"—beyond an ordinary assertion of their rights under a contract—to compel a consumer to pay the relevant fees.

Instead, common sense dictates that the 2015 Rule's use of the term "impose" is meant to refer to nothing more than a requirement under a credit agreement that obligates the consumer to pay the relevant fee or a creditor's assertion of a purported right to such fees.  That is the sense in which the term—when used in conjunction with financial terms like "fees," "charges," or "interest" and directed primarily at private parties—is used throughout the federal consumer financial protection laws and regulations, including in the MLA itself.  *See* 10 U.S.C. § 987(b) ("A creditor . . . may not *impose* an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member." (emphasis added)); *see also, e.g.*, 15 U.S.C. § 1693*l*-1(b); *id.* § 1647(e); *id.* § 1639(k); *id.* § 1637; *id.* § 1637a; *id.* § 1605(a); 12 U.S.C. § 2610; 12 C.F.R. § 226.4(a)-(c).  And under that common-sense, contextual understanding of the term, the First Amended Complaint contains ample allegations that MoneyLion "imposed" membership fees on consumers by including them as a contractual obligation in connection with its loan agreements and by asserting its purported contractual right to collect such fees.  *See, e.g.*, Am. Compl. ¶¶ 2-3, 29-35, 37-45.

44

MoneyLion also contends that its membership fees were not imposed "*for* participation in any plan or arrangement *for* consumer credit."  Motion at 28 (quoting 32 C.F.R. § 232.4(c)) (emphases added in Motion).  But the First Amended Complaint alleges at length that MoneyLion charged the membership fees "[w]ith a view to," "with the object or purpose of," or at least "as preparatory to" its offers of consumer credit under the ML Plus and Credit Builder programs, *id.* (quoting *For*, The American Heritage Dictionary of the English Language).  For instance, the Bureau alleges that borrowers were required to join MoneyLion's membership program and pay the accompanying membership fees to be eligible to take out the relevant loans.  Am. Compl. ¶ 29. The Bureau also alleges that MoneyLion automatically renewed borrowers' memberships and continued collecting membership fees while the borrower had an active loan.  *Id.* ¶ 34.  And MoneyLion allegedly maintained a policy of preventing borrowers with unpaid loan balances from canceling their memberships.  *Id.* ¶ 36.  These allegations are sufficient to raise a reasonable expectation that discovery will reveal evidence that MoneyLion's membership fees fell within the regulatory definition of a participation fee.

Pushing back, MoneyLion points out that, as alleged, its membership programs did offer some perks beyond the loans themselves.  Motion at 28-29.  The First Amended Complaint, however, plausibly alleges that those perks were illusory and largely served to obscure the true purpose of the membership fee, which was to facilitate the extension of consumer credit.  *See, e.g.*, Am. Compl. ¶¶ 49-51, 108, 115.  The regulation also does not say, as MoneyLion urges, that participation fees must be imposed "solely" or "exclusively" for a loan itself.  Motion at 28-29. To be sure, the Court does not rule out that there could be some point at which the existence of sufficient benefits beyond the loans themselves would undermine the Bureau's position regarding the purpose of the membership fees.  But MoneyLion's suggestion that a material portion of its

membership fees are attributable to products other than consumer loans—and hence must be deducted from the Bureau's MAPR calculation or otherwise show that the purpose of the fees was not to facilitate the loans—raises at most a factual issue not amenable to resolution at the pleading stage.

* * *

For these reasons, the First Amended Complaint plausibly alleges that MoneyLion issued loans to military borrowers that exceeded the 36% MAPR cap in the MLA and the 2015 Rule. The Court therefore denies MoneyLion's Motion as to Count One and the portion of Count Six that depends on that alleged violation.

### 3. The First Amended Complaint Does Not Plausibly Allege that MoneyLion's Arbitration Clause Violated the MLA.

MoneyLion also moves to dismiss Counts Two, Three, and Four of the First Amended Complaint, each of which alleges that MoneyLion's inclusion of an arbitration clause in its loan agreements violates a different provision of the MLA. Motion at 29-34.

Count Two alleges that MoneyLion's arbitration clauses violate the first part of Section 987(e)(3), which makes it unlawful for a creditor to include a provision in a loan agreement that "requires the borrower to submit to arbitration . . . in the case of a dispute," 10 U.S.C. § 987(e)(3). Am. Compl. ¶¶ 68-71. Count Three alleges that the same arbitration provisions violate the second part of Section 987(e)(3), which prevents creditors from imposing "onerous legal notice provisions in the case of a dispute," 10 U.S.C. § 987(e)(3). Am. Compl. ¶¶ 72-77. And Count Four alleges that the arbitration provisions separately violate Section 987(e)(4), which states that a loan agreement may not "demand[] unreasonable notice from the borrower as a condition for legal action," 10 U.S.C. § 987(e)(4). Am. Compl. ¶¶ 78-83. MoneyLion argues that its loan agreements, which allowed borrowers to opt out of arbitration within thirty days after signing the contract, did

46

not "require[] the borrower to submit to arbitration" under Section 987(e)(3). Motion at 30-31. And as for Counts Three and Four, MoneyLion argues that the arbitration provision is neither a "legal notice provision," 10 U.S.C. § 987(e)(3), nor a provision that requires "unreasonable notice . . . as a condition for legal action," *id.* § 987(e)(4). Motion at 31-34.[12]

### i. MoneyLion's Arbitration Clause Did Not Plausibly Violate the First Part of Section 987(e)(3).

According to the Bureau, the First Amended Complaint plausibly alleges that MoneyLion's loan agreements included "mandatory arbitration provisions" that unlawfully "require[d] the borrower to submit to arbitration . . . in the case of a dispute." 10 U.S.C. § 987(e)(3); *see* Opposition at 22-23. The Court disagrees.

To ascertain the meaning of Section 987(e)(3), the Court "begin[s] by examining the statutory text." *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011)). In relevant part, Section 987(e)(3)'s arbitration prohibition and its prefatory language provide: "It shall be unlawful for any creditor to extend consumer credit to a [military borrower] with respect to which . . . the creditor requires the borrower to submit to arbitration . . . in the case of a dispute." 10 U.S.C. § 987(e)(3). The statute does not define what it means to "require" arbitration, so the Court gives that term its ordinary meaning. *See Taniguchi*, 566 U.S. at 566. At the time of the MLA's enactment, as now, to "require" something in this context meant to "demand as necessary or essential" or to "impose a compulsion or command on." *Establish,* Merriam-Webster's Collegiate Dictionary (11th ed.

---

[12] Counts Two, Three, and Four implicate alleged conduct that is also prohibited under the MLA's implementing regulations through language nearly identical to that contained in the MLA itself. *Compare* 32 C.F.R. § 232.8(c)-(d), *with* 10 U.S.C. § 987(e)(3)-(4). Because the parties have not suggested that there are any material differences between the MLA and its implementing regulations in this regard, the Court focuses its analysis on the statute.

2003).  The question, therefore, is whether MoneyLion included a provision in its loan agreements that specified arbitration of disputes as necessary, essential, or compulsory, or otherwise imposed a compulsion or command on its borrowers to agree to submit their disputes to arbitration.

As described in the First Amended Complaint, MoneyLion's arbitration clauses do not fit that bill.  The Bureau alleges that MoneyLion's loan agreements "allow borrowers to reject the binding-arbitration provision by 'delivering a written notice' to a post office box address in Utah within 30 days of the date of the loan contract."  Am. Compl. ¶ 58.  The First Amended Complaint does not allege that borrowers would suffer any penalty under the loan agreements for opting out of arbitration or that MoneyLion otherwise leveraged any incentives or disincentives to compel borrowers to agree to its arbitration clause.  Accordingly, the borrower's agreement to submit to arbitration "was entirely voluntary" and "not a condition of" the extension of consumer credit under MoneyLion's loan agreements.  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16 Civ. 1900 (WHP), 2017 WL 3524682, at *8 (S.D.N.Y. Aug. 15, 2017) (alterations adopted and internal quotation marks and emphasis omitted), *rev'd on other grounds*, 990 F.3d 173 (2d Cir. 2021).  In other words, because MoneyLion's borrowers were "afforded a 30-day period to opt-out," "arbitration between the parties [was] not required" in connection with the extension of credit under its loan agreements.  *Singh v. Uber Techs. Inc.*, 235 F. Supp. 3d 656, 673 (D.N.J. 2017).  The plain meaning of Section 987(e)(3) therefore strongly supports MoneyLion's position.  *See Garrett v. Monterey Fin. Servs., LLC*, No. 18 Civ. 325 (JKB), 2018 WL 3579856, at *4 (D. Md. July 25, 2018) ("[T]he [loan agreement] does not '*require* the borrower to submit to arbitration' because the arbitration provision contains an opt-out clause." (quoting 10 U.S.C. § 987(e)(3))).

The Bureau's response to this straightforward reading of Section 987(e)(3) is unpersuasive.  The Bureau principally argues that because the loan agreements' "default terms required covered

borrowers to arbitrate," they fall within Section 987(e)(3)'s prohibition. Opposition at 22-23 (citing *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020)). To that end, the Bureau emphasizes that Section 987(e)'s "protections apply to the contract's terms at the time the creditor . . . extends consumer credit to a covered member or a dependent of such a member" and cannot be "undone by events after that extension." *Id.* at 23 (alterations adopted and internal quotation marks omitted). The Bureau further argues that "the MLA's arbitration prohibition is directed to the *terms* of the extension of credit at the time credit is extended, not on some future contingent event." *Id.* at 27. But the Bureau's focus on the default terms of MoneyLion's contracts and on the state of affairs at the moment credit is extended is self-defeating: The default, starting terms of the loan agreement made arbitration optional, and it is only by virtue of the "future contingent event" of thirty days elapsing with no opt out by the borrower that arbitration would later become mandatory—or "require[d]."

The Bureau also provides no basis for departing from Section 987(e)(3)'s plain meaning with respect to opt-out arbitration clauses. To that end, the Bureau principally argues that giving Section 987(e)(3) its plain meaning would "produce an absurd result, where an arbitration provision is lawful under subsection (e)(3) even though unenforceable under subsection (f)(4)." *Id.* at 23 (footnote omitted). As the Bureau explains, Section 987(f)(4) states that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable" against any military borrower protected under the statute. 10 U.S.C. § 987(f)(4). By its terms, Section 987(f)(4) applies to any contractual provision that purports to bind a military borrower to arbitration, regardless of whether the process by which that provision became an effective part of the contract was voluntary or not. Under MoneyLion's reading of the statute, Section 987(e)(3) therefore appears to allow what Section 987(f)(4) renders unenforceable: An arbitration provision

that, upon a military borrower's failure to opt out, purports to require that borrower to submit any disputes to arbitration. The Bureau urges the Court to avoid what it characterizes as this "absurd" result by reading Section 987(e)(3), like Section 987(f)(4), to extend to voluntary (or at least opt-out) arbitration agreements as well. Opposition at 23.[13]

A statute, however, "is not 'absurd' merely because it produces results that a court or litigant finds anomalous or perhaps unwise." *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019). Thus, "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Lockhart v. United States*, 546 U.S. 142, 146 (2005) (internal quotation marks omitted); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (explaining that courts "[do] not revise legislation . . . just because the text as written creates an apparent anomaly").

To the contrary, the canon that absurd results are to be avoided applies "only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 517 (2d Cir. 2017) (internal quotation marks omitted). Thus, the canon does not extend to "substantive errors arising from a drafter's failure to appreciate the effect of certain provisions." Scalia & Garner, *supra*, at 238. And although courts must consider a

---

[13] The Bureau also argues that MoneyLion's reading of Section 987(e)(3) renders that provision "largely inoperative and superfluous" given Section 987(f)(4). Opposition at 23. But under MoneyLion's interpretation, Section 987(e)(3) would continue to apply to mandatory arbitration clauses. And Section 987(e)(3) and Section 987(f)(4) operate in different ways: the former makes it unlawful to include mandatory arbitration clauses in covered loan agreements and subjects a violator to civil or criminal liability, whereas the latter renders such provisions unenforceable as against the borrower. There is therefore no superfluity problem with adopting a narrower reading of Section 987(e)(3).

provision's statutory context to determine its meaning and prefer interpretations that are consistent with the statute's structure as a whole, *Giovinco v. Pullen*, 118 F.4th 527, 531 (2d Cir. 2024), courts are not at liberty to rewrite the plain meaning of unambiguous statutory text to reach a result thought to be more consistent with the statute's structure or Congress's legislative objectives in enacting it.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.  It is beyond [a court's] province to rescue Congress from its drafting errors, and to provide for what [the court] might think . . . is the preferred result."  (internal quotation marks omitted)).

Under these principles, the Court finds no reason to depart from the plain meaning of Section 987(e)(3).  The practical result of holding that Section 987(e)(3) does not apply to opt-out arbitration provisions does not undermine the function of the MLA to the extent that the Bureau suggests.  Regardless of what Section 987(e)(3) prohibits, Section 987(f)(4) independently renders all arbitration agreements unenforceable as against military borrowers, guaranteeing that military borrowers who commence legal action will still have their day in court notwithstanding the voluntariness of any arbitration clause.  10 U.S.C. § 987(f)(4).  And creditors who attempt to mislead military borrowers regarding the enforceability of an opt-out arbitration clause will do so at their peril regardless of the scope of Section 987(e)(3).  *See, e.g.*, 12 U.S.C. § 5536(a)(1)(B) (making it unlawful for providers of consumer financial products and services "to engage in any unfair, deceptive, or abusive act or practice").[14]  It is therefore not the case that holding that Section 987(e)(3) does not apply to opt-out arbitration agreements as such will open the floodgates to the

---

[14] At the time of the MLA's enactment, similar enforcement avenues would have been available under the Federal Trade Commission Act and related statutes.  *See, e.g.*, 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.").

deceptive inclusion of such provisions in loan agreements with military borrowers or eviscerate those borrowers' access to the courts. Indeed, MoneyLion itself eventually exempted military borrowers from its opt-out arbitration clauses. Am. Compl. ¶ 57; Opposition at 25. So at most, it appears that Congress simply "fail[ed] to appreciate the effect" of the different language that it used in Section 987(e)(3) compared to Section 987(f)(4). Scalia & Garner, *supra*, at 238.

Relying on the MLA's legislative history, the Bureau next urges that interpreting Section 987(e)(3) to cover opt-out arbitration agreements would better serve the MLA's purpose of protecting military borrowers' access to the courts. *See* Opposition at 24. For instance, the Bureau warns that "notwithstanding the unenforceability of such a provision, it would have the effect of deterring covered borrowers from seeking the judicial redress that the MLA intended to protect." *Id.* The Supreme Court, however, has made clear that "even the most formidable argument concerning [a] statute's purposes could not overcome the clarity [of] the statute's text." *Nichols v. United States*, 578 U.S. 104, 112 (2016) (internal quotation marks omitted). So while it might be true that interpreting Section 987(e)(3) to cover voluntary arbitration agreements would better serve Congress's purpose of protecting the legal rights of military borrowers, that alone cannot justify a departure from the plain meaning of the provision's text. *See Env't Prot. Agency v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508-09 (2014) ("However sensible (or not) [an alternative reading], a reviewing court's task is to apply the text of the statute, not to improve upon it." (alterations adopted and internal quotation marks omitted)). And as noted, military borrowers still remain fully protected from the substantive legal effect of arbitration clauses by virtue of Section 987(f)(4), and giving Section 987(e)(3) its plain meaning is by no means a license for creditors to mislead military borrowers regarding the enforceability of such provisions.

The Bureau also argues that Section 987(e)(3)'s prohibition on required arbitration must be "construed within the context of the statute's other safeguards against creditor-imposed barriers to judicial redress," such as the second part of Section 987(e)(3) and Section 987(e)(4).  Opposition at 25; *see* 10 U.S.C. § 987(e)(3) (preventing creditors from "impos[ing] onerous legal notice provisions in the case of a dispute"); *id.* § 987(e)(4) (preventing creditors from "demand[ing] unreasonable notice from the borrower as a condition for legal action").  In the Bureau's view, "[t]hese provisions make clear that Congress intended to prohibit any contractual barriers to covered borrowers' access to the courts."  Opposition at 25.  But if anything, these provisions (neither of which refers to arbitration at all) suggest that Congress only sought to prohibit "onerous" and "unreasonable" contractual barriers to military borrowers' access to the courts. 10 U.S.C. § 987(e)(3), (e)(4).  These provisions, therefore, cannot justify expanding the first part of Section 987(e)(3) beyond the plain meaning of its text.

Finally, the Bureau relies on a decision by the Fourth Circuit in the TILA context that "prohibited a mortgage lender's attempt to compel arbitration—even though the arbitration provision contained an opt-out clause."  Opposition at 25 (citing *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180 (4th Cir. 2022)).  But in *Lyons*, the Fourth Circuit declined to resolve whether a provision of TILA (15 U.S.C. § 1639c(e)(1)) that in some ways resembles Section 987(e)(3) rendered an opt-out arbitration clause unenforceable because another provision of TILA did so already.  26 F.4th at 186.[15]  *Lyons* did not consider the meaning of the term "requires" as used in

---

[15] In full, Section 1639c(e)(1) provides:

No residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction.

Section 1639c(e)(1), and the result of *Lyons* (that the opt-out arbitration provision was ineffective to compel arbitration) is consistent with the result of the Court's analysis here in light of Section 987(f)(4). *Lyons* therefore does not suggest a different outcome in this case.

Apart from these arguments, the Bureau presents no other basis for reading Section 987(e)(3), contrary to its plain meaning, to cover arbitration clauses with opt-out provisions.[16] Accordingly, the Court holds that Section 987(e)(3)'s prohibition on agreements that "require[]" military borrowers to submit to arbitration does not reach MoneyLion's arbitration clauses as described in the First Amended Complaint.

### ii. MoneyLion Did Not Plausibly Violate the Second Part of Section 987(e)(3) or Section 987(e)(4).

The Bureau also maintains that MoneyLion's inclusion of an arbitration clause with an opt-out provision in its loan agreements "impose[d] onerous legal notice provisions in the case of a dispute," 10 U.S.C. § 987(e)(3), and "demand[ed] unreasonable notice from the borrower as a condition for legal action," *id.* § 987(e)(4). The Court still disagrees with the Bureau.

Beginning again with the text, the Court agrees with MoneyLion's observation that Counts Three and Four "are best described as square pegs in round holes." Reply at 13. Section 987(e)(3) refers to provisions that require legal notice *in the case of a dispute*. Yet as pleaded, the opt-out provision in MoneyLion's arbitration clauses required notice independently of whether any dispute had arisen, and the required notice only concerned the borrower's desire to be bound by the arbitration clause *ex ante*, not any information concerning a concrete dispute with the creditor.

---

15 U.S.C. § 1639c(e)(1).

[16] The Court observes that the MLA exposes creditors to potential criminal liability for violating Section 987(e). *See* 10 U.S.C. § 987(f)(1) ("A creditor who knowingly violates this section shall be fined as provided in title 18, or imprisoned for not more than one year, or both."). Although this case presents no occasion to consider the rule of lenity as such, the criminal nature of the MLA presents one additional reason to prefer a natural reading of the statute's text.

Am. Compl. ¶ 58.  The Bureau's theory under Section 987(e)(4) fares no better, for the Bureau identifies no legal authority holding that a thirty-day opt out requirement is "unreasonable" within the meaning of the statute or in analogous contexts.  To the contrary, courts have generally treated arbitration clauses with similar time-limited opt-out provisions as providing consumers a meaningful degree of choice regarding their legal rights.  *See, e.g.*, *Singh*, 235 F. Supp. 3d at 675 (collecting cases).  And in the Fair Credit Reporting Act context, the Bureau's own regulations define as "reasonable" the right to opt out of affiliate marketing within thirty days.  12 C.F.R. § 1022.24(b)(1).  In the end, the First Amended Complaint pleads no facts regarding MoneyLion's opt-out provision that render it onerous or unreasonable within the meaning of the statute.[17]

In an effort to show how a fairly standard thirty-day opt-out provision in an arbitration agreement is "onerous" or "unreasonable," the Bureau argues that once a dispute has arisen (which the Bureau assumes would generally happen more than thirty days after signing the loan agreement), it will be impossible for a borrower to go back in time to opt out of arbitration, thereby making the thirty-day notice requirement onerous and/or unreasonable.  Opposition at 28 ("[B]y the time of a dispute, [the] deadline for mailing the notice would in most cases have passed or been days from passing, making it impossible or nearly impossible for borrowers to access the courts").  The Court rejects this argument, which would seem to imply that thirty-day opt-out provisions,

_____

[17] The Bureau suggests that military borrowers, strictly speaking, had less than thirty days to opt out because MoneyLion's loan agreements required that the notice be *received* within thirty days.  Opposition at 28.  The Bureau, however, cites no authority holding that a date-of-receipt approach is unreasonable in the context of a thirty-day opt-out provision, and the Court disagrees that MoneyLion's adoption of such an approach would plausibly deprive military borrowers of a reasonable opportunity to exercise their decision to opt out given the duration of the opt-out period in this case.  The Bureau also suggests in passing that the opt-out provision was onerous and unreasonable because it was presented "as a provision within a larger loan contract."  Opposition at 28.  But the First Amended Complaint alleges no facts regarding the presentation of the provision that make it onerous or unreasonable.

which courts have found are capable of providing consumers with a reasonable degree of choice, are *per se* "onerous" or "unreasonable" under the MLA by virtue of the fact that borrowers cannot retroactively opt out once a dispute arises.

The MLA's structure casts serious doubt on the Bureau's view that Congress so circuitously intended the second part of Section 987(e)(3) and Section 987(e)(4) to prohibit thirty-day opt-out provisions in arbitration clauses. In general, when Congress addresses a discrete problem through specific language in one part of a statute, it is safe to assume that it did not also intend to address that same issue through more general provisions included in the same enactment. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (explaining that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment" (alteration in original) (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932))). And that is especially true when the provisions "'are interrelated and closely positioned, . . . in fact being parts of' the same statutory scheme." *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 103 F. Supp. 2d 495, 503 (D. Conn. 2000) (quoting *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam)).

In enacting the MLA, Congress was well aware of the Department of Defense's concern that mandatory arbitration provisions could unduly limit military borrowers' access to the judicial system. *See, e.g.*, DoD Report at 51. And Congress "targeted [that] specific problem[] with specific solutions," *Maracich v. Spears*, 570 U.S. 48, 66 (2013) (internal quotation marks omitted), outlawing contractual provisions requiring military borrowers to arbitrate in the first half of Section 987(e)(3) and rendering arbitration provisions unenforceable as against military borrowers through Section 987(f)(4). This demonstrates that when Congress intended to curtail the use of

arbitration in the MLA, it did so through explicit, bespoke provisions that clearly targeted the issue of arbitration. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-53 (2002); *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1113 (5th Cir. 2024). That Congress acted expressly when addressing arbitration in the MLA is unsurprising, since Congress ordinarily speaks in clear terms when placing limits on the use, design, or enforceability of arbitration agreements. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018) (citing the first half of Section 987(e)(3) as one such example). So given the specificity with which the MLA deals with the subject of arbitration in the first half of Section 987(e)(3) and in Section 987(f)(4), it is unlikely that Congress intended through the orthogonal language of the second half of Section 987(e)(3) and Section 987(e)(4), neither of which by its terms refers to arbitration in any way, to ban thirty-day front-end opt-out provisions in arbitration agreements as inherently "onerous" or "unreasonable" under the Bureau's creative logic. 10 U.S.C. § 987(e)(3) (making unlawful, in its second half, "onerous legal notice provisions in the case of a dispute"); *id.* § 987(e)(4) (prohibiting terms requiring "unreasonable notice from the borrower as a condition for legal action").

The Bureau does not identify any strong textual, structural, or other basis for inferring that either the second half of Section 987(e)(3) or Section 987(e)(4) was intended to effect such a ban on front-end opt-out provisions in arbitration agreements. Instead, it is far more natural to understand the first half of Section 987(e)(3) and Section 987(f)(4) as the MLA's exclusive pronouncements on the subject of agreements to arbitrate, and to read the second half of Section 987(e)(3) and Section 987(e)(4) as dealing with legal notice requirements—such as notice-of-claim, notice-of-breach provisions—or other provisions restricting a borrower's exercise of his

legal rights, that may sometimes be included in consumer contracts.[18]  And the Bureau does not plausibly allege that MoneyLion required borrowers to provide the company with any form of onerous notice once a concrete dispute had arisen (including as a condition for pursuing judicial action or arbitration), that MoneyLion required unreasonable notice prior to exercising other legal rights, or that MoneyLion's thirty-day, front-end opt-out provision did not give borrowers a meaningful degree of choice.  Thus, MoneyLion did not plausibly violate the second part of Section 987(e)(3) or Section 987(e)(4).

* * *

For these reasons, the Bureau has not plausibly alleged that MoneyLion violated Section 987(e)(3) or Section 987(e)(4).  The Court therefore grants MoneyLion's Motion as to Counts Two, Three, and Four.  The Court also dismisses Count Six to the extent that it depends on the underlying violations of the MLA alleged in those Counts.

### 4.  The First Amended Complaint Does Not Provide Enough Facts About MoneyLion's Alleged Disclosure Violations.

Count Five of the First Amended Complaint alleges that MoneyLion "made loans to covered borrowers without making all loan disclosures required by the MLA" and its implementing regulations.  Am. Compl. ¶ 86.  The MLA requires creditors to disclose: (1) "[a] statement of the annual percentage rate of interest," (2) "[a]ny disclosures required under [TILA]," and (3) "[a] clear description of the [borrower's] payment obligations."   10 U.S.C. § 987(c). Similarly, under the MLA's implementing regulations, creditors must disclose: (1) "[a] statement of the MAPR," (2) "[a]ny disclosure required by Regulation Z," and (3) "[a] clear description of

---

[18]  That is not to say, of course, that the second half of Section 987(e)(3) and Section 987(e)(4) can never apply to issues relating to arbitration, only that the Court does not construe those provisions as separately prohibiting front-end opt-out provisions in arbitration clauses as such.

the [borrower's] payment obligation." 32 C.F.R. § 232.6(a). MoneyLion argues that Count Five must be dismissed for failure to state a claim because the First Amended Complaint "nowhere alleges which disclosures MoneyLion supposedly failed to make." Motion at 34. The Court agrees.

The First Amended Complaint identifies the relevant statutory and regulatory provisions, but never reveals which disclosures were allegedly missing from MoneyLion's loan agreements. *See, e.g.*, Am. Compl. ¶ 1 (alleging that MoneyLion "failed to give requisite disclosures," without stating which ones); *id.* ¶ 60 (alleging that MoneyLion's "loan contracts . . . lacked disclosures required under the MLA," but without stating which disclosures were missing); *id.* ¶ 85 (accurately stating that the "MLA requires creditors that extend consumer credit to covered borrowers to make certain loan disclosures," including "a statement of the MAPR," while stopping short of explaining how MoneyLion violated these rules); *id.* ¶ 86 (alleging that MoneyLion "made loans to covered borrowers without making all loan disclosures required by the MLA," with no factual elaboration).

The Bureau counters that its nondisclosure claim is well pleaded since the First Amended Complaint "plainly references the required disclosures—including, specifically, the required statement of MAPR." Opposition at 33 (citing Am. Compl. ¶¶ 85-86). But that rejoinder only highlights the First Amended Complaint's pleading defect; that is, its failure to allege how MoneyLion's disclosures fell short of what the MLA and its implementing regulations require beyond a "formulaic recitation" of what the required disclosures are. *Twombly*, 550 U.S. at 555. Indeed, courts regularly find that nondisclosure claims brought under analogous statutes like TILA fail to plausibly state a claim for relief where the complaint does no more than identify the relevant statute and assert that the defendant's disclosures fell short in some respect. *See, e.g.*, *Bocci v. Nationstar Mortg. LLC*, No. 23 Civ. 1780 (JPC) (KHP), 2024 WL 4326932, at *9 (S.D.N.Y. Sept.

27, 2024) (dismissing a TILA claim where the plaintiff did not "allege what information required to be disclosed Defendants failed to supply"); *Rosario v. Santander Consumer USA*, No. 22 Civ. 10565 (LTS), 2023 WL 35239, at *3 (S.D.N.Y. Jan. 3, 2023) (dismissing a TILA claim where it was "unclear from [the plaintiff's] allegations . . . what information [the defendant] failed to disclose"); *Estes v. Toyota Fin. Serv.*, No. 14 Civ. 1300 (JFB), 2015 WL 3830350, at *6 (E.D.N.Y. June 22, 2015) (explaining that a "conclusory statement that defendant failed to provide [the plaintiff] with sufficient disclosure does not state a plausible claim under . . . TILA").

Although the Court can surmise that the Bureau probably intended to allege at least that MoneyLion failed to disclose the correct MAPR figure, the Court cannot supply that missing allegation itself. And even if it could, the Bureau's pleading would still "leave[] MoneyLion (and the Court) guessing whether the MAPR disclosure is the only disclosure at issue" in Count Five. Reply at 15. As pleaded, the First Amended Complaint therefore falls short of plausibly alleging the Bureau's nondisclosure claim. Thus, the Court dismisses Count Five and dismisses Count Six to the extent that it is based on the same violations alleged in Count Five.

## D.    **Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Bureau has asked the Court for leave to further amend its pleading "to correct any identified deficiencies, including through amplification of factual allegations." Opposition at 34. The Court agrees that as to Count Five, the deficiencies identified above could well be fixed through additional factual allegations that identify with a greater degree of clarity which disclosures MoneyLion is alleged not to have provided and the circumstances of such nondisclosure. The Bureau, however, gives no indication as to how the deficiencies identified in its theories of liability under Counts Two, Three, and Four

could be cured through further amendment. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) ("[D]enial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." (internal quotation marks omitted)).

Accordingly, the Court grants the Bureau leave to further amend its pleading as to its nondisclosure allegations in Count Five and the portion of Count Six that is based on that alleged nondisclosure, but not as to Counts Two, Three, and Four.

### IV. Conclusion

For these reasons, the Court grants MoneyLion's Motion as to Counts Two through Five, and as to Count Six only to the extent that it is based on the same alleged violations underlying those Counts, and otherwise denies the Motion. The Bureau may, if it wishes, file a second amended complaint on or before April 23, 2025, addressing the identified pleading deficiencies in Count Five and the related allegations in Count Six. Alternatively, if the Bureau would prefer to get this litigation underway without Count Five and the corresponding portion of Count Six, it shall so notify the Court by April 7, 2025, in which case MoneyLion's answer to the First Amended Complaint shall be due on April 28, 2025. The Court also lifts the stay of this case and respectfully directs the Clerk of Court to terminate the motion pending at Docket Number 68.

SO ORDERED.

Dated: March 24, 2025
New York, New York

JOHN P. CRONAN
United States District Judge