UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

                                                             :

Consumer Financial Protection Bureau,                        :        Index No. 1:22-cv-8308 (JPC)

                                                             :

                              Plaintiff,                     :

                                                             :

                -against-                                    :

                                                             :

MoneyLion Technologies Inc., ML Plus, LLC,                   :
MoneyLion of Alabama LLC, MoneyLion of                       :
Arizona LLC, MoneyLion of California LLC,                    :
MoneyLion of Colorado LLC, MoneyLion of                      :
Connecticut LLC, MoneyLion of Delaware                       :
LLC, MoneyLion of Florida LLC, MoneyLion                     :
of Georgia LLC, MoneyLion of Idaho LLC,                      :
MoneyLion of Illinois LLC, MoneyLion of                      :
Indiana LLC, MoneyLion of Kansas LLC,                        :
MoneyLion of Kentucky LLC, MoneyLion of                      :
Louisiana LLC, MoneyLion of Maryland LLC,                    :
MoneyLion of Michigan LLC, MoneyLion of                      :
Minnesota LLC, MoneyLion of Mississippi                      :
LLC, MoneyLion of Missouri LLC, MoneyLion                    :
of Nevada LLC, MoneyLion of New Jersey                       :
LLC, MoneyLion of New Mexico LLC,                            :
MoneyLion of New York LLC, MoneyLion of                      :
North Carolina LLC, MoneyLion of North                       :
Dakota LLC, MoneyLion of Ohio LLC,                           :
MoneyLion of Oklahoma LLC, MoneyLion of                      :
Oregon LLC, MoneyLion of South Carolina                      :
LLC, MoneyLion of South Dakota LLC,                          :
MoneyLion of Tennessee LLC, MoneyLion of                     :
Texas LLC, MoneyLion of Utah LLC,                            :
MoneyLion of Virginia LLC, MoneyLion of                      :
Washington LLC, MoneyLion of Wisconsin                       :
LLC, and MoneyLion of Wyoming LLC,                           :

                                                             :

                              Defendants.                    :

------------------------------------------------------------ X

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD............................................................................................. 3

ARGUMENT ......................................................................................................... 4

I.    The Phrase "Combined Earnings" Refers to the Surplus Profits of the Federal Reserve Banks.................................................................................................................. 4

     A.     Ordinary Meaning of the Statute.................................................................5

     B.     Statutory Context ....................................................................................... 8

     C.     Statutory History........................................................................................ 11

     D.     The Supreme Court's Holding in CFSA..................................................... 12

     E.     Faithful Application of the Law as Written ............................................... 13

II.   The CFPB's Unconstitutionally Funded Actions Must Be Invalidated............................... 14

III.  The CFPB Lacks Constitutionally Appropriated Funds to Bring this Action ..................... 16

CONCLUSION...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 3

*AT&T Corp. v. Iowa Utils. Bd.*,
    525 U.S. 366 (1999) ............................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 3

*Burnette v. Carothers*,
    192 F.3d 52 (2d Cir. 1999) ...................................................................................... 3

*CFPB v. All American Check Cashing, Inc.*,
    33 F.4th 218 (5th Cir. 2022) (en banc) (Jones, J., concurring) ............................. 15

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) ...................................................................................... *passim*

*Cmty. Fin. Servs. Assoc. of Am., Inc. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022). ....................................................................... *passim*

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .................................................................................... 3

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000) ............................................................................................ 6, 7

*Collins v. Yellen*,
    594 U.S. 220 (2021) ............................................................................................... 14

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974) ............................................................................................ 5, 6

*Edwards v. Douglas*,
    269 U.S. 204 (1925) ................................................................................................. 8

*Field v. Mans*,
    516 U.S. 59 (1995) ................................................................................................... 5

*In re Glenn*,
    900 F.3d 187 (5th Cir. 2018) ................................................................................... 9

*Henson v. Santander Consumer USA, Inc.*,
    582 U.S. 79 (2017) ................................................................................................. 14

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ..................................................................................11

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ................................................................................3, 8

*Mississippi v. Louisiana,*
    506 U.S. 73 (1992) ....................................................................................5

*New Process Steel, L.P. v. NLRB,*
    560 U.S. 674 (2010) ..............................................................................3, 14

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ...................................................................................3

*Off. of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990) .......................................................................... *passim*

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ...................................................................................5

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) .................................................................................14

*Springfield Parcel C, LLC v. United States,*
    124 Fed. Cl. 163 (2015) ............................................................................16

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) ...................................................................15

*United States v. Trump,*
    740 F. Supp. 3d 1245 (S.D. Fla. 2024) ........................................................15

*Wisconsin Cent. Ltd v. United States,*
    585 U.S. 274 (2018) ...................................................................................9

**Statutes**

12 U.S.C. § 243 ...............................................................................................5

12 U.S.C. § 289 ...........................................................................................9, 16

12 U.S.C. §§ 341–361 ..................................................................................5, 16

12 U.S.C. § 5328 ...........................................................................................10

12 U.S.C. § 5381(b) ..........................................................................................9

12 U.S.C. § 5491(a) ..........................................................................................4

12 U.S.C. § 5497 ................................................................................................17

12 U.S.C. § 5497(a)(1) ................................................................................... *passim*

12 U.S.C. § 5497(b)(1), (c)(2) .............................................................................17

12 U.S.C. § 5497(e)(1) ................................................................................2, 13, 8

31 U.S.C. §§ 1341–42 .......................................................................................2, 15

Administrative Procedure Act................................................................................4

Antideficiency Act .........................................................................................2, 14, 15

The Dodd-Frank Wall Street Reform and Consumer Protection Act ................... *passim*

National Labor Relations Act ...............................................................................3, 14

**Other Authorities**

Cong. Research Serv., *Why Is the Federal Reserve Operating at A Loss* ....................................16

Fed. R. Civ. P. 12 ...............................................................................................1, 3

Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements* ............................6

Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* .................................7

Sec. & Exch. Comm'n, *Beginners' Guide to Financial Statements* ...............................7

Stanley I. Langbein, *Federal Income Taxation of Banks & Financial Institutions* ...................6, 7

U.S. Const. art. I, §9, cl. 7..................................................................................12, 15

Defendants respectfully submit this Memorandum in Support of their Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) ("Motion").[1]  For the reasons detailed below, this Court should grant the Motion and dismiss with prejudice all counts asserted by the Consumer Financial Protection Bureau ("CFPB") in the above-captioned Complaint ("Complaint").

## INTRODUCTION

This action was previously stayed pending the Supreme Court's decision in *CFPB v. Cmty. Fin. Servs. Ass'n of Am.* ("*CFSA*"), 601 U.S. 416, 425–26, 435, 441 (2024).  In *CFSA*, the Supreme Court held that the statute providing funding to the CFPB is consistent with the Appropriations Clause because it identifies a specific "source of public funds": the "'combined earnings of the Federal Reserve System.'"  *Id.* at 434-35 (citing 12 U.S.C. § 5497).  The Court observed that these are "surplus funds" that "would otherwise be deposited into the general fund of the Treasury."  *Id.* at 425 (citing 12 U.S.C. § 289).

While Congress's decision to specify this funding source may have saved the CFPB in *CFSA*, it requires dismissal of this case.  The Supreme Court made clear that the price for constitutionality is the CFPB's funding statute imposes a significant limitation—it cannot draw funds from any source except the earnings of the Federal Reserve System.  And since September 2022, the Federal Reserve System has had no such earnings.  *See* Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Banks Combined Quarterly Financial Report* 23 (Mar. 31, 2025)[2] (hereinafter "March 2025 Financial Statement").  As the Board of Governors recently explained, the Federal Reserve System will need to realize nearly $234 billion in future earnings (*i.e.*, profits) before it can cover operational costs and generate a surplus that can be deposited into the Treasury.

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added.

[2] Available at https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20250516.pdf (last visited July 21, 2025).

*See* Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Balance Sheet: Factors Affecting Reserve Balances, H.4.1, fig. 6 & n.8 (July 16, 2025).[3]

In other words, the CFPB's only authorized source of funding has been empty for almost three years. Although Congress provided the CFPB with a backstop by authorizing the CFPB's Director to ask Congress for new funds, 12 U.S.C. § 5497(e)(1)(A), the former Director failed to do so. The CFPB has instead relied on unauthorized funds, beginning in October 2022 with a $315,700,000 request that the Federal Reserve approved five days later. *See* Letter from Rohit Chopra, Director, CFPB, to Jerome Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys. (Oct. 14, 2022[4]; Letter from Ricardo A. Aguilera, Div. Dir. and Chief Fin. Off., Bd. of Governors of the Fed. Rsrv. Sys., to Dana James, Acting Chief Fin. Off., CFPB (Oct. 19, 2022).[5]

Accordingly, the prosecution of this action violates the CFPB's funding statute and the Appropriations Clause. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (explaining that if "Congress has appropriated no money for the payment" of government expenditures, "the Constitution prohibits that any money 'be drawn from the Treasury' to pay them"). The CFPB is also violating the Antideficiency Act, which prohibits agencies from spending money in excess of the amount Congress appropriated them. 31 U.S.C. §§ 1341–42; *see also* Gov't Accountability Off., *Antideficiency Act Resources*.[6] The government's "improper use of unappropriated funds" requires dismissal under the undisturbed rationale of the Fifth Circuit in *CFSA. Cmty. Fin. Servs.*

---

[3] Available at https://www.federalreserve.gov/releases/h41/current/default.htm  (last visited July 21, 2025).

[4] Available at https://files.consumerfinance.gov/f/documents/cfpb_funds-transferrequest_fy2023-q1.pdf (last visited July 21, 2025).

[5] Available at https://files.consumerfinance.gov/f/documents/cfpb_transfer-of-funds-fy2023-q1.pdf  (last visited July 21, 2025).

[6] Available at https://www.gao.gov/legal/appropriations-law/resources (last visited July 21, 2025).

*Assoc. of Am., Inc. v. CFPB*, 51 F.4th 616, 642-43 & n.17 (5th Cir. 2022), *rev'd on other grounds*, *CFSA*, 601 U.S. at 416.  The Court should dismiss with prejudice all counts asserted by the CFPB.

## LEGAL STANDARD

Rule 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  Rule 12(c) motions are subject to the same standard as motions to dismiss under Rule 12(b)(6).  *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999).  Accordingly, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  Courts may consider matters outside of the complaint, including exhibits to the pleadings and documents that are integral to the complaint, even if not incorporated by reference therein.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  But "labels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertion[s]" devoid of factual enhancement are not sufficient.  *Twombly,* 550 U.S. at 555, 557.

The Constitution and laws of the United States circumscribe the lawful authority of federal agencies—any exercise of agency power that exceeds those bounds is subject to invalidation as a matter of law.  *See*, *e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 521-22, 557 (2014) (affirming invalidation of NLRB enforcement order issued by NLRB members who were invalidly appointed under the Constitution's Recess Appointments Clause and lacked requisite quorum to act under the National Labor Relations Act ("NLRA")); *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 687–88 (2010) (reversing NLRB enforcement orders entered by two-member Board in violation of the NLRA's three-member quorum requirement).  "[F]inal 'interpretation of the laws'" demarcating an agency's authority is "the proper and peculiar province of the courts," and the Constitution empowers courts to "exercise that judgment independent of influence from the

political branches." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting The Federalist No. 78, pp. 522, 525 (J. Cooke ed. 1961) (A. Hamilton)).  A "reviewing court" therefore must, "as always, . . . independently interpret [a] statute and effectuate the will of Congress subject to constitutional limits."  *Id.* at 394–95 (holding that the Administrative Procedure Act "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions").

## ARGUMENT

The prosecution of this action violates the CFPB's funding statute and the Appropriations Clause.  The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (12 U.S.C. 5301 *et seq.*), created an unusual funding mechanism for the CFPB, specifying that it would receive up to a capped amount of annual funding "from the combined earnings of the Federal Reserve System."  12 U.S.C. § 5497(a)(1).  Text, context, and Supreme Court precedent make clear that the phrase "combined earnings" refers to the "*surplus* funds" that "would otherwise be deposited into the general fund of the Treasury."  *CFSA*, 601 U.S. at 423, 425 (2024).  And since September 2022, the Federal Reserve's costs have exceeded its income, meaning that it has had no surplus funds to deposit into the Treasury.  *See* March 2025 Financial Statement.  Although the Dodd-Frank Act allows the CFPB Director to ask Congress for additional funding in the event of a shortfall, the Director has failed to do so.  Thus, the CFPB has lacked constitutionally appropriated funds since September 2022 and this lawsuit, which was filed on September 29, 2022, should be dismissed.  *See* ECF No. 1.

## I.    The Phrase "Combined Earnings" Refers to the Surplus Profits of the Federal Reserve Banks

The Dodd-Frank Act established the CFPB as an "independent bureau" "in the Federal Reserve System."  12 U.S.C. § 5491(a).  The Federal Reserve System is a central banking system

that comprises the Board of Governors, twelve regional Federal Reserve Banks, the Federal Open Market Committee, and various advisory councils.  *See generally id.* §§ 221–263.  The Federal Reserve Banks—which are structured like private corporations and primarily raise capital by selling shares to banks and other financial institutions—have primary responsibility for implementing monetary policy.  *See generally id.* §§ 281-290, 341-361.  They earn money for the Federal Reserve System by buying and selling bonds and securities, charging fees for services provided to banks, credit unions, and other depository institutions, and generating interest on loans to depository institutions.  *See generally id.* §§ 341–361.  The Board of Governors may levy assessments on the Federal Reserve Banks in an amount "sufficient to pay [the Board's] estimated expenses and the salaries of its members and employees."  12 U.S.C. § 243.

The CFPB draws funds "from the combined earnings of the Federal Reserve System."  12 U.S.C. § 5497(a)(1).  Although the Dodd-Frank Act does not define "combined earnings," the plain meaning of this phrase indicates that the CFPB's funding is limited to the surplus profits generated by the Federal Reserve Banks.  Surrounding context and the Act's legislative history reinforce this conclusion.  And the Supreme Court's recent decision in *CFSA* confirms it.

A.    **Ordinary Meaning of the Statute**

When interpreting a statute, courts start with its plain language.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  A statute's plain meaning is determined "by reference to the [statutory] language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Id.* at 341.  Courts may reference dictionaries as a source of the statutory language's plain meaning, *Mississippi v. Louisiana*, 506 U.S. 73, 78 (1992), and where a statute uses language that has an established legal meaning, courts presume that Congress intended for the language to take on its established meaning. *Field v. Mans,* 516 U.S. 59, 69 (1995). Additionally, "where Congress has used technical words or terms of art, 'it [is] proper to explain

them by reference to the art or science to which they [are] appropriate.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (alterations in original).  Likewise, "[i]nterpretations such as those in opinion letters[,] . . . policy statements, agency manuals, and enforcement guidelines" are "entitled to respect" to the extent that they have the "power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

When Congress enacted Dodd-Frank in 2010, "earnings" ordinarily meant "the balance of revenue after deduction of costs and expenses." *Earnings*, Merriam-Webster Online Dictionary (Apr. 11, 2010).[7]  Dictionaries, including financial dictionaries and accounting dictionaries, consistently define "earnings" as the "net income or profit" of a business.  *See Earnings*, Oxford Dictionary of Accounting (4th ed. 2010); *see also Earnings*, Encyclopedia of Banking and Finance (10th ed. 1994) (defining "earnings as [p]rofits; net income"); *Earnings*, American Heritage Dictionary (defining "earnings" as "business profits").  "[E]arnings and profits basically are increased by all items of income . . . and reduced by all expenses . . . and all distributions."  Stanley I. Langbein, *Federal Income Taxation of Banks & Financial Institutions* § 13:33 (2024).

"Earnings" also clearly means "profits" under well-established accounting principles.  *See Corning*, 417 U.S. at 201 (noting that "it is proper to explain" a statute's use of "technical words" "by reference to the art or science to which they are appropriate"  The Board of Governors of the Federal Reserve prepares its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements* (last updated Mar. 21, 2025),[8] while the Federal

---

[7] Retrieved from https://web.archive.org/web/20100411052041/https://www.merriamwebster.com/dictionary/earnings.

[8] Available at https://www.federalreserve.gov/aboutthefed/audited-annual-financial-statements.htm (last visited July 21, 2025).

Reserve Banks prepare their financial statements in accordance with the Financial Accounting Manual for Federal Reserve Banks, which the Board of Governors of the Federal Reserve developed specifically to address the "nature and function of a central bank," Bd. of Governors of the Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* at iii (May. 2025) (hereinafter "Financial Accounting Manual").[9]  Both GAAP and the Financial Accounting Manual provide that "earnings" means profits.  *See id.* § 12.60 (stating that remittances are paid from "net earnings"); *accord* Sec. & Exch. Comm'n, Non-GAAP Financial Measures, Questions and Answers of General Applicability, §103.01 (last updated Dec. 2022) ("Earnings' means *net* income [*i.e.*, profit] as presented in the statement of operations under GAAP."); *see also Christensen*, 529 U.S. at 587.  Other leading financial institutions have adopted the same accounting-based definition of "earnings."  For instance, the Nasdaq defines "Earnings" as "[n]et income for the company during a period," Nasdaq, *Glossary of Stock Market Terms*[10] (defining "Earnings"), and the Securities and Exchange Commission similarly equates "net earnings" with "net profit."  Sec. & Exch. Comm'n, *Beginners' Guide to Financial Statements* (Feb. 4, 2007).[11]

The Federal Reserve's own financial statements support the conclusion that it understands its "earnings" to mean its "profits."  In the context of remittances to the U.S. Treasury, the Federal Reserve uses the term "earnings" to mean the "residual *net* earnings . . . after providing for the costs of operations, payment of dividends, and the amount necessary to maintain each Federal Reserve Bank's allotted surplus cap."  *See* Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve

---

[9] Available at https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf (last visited July 21, 2025).

[10] Available at https://www.nasdaq.com/glossary/e/earnings (last visited July 21, 2025).

[11] Available at https://www.sec.gov/about/reports-publications/investorpubsbegfinstmtguide (last visited July 21, 2025).

Balance Sheet: Factors Affecting Reserve Balances, H.4.1, fig. 6 & n.8 (July 16, 2025).[12] Furthermore, the Federal Reserve's financial statements include "[e]arnings remittances to the Treasury" as one of the final line items, calculated *after* accounting for its assets, income, liabilities, and expenses and thereby demonstrating that "earnings" are the profits remaining after expenses are deducted from income. *See* March 2025 Financial Statement.[13]

The Supreme Court has similarly used "earnings" to refer to profits. In the context of corporate finance, which uses substantially same accounting terminology as the Federal Reserve, the Supreme Court has explained that the "natural meaning" of the term "undivided profits" is "undistributed earnings." *Edwards v. Douglas*, 269 U.S. 204, 214–15 & n.4 (1925). To reach this conclusion, the Supreme Court relied upon The Committee on Accounting Terminology of the American Association of Public Accountants' explanation that "undivided profits" had the same meaning as "[e]arnings or profits." *Id*. at 214, n.4.

The CFPB has no persuasive textual counterargument. The CFPB likely will ask the Court to interpret "earnings" as "revenue" and ignore the other dictionaries' definitions of "earnings" as "net income or profit," *Earnings*, Oxford Dictionary of Accounting (5th ed. 2016). But the CFPB has no factual expertise or delegated authority for interpreting the Fed's or its own statutory funding provisions. *See Loper Bright*, 603 U.S. at 402–03. It accordingly is entitled to no deference when it comes to interpreting the meaning of these statutes. *See id.*

## B.    Statutory Context

Three aspects of the surrounding statutory context reinforce the conclusion that "combined

---

[12] Available at https://www.federalreserve.gov/releases/h41/current/default.htm (last visited July 21, 2025).

[13] Available at https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20250516.pdf (last visited July 21, 2025).

earnings" means "surplus profits."  First, the Dodd-Frank Act makes clear that Federal Reserve Banks generally do not contribute funds to the broader Federal Reserve System until they have paid their operating expenses, distributed dividends to their shareholders, and filled their own surplus funds.  Specifically, the Act provides that "[a]fter all necessary expenses of a Federal reserve bank have been paid or provided for, the stockholders of the bank shall be entitled to receive an annual dividend."  12 U.S.C. § 289(a)(1)(A).  After dividends are paid, the "portion of net earnings . . . which remains . . . shall be deposited in the surplus fund of the bank" up to a limit of $6.825 billion.  *Id.* §§ 289(a)(2)–(a)(3).  It is only after the bank reaches this limit that additional surplus funds "***shall be transferred to the Board of Governors of the Federal Reserve System*** for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury."  *Id.* § 289(a)(3)(B) (emphasis added).  In other words, the Act creates a funding structure in which the Federal Reserve Banks contribute only their surplus profits to the broader Federal Reserve System.  The natural conclusion is that these profits—when pooled together by the Federal Reserve Board—constitute the "combined earnings of the Federal Reserve System."

Second, context shows that when Congress wanted to refer to revenue, it did so explicitly.  It is a "cardinal rule that a statute is to be read as a whole, in order not to render portions of it inconsistent or devoid of meaning."  *In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018).  And when Congress uses different terms in the same statute, courts "usually 'presume differences in language like this convey differences in meaning.'" *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018).  In multiple places, the Dodd-Frank Act uses the term "revenue" without referring to earnings.  *See*, *e.g.*, 12 U.S.C. § 5381(b) ("[I]f the consolidated revenues of such company from such activities constitute less than 85 percent of the total consolidated revenues of such company."); *id.* § 5311(a)(6)(A) ("[T]he annual gross revenues derived by the company and all of

9

its subsidiaries from activities that are financial in nature."); *id.* § 5367(b)(2) ("[A]s long as not less than 2/3 of the assets or 2/3 of the revenues generated from the activity are from or attributable to such company or an affiliate.").  This repeated usage clearly signals that Congress did not use the term "earnings" to refer to "revenue" and that the terms hold different meanings.

Third, funding provisions for the other two federal agencies created by the Dodd-Frank Act—the Financial Stability Oversight Counsel and the Office of Financial Research—show that the CFPB's funding from "combined earnings" should not be conflated with "revenues."  Under Dodd-Frank, "[a]ny expenses of the [Federal Stability Oversight] Counsel" were to "be treated as expenses of, and paid by, the Office of Financial Research," 12 U.S.C. § 5328, which in turn was to be funded for the first two years by "the Board of Governors" of the Federal Reserve System in "an[y] amount sufficient to cover the expenses of the Office," *id.* § 5345(c).  The Office of Financial Research then would be granted "Permanent self-funding" from "assessments equal to the total expenses of the Office" collected from certain bank holding companies and nonbank financial companies supervised by the Board of Governors.  *Id.* § 5345(d).  The 111th Congress could have granted the CFPB a similar open-ended appropriation, whether from an unspecified source paid by the Federal Reserve Board (like the Office of Financial Research and Federal Stability Oversight Counsel's interim funding, *cf. id.* §§ 5328, 5345(c)) or through assessments levied on regulated entities (like the Office and Counsel's permanent self-funding, *cf. id.* §§ 5328, 5345(d)).  But it did not.  Instead, the CFPB's appropriation is limited to a statutorily capped transfer drawn "from the combined earnings of the Federal Reserve System."  *Id.* § 5497(a)(1)–(a)(2).  The Court should not read that provision expansively to encompass any income, revenue, or other source of funding at the Federal Reserve System when Congress did not appropriate such funds for the CFPB.

### C.    Statutory History

Statutory history further reinforces that Congress used the term "earnings" to refer to the "surplus funds" that remain after payment of expenses.  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43(1987) (emphasis in original); *see also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 422–23 (1999) (Breyer, J., concurring in part and dissenting in part) (noting Congress discarded language that would have given FCC power it sought to exercise).  An earlier draft of the Dodd-Frank Act included a CFPB funding provision that would have drawn funds from the Federal Reserve's "total system expenses."  *See* Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173, 111th Cong. § 4109(a) (as introduced in H.R., Dec. 2, 2009).  This provision would have allowed the Federal Reserve to transfer funds to the CFPB without any regard to whether it had "earnings."  But in a May 2010 amendment, Congress jettisoned that provision and opted to limit the CFPB's source of funding to "the combined earnings of the Federal Reserve System"—the language that was carried forth into the version enacted by Congress and signed by the President.  *Compare id.* ("shall transfer funds in an amount equaling 10 percent of the Federal Reserve System's total system expenses"), *with* H.R. 4173, 111th Cong. § 1017(a)(1) (as passed by Senate, May 20, 2010) ("shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau"), *and* 12 U.S.C. § 5497(a)(1) (same).  Accordingly, the term "combined earnings" should not be interpreted as enacting the "total system expenses" language that Congress discarded.  *See Cardoza-Fonseca*, 480 U.S. at 442–43.

### D.    The Supreme Court's Holding in *CFSA*

The Supreme Court's decision in *CFSA* confirms that the phrase "combined earnings" refers to the surplus profits of the Federal Reserve Banks.  In *CFSA*, the Supreme Court considered whether the CFPB's funding provision violates the Appropriations Clause, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, §9, cl. 7.  "Textually," the Appropriations Clause's "command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'"  *CFSA*, 601 U.S. at 425 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).  If "Congress has appropriated no money for the payment" of government expenditures, "the Constitution prohibits that any money be drawn from the Treasury to pay them."  *Richmond*, 496 U.S. at 424.

As a threshold matter, the Court had to explain why the CFPB's funding provision was subject to the Appropriations Clause at all.  On its face, the Appropriations Clause applies only when money is "drawn from the Treasury."  art. I., § 9, cl. 7.  And as the Court noted, the CFPB "draws money from the Federal Reserve System."  *CFSA*, 601 U.S. at 425.

The Court concluded that the CFPB's funding is subject to the Appropriations Clause because it consists of "surplus funds in the Federal Reserve System" that "would *otherwise be deposited into the general fund of the Treasury*."  *Id*. (citing 12 U.S.C. § 289(a)(3)(B)).  In other words, the Court recognized that the CFPB is funded using the surplus profits that the Federal Reserve Banks send to the Federal Reserve Board after paying their operating expenses, distributing dividends, and filling their own surplus funds.

The Court went on to hold that the CFPB's "funding mechanism does not violate the Appropriations Clause."  *Id*. at 424.  After considering "the Constitution's text, the history against which that text was enacted, and congressional practice immediately following ratification," the

12

*CFSA* Court concluded that "appropriations need only identify a source of public funds and authorize the expenditure of those funds for designated purposes to satisfy the Appropriations Clause." *Id.* at 426. It then explained that the CFPB's funding statute satisfies those requirements. *See id.* at 435. First, "[t]he statute authorizes the Bureau to draw public funds from a particular source—'the combined earnings of the Federal Reserve System,' in an amount not exceeding an inflation-adjusted cap." *Id.* (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)). And second, "it specifies the objects for which the Bureau can use those funds—to 'pay the expenses of the Bureau in carrying out its duties and responsibilities.'" *Id.* (quoting 12 U.S.C. § 5497(c)(1)).

Although this decision upheld the CFPB's funding mechanism, it also made clear that the CFPB's funding mechanism is constitutional precisely because it limits the CFPB to drawing funds "from the combined ***earnings*** of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). And in doing so, it interpreted that term to mean "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *CFSA*, 601 U.S. at 425. "It follows that Congress has appropriated no money for the payment" of the CFPB's funding outside those surplus funds, "and the Constitution prohibits that any money 'be drawn from the Treasury' to pay for" expenditures drawn from sources other than the surplus funds designated by Congress. *Richmond*, 496 U.S. at 424 (quoting U.S. Const. art. I, § 9, cl. 7).

### E.    Faithful Application of the Law as Written

Although the CFPB may argue that Congress never intended the agency to operate without a guaranteed source of funding, the statutory framework makes clear that Congress expressly contemplated the possibility of a funding shortfall—at which point the CFPB Director would be required to return to Congress to request additional appropriations. *See* 12 U.S.C. § 5497(e)(1). Nothing prevents the Director from doing so when the Federal Reserve System fails to produce "combined earnings," and in fact that is what the Director *should have done* when there were no

such earnings available to fund the CFPB's operations beginning in 2022. Indeed, returning to Congress in the event of a funding shortfall is standard practice for agencies across the federal government. It thus makes sense that Congress would have envisioned the CFPB following that practice when its novel arrangement with the Federal Reserve ceases to provide funds. The Supreme Court's Appropriations Clause precedents, moreover, confirm that when an agency lacks funding to take a particular action, its remedy "must lie with Congress." *Richmond*, 496 U.S. at 432, 434 ("The rationale of the Appropriations Clause is that if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress.").

Yet, even if Congress never contemplated the possibility that the Fed might one day have no earnings and deprive the CFPB of its default source of funding, "it is never [the judiciary's] job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Henson v. Santander Consumer USA, Inc.*, 582 U.S. 79, 89 (2017). Instead, "Congress's decision to require" the CFPB to be funded from the combined earnings of the Federal Reserve System, or to seek additional funding from Congress if necessary, "must be given practical effect rather than swept aside in the face of admittedly difficult circumstances." *New Process Steel*, 560 U.S. at 688 ("Section 3(b) [of the National Labor Relations Act], as it currently exists, does not authorize the Board to create a tail that would not only wag the dog, but would continue to wag after the dog died."). The CFPB's "desire to keep its doors open" does not override the commands of Congress. *Id.* Nor does it excuse violations of the separation of powers. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 205 (2020).

## II.    The CFPB's Unconstitutionally Funded Actions Must Be Invalidated

Courts have held as unconstitutional the actions of government agents lacking lawful authority and have invalidated such unconstitutional actions. Congress has also codified this

principle in the Antideficiency Act, which prohibits agency action when an agency lacks appropriated funds or spends in excess of its funding.

Where an official "exercise[s] . . . power that the actor did not lawfully possess," *Collins v. Yellen*, 594 U.S. 220, 258 (2021), the "remedy in those cases" is "invalidation of the unlawful actions," *CFSA*, 51 F.4th at 642; *see also United States v. Trump*, 740 F. Supp. 3d 1245, 1302 (S.D. Fla. 2024), *appeal filed*, *United States v. Trump*, 24-12311 (11th Cir. July 18, 2024).

Government action without properly appropriated funds violates the "straightforward and explicit command of the Appropriations Clause." *Richmond*, 496 U.S. at 424; U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). An agency "cannot touch moneys [to be deposited in the] treasury of the United States, except expressly authorized by act of Congress." *Richmond*, 496 U.S. at 424–26 (quoting *Knote v. United States*, 95 U.S. 149, 154 (1877)). Agencies must draw upon valid appropriations to take actions because proper funding is fundamentally "a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority." *CFPB v. All American Check Cashing, Inc*., 33 F.4th 218, 242 (5th Cir. 2022) (en banc) (Jones, J., concurring); *see also United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016). Invalidation as a remedy for unconstitutional spending extends to an agency's authority to "maintain [a] suit or otherwise enforce [a] demand." *Seila Law* at 233 (if an agency action is unconstitutional, the "appropriate disposition would be to reverse . . . *and dismiss the case*."). Such dismissal is appropriate considering prior court decisions granting a new hearing or invalidating orders. *See CFSA*, 51 F.4th at 643 (citing as examples *Lucia v. SEC*, 585 U.S. 237 (2018) and *Noel Canning*, 573 U.S. at 513).

The Antideficiency Act calls for the same conclusion: An agency cannot lawfully act when

it lacks constitutionally authorized funds.  31 U.S.C. §§ 1341–42; *see also* Gov't Accountability Off., *Antideficiency Act*.[14]  Instead, the Antideficiency Act requires agencies to cease operations when they are unfunded.  31 U.S.C. §§ 1341(a).  And courts must invalidate government actions taken without constitutional appropriations to support the unfunded actions.  *See*, *e.g.*, *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 190 (2015).

## III.    The CFPB Lacks Constitutionally Appropriated Funds to Bring this Action

This action constitutes an unauthorized and unconstitutional expenditure of funds because the Federal Reserve has (and at all relevant times, had) no "combined earnings" to transfer to the CFPB.  As discussed, the Federal Reserve Banks raise funds for the Federal Reserve System by buying and selling bonds and securities, charging fees for services provided to banks, credit unions, and other depository institutions, and generating interest on loans to depository institutions.  *See generally* 12 U.S.C. §§ 341–361.  After covering their operating costs, paying dividends, and setting aside a mandated surplus, the Federal Reserve Banks sends their surplus profits (if any) to the Board of Governors, who consolidates those profits and remits them to the U.S. Treasury.  12 U.S.C. § 289.  Due to rising interest rates, however, the Federal Reserve has not generated sufficient revenue to cover its expenses since September 2022 and has ceased making certain periodic remittances to the Treasury.  *See* Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Balance Sheet Developments 5 (May 2025)[15]; CFPB, *Financial Report Of The Consumer Financial Protection Bureau* 7 (Nov. 14, 2024)[16] (hereinafter "CFPB November 2024 Financial Report") (providing that the cap on CFPB's potential funding was about $785 million in fiscal year

---

[14] Available at https://www.gao.gov/legal/appropriations-law/resources (last visited July 21, 2025).

[15] Available at https://www.federalreserve.gov/publications/files/balance_sheet_developments_report_202505.pdf (last visited July 21, 2025).

[16] Available at https://files.consumerfinance.gov/f/documents/cfpb_financial-report-fy-2024.pdf (last visited July 21, 2025).

2024).  When its expenses exceed its income, the Federal Reserve registers the loss as a deferred asset on its balance sheet, and any "positive net income" in future years is directed to eliminating this deferred asset before remittances to the Treasury resume.  Cong. Research Serv., *Why Is the Federal Reserve Operating at A Loss* (Jan. 23, 2023).  At the date of this motion, banks across the Federal Reserve System need to generate at least $234 billion in collective net earnings before they can deposit any more money into the U.S. Treasury.[17]

Despite the publicly reported shortfall that has existed since September 2022, the Federal Reserve has continued to transfer funds to the CFPB.  In 2024, the CFPB's Director requested hundreds of millions of dollars from the Board of Governors.  *See, e.g.*, Letter from Rohit Chopra, Director, CFPB, to Jerome Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys. (Mar. 25, 2024),[18] (requesting $104,200,000 as "the amount necessary to carry out the authorities of the Bureau for FY 2024 Q3" alone).  The Board of Governors acquiesced, depositing the Director's requested funds into the CFPB's "Bureau Fund" at the Federal Reserve Bank of New York.  *See* 12 U.S.C. § 5497(b)(1), (c)(2); *see, e.g.*, Board of Governors Letter re: Funding Request (Apr. 2, 2024),[19] ("This is to inform you that the funds requested in Director Chopra's letter, dated March 25, 2024, were deposited into the Bureau of Consumer Financial Protection Fund located at the Federal Reserve Bank of New York on April 2, 2024.").  In 2024, the CFPB received four transfers totaling $729.4 million from the Board of Governors. CFPB November 2024 Financial Report, 45.

But because the Federal Reserve has failed to generate surplus profits in those periods,

---

[17] *See* Factors Affecting Reserve Balances, supra note 8.

[18] Available at https://files.consumerfinance.gov/f/documents/cfpb-frb-transfer-of-funds-fy-2024-q3_2024-03.pdf (last visited July 21, 2025).

[19] Available at https://files.consumerfinance.gov/f/documents/cfpb-frb-transfer-of-funds-fy-2024-q3_2024-04.pdf (last visited July 21, 2025).

those funds do not come from the "combined earnings of the Federal Reserve System" and thus are unlawful. *See* 12 U.S.C. § 5497; March 2025 Financial Statement; CFPB November 2024 Financial Report", 45. As discussed, the term "combined earnings" plainly refers to surplus profits produced by the Federal Reserve Banks. *See supra* at 4-14. And as the Supreme Court made clear in *CFSA*, the CFPB's funding mechanism is constitutional because Congress has specified that funding for the CFPB's actions must come from those profits. 601 U.S. at 425. Thus, the CFPB has no authority to draw funds from the Federal Reserve System in years when there are no surplus profits.

Although the Dodd-Frank Act provides back-up funding, the CFPB's Director has not taken advantage of it. As noted, the Act authorizes the Director "to determine that sums available to the Bureau under this section"—*i.e.*, "from the combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1)—"will not be sufficient to carry out the authorities of the Bureau . . . for the upcoming year," *id.* § 5497(e)(1)(A). In that event, the Director must submit a report to Congress and the President, substantiating the Director's determination and the extent to which the CFPB's funding needs may exceed the amount provided from the Federal Reserve. *See id.* § 5497(e)(1)(B). Congress accordingly authorized an additional $200 million in appropriations for each of the first five fiscal years after Dodd-Frank's enactment, should the Director determine the Fed's funds to be insufficient and submit the requisite report to Congress. *See id.* § 5497(e)(2). But Congress did ***not*** appropriate additional funds for that contingency from fiscal year 2015 onward, rather leaving it to future legislation to address any shortfall in funding the CFPB might experience. *See id.*

The CFPB's prosecution of this action—with funds levied by the Federal Reserve Board through above-the-line assessments of operating expenses from the Reserve banks' gross income

or revenue, **not** "from the combined earnings of" or "surplus funds in the Federal Reserve System"

"otherwise destined for the general fund of the Treasury"—contravenes the CFPB's funding

authority under the Dodd-Frank Act and violates the Appropriations Clause under *CFSA*. 12

U.S.C. § 5497(a)(1); *see also CFSA*, 601 U.S. at 424-25, 435.  As such, the CFPB's prosecution

of this action with unconstitutional funds renders it invalid.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that this Court dismiss with

prejudice all counts in the Complaint and award any further relief deemed just and proper.

Dated: July 21, 2025                                    Respectfully submitted,

COOLEY LLP

By:     */s/James Kim*
        James Kim
        Shireen Younus (*pro hac vice* forthcoming)
        COOLEY LLP
        55 Hudson Yards
        New York, NY  10001-2157
        Phone:  (212) 479-6000
        Email:  jameskim@cooley.com
                syounus@cooley.com

        Michelle L. Rogers
        COOLEY LLP
        1299 Pennsylvania Avenue NW, Suite 700
        Washington, DC  20004-2400
        Phone:  (202) 842 7800
        Email: mrogers@cooley.com

        *Attorneys for Defendants*